UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

LAS VEGAS, NEVADA

| | |
|---|---|
| In re: USA COMMERCIAL MORTGAGE COMPANY, Debtor. | E-Filed: 06/26/07<br>Case No. BK-S-06-10725-LBR<br>Chapter 11 |
| BINFORD MEDICAL DEVELOPERS, LLC, Plaintiff, vs. USA COMMERCIAL MORTGAGE COMPANY, et al., Defendants. | Adversary No. 06-01212-LBR |

TRANSCRIPT OF PROCEEDINGS
OF
(06-10725) EMERGENCY MOTION TO ENFORCE CONFIRMATION ORDER
AND FOR CIVIL CONTEMPT SANCTIONS
PURSUANT TO 11, USC, SECTIONS 105 AND 1141
AND
(06-01212) STATUS HEARING RE: COMPLAINT
VOLUME 1
BEFORE THE HONORABLE LINDA B. RIEGEL
UNITED STATES BANKRUPTCY JUDGE

Wednesday, June 20, 2007

10:30 a.m.

Court Recorders: Larry Espinoza - A.M. Session
Evangeline Perea - P.M. Session

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Lenders Protection Group: | ALAN R. SMITH, ESQ.<br>Law Office of Alan R. Smith<br>505 Ridge Street<br>Reno, Nevada 89501 |
| For Compass Financial Partners, LLC: | GEORGE A. DAVIS, ESQ.<br>Cadwalader, Wickersham & Taft, LLP<br>One World Financial Center<br>New York, New York 10281 |
| For the Debtor: | ANNETTE W. JARVIS, ESQ.<br>Ray, Quinney & Nebeker, P.C.<br>36 South State Street<br>Suite 1400<br>Salt Lake City, Utah 84145 |
| For 619 Main, L.P., and Shamrock Tower, L.P.: | EDGAR C. SMITH, ESQ.<br>Smith Law Offices<br>850 East Bonneville Avenue<br>Las Vegas, Nevada 89101 |
| For the State of Nevada, Mortgage Lending Division: | RICHARD I. DREITZER, ESQ.<br>Attorney General's Office<br>State of Nevada<br>Department of Business and Industry<br>Mortgage Lending Division<br>555 East Washington Avenue<br>Room 3900<br>Las Vegas, Nevada 89101 |
| For Silver Point Capital, L.P.: | KRISTINA PICKERING, ESQ.<br>Morris, Pickering & Peterson<br>300 South Fourth Street<br>Suite 900<br>Las Vegas, Nevada 89101 |
| Also Present: | FLORENCE ALEXANDER<br>In Propria Persona<br><br>STANLEY ALEXANDER<br>In Propria Persona<br><br>CHRISTINA KNOLES (phonetic)<br>In Propria Persona |

(Court convened at 11:02:50 a.m.)

THE CLERK: Bankruptcy court is now in session.

THE COURT: Be seated.

(Colloquy not on the record.)

THE COURT: USA Commercial.

Appearances, please.

(Colloquy not on the record.)

MR. A. SMITH: Good morning, your Honor. Alan Smith representing the Lenders Protection Group.

MR. DAVIS: Good morning, your Honor. George Davis for Compass Partners.

THE COURT: Anyone on the telephone that wish to make an appearance or anyone else in the courtroom?

MS. JARVIS: Your Honor, this is Annette Jarvis on behalf of USA Commercial Mortgage.

THE COURT: Okay.

MS. ALEXANDER: Dr. Florence Alexander, pro se.

THE COURT: Okay. Thank you.

MR. E. SMITH: Good morning, your Honor. Edgar Smith on behalf of 619 Main, LP, and Shamrock Tower, LP.

THE COURT: Okay.

MR. E. SMITH: They are borrowers under the loan transaction.

MR. DREITZER: Good morning, your Honor. Richard Dreitzer on behalf of the Mortgage Lending Division,

State of Nevada.

MS. PICKERING: Good morning, your Honor. Kristina Pickering on behalf of Silver Point Capital.

THE CLERK: Could you spell your last name for me, please.

MS. PICKERING: Sure. P-, as in Peter, i-c-k-e-r-i-n-g, Bar No. 992.

THE CLERK: Thank you.

THE COURT: Now, hasn't Silver Point received their money, already?

MS. PICKERING: I'm sorry?

THE COURT: Hasn't Silver Point received their stalking-horse money, already?

MS. PICKERING: They have. I'm simply (indiscernible) --

MS. JARVIS: Your Honor, this is Annette Jarvis. Yes, they have.

THE COURT: Okay.

MR. ALEXANDER: Good morning, your Honor. Stanley Alexander appearing for himself --

THE COURT: Okay.

MR. ALEXANDER: -- pro se.

THE COURT: Thank you.

MR. ALEXANDER: Yes.

MS. KNOLES: I'm Christina Knoles (phonetic),

your Honor, here pro se as well.

THE COURT: Okay.

THE CLERK: Could you --

THE COURT: And on the telephone.

THE CLERK: -- spell your last name for me?

MS. KNOLES: Certainly. K-n-o-l-e-s.

THE CLERK: Thank you.

THE COURT: And on the telephone. Anyone? All right.

Thank you.

MS. JARVIS: Well, your Honor --

THE COURT: Sorry.

MS. JARVIS: -- it's Annette Jarvis. Did you get my appearance --

THE COURT: I did.

MS. JARVIS: -- on the telephone? Sorry.

THE COURT: All right. Mr. Davis, do you want to go ahead?

And if you would in your argument for my benefit and Mr. Smith's benefit, if you would also address any comments you may have concerning his supplemental response, rather than waiting for the reply, so that he'll know what your objections are to that supplemental response, so he can address those as well in his response.

MR. DAVIS: Sure, your Honor. I'd be happy to do

that.

We had debated whether to file yet another pleading with your Honor kind of addressing those issues. We determined that since that was not part of the procedure that was outlined, the briefing schedule that was outlined, at the last hearing we chose not to do that, so I would ask for your Honor's indulgence.

I will do my best to go through our argument as well as, you know, address the various cases and arguments that Mr. Smith has raised.

Your Honor, the first point I'd like to make this morning is that your Honor clearly has arising-in jurisdiction to hear the emergency motion.

In this reply brief, the LPG makes the sweeping statement that related-to jurisdiction is the only relevant jurisdiction when disputes are between two nondebtor parties. That statement is simply not the law.

In fact, in the only case cited by LPG for this proposition, the Fifth Circuit's decision in Zale Corp., the Court stated we need not identify which jurisdictional provision specifically applies.

Instead, to ascertain whether jurisdiction exists, it is necessary only to determine whether a matter is at least related to the bankruptcy.

In the Second Circuit's Petrie Retail decision,

your Honor, the Court held that the bankruptcy court has postconfirmation arising-in jurisdiction where the dispute is based on rights established in a bankruptcy court order.

The Court made particular reference that that is particularly true where the disputes arise out of a confirmation order.

The Court would be required to interpret and enforce its own orders in the dispute involved an issue already before the bankruptcy court.

In that case, the Second Circuit found that the bankruptcy court had postconfirmation jurisdiction to adjudicate one year after entry of the confirmation order a contract dispute between two nondebtors, one an assignee of the debtor's leasehold interest over the triggering of a rent-escalation clause under the lease. The debtor's assignee brought a motion to enforce the free-and-clear provisions of the bankruptcy court's order.

The Second Circuit ruled that the bankruptcy court had core arising-in jurisdiction because, quote, "Many of the assignee's rights with regard to the lease were established as part of the core bankruptcy court function of approving the sale, and, accordingly, the dispute was uniquely affected by and inextricably linked to the bankruptcy court's sale order."

LPG's statement on page 16 of its brief that the Kmart Court soundly distinguished and criticized the holding in

Petrie is simply not true. In fact, Kmart supports a finding of subject-matter jurisdiction in this case.

In Kmart, the bankruptcy court for the Northern District of Illinois ruled that it did not have jurisdiction to provide an advisory ruling one year after entry of the confirmation order to interpret the Court's lease-assignment order to determine if Wal-Mart, the debtor's assignee's use of the lease was consistent with what was provided for in the assignment order.

The Court distinguished, but did not criticize Petrie, noting that in Petrie there was an injunction contained in the sale order and the plan, and the dispute impacted consummation of the plan.

In stark contrast, the Kmart Court found -- and I quote -- "Here the assignment of the St. Paul lease was approved before entry of the confirmation order and was not incorporated into the plan. The assignment was not by itself an integral aspect of the plan and did not form the cornerstone of the Kmart reorganization efforts.

There is no suggestion that the plan is in jeopardy. Indeed, the only asserted impact on the Kmart creditors is a remote possibility of a decrease in stock value," close quote.

The Kmart Court went on to conclude, "That this does not mean that there is no postconfirmation jurisdiction, and the functions of the bankruptcy court are at an absolute end.

Rather, the bankruptcy court retains jurisdiction to protect the confirmation order, prevent interference with the execution of the plan, and otherwise aid in the plan's operation," close quote.

Your Honor, the Second Circuit's Petrie decision was also followed by the bankruptcy courts for the Southern District of New York in the in re Ames decision and for the District of Hawaii in the 2006 Hawaiian Airlines case.

The Ames case is in some respects remarkably similar to our situation, although the facts of our case are 100 times more compelling for the exercise of postconfirmation jurisdiction.

In Ames, the Court determined that it had postconfirmation arising-in jurisdiction over a contract dispute between two nondebtors, one of whom was the assignee of a single Ames Store lease during the bankruptcy case.

The dispute related to whether the assignee had breached postconfirmation the terms of the lease by making unauthorized alterations or whether such alterations were permitted by the Court's prior assignment order.

What makes Ames remarkably similar to our situation is the Court predicated its decision, in part, on the determination after conducting an evidentiary hearing that the landlord's breach claims were nothing more than pretext, quote, "for the purpose of depriving the debtor's assignee of the assignment

this Court authorized and capturing the leasehold and its value for its own purposes," close quote. That appears at page 262.

Similarly, after an evidentiary hearing, the evidence will show that Cangelosi, Ms. Cangelosi, and the LPG's allegations of postclosing defaults by Compass are absolutely specious and pretext for their desire to be free of the restrictions of the loan-servicing agreements, including the fees payable to Compass as servicer and capture for Ms. Cangelosi's own personal gain the servicing fees for which Compass paid these estates $67,000,000.

Relying on Petrie, the Ames Court held, quote, "This Court has subject-matter jurisdiction to enforce its orders not only because they were entered in proceedings in a case under Title 11 and, indeed, in a core function with respect to which it undoubtedly had subject-matter jurisdiction, but, also, by reason of the power granted to any federal court to enforce its own orders. That is particularly so since the Court twice expressly reserved jurisdiction to do so.

This Court has an important interest in ensuring that its orders are not circumvented, and landlord's contentions that this Court lacks the jurisdiction to do so by reason of the procedural setting in which the landlord wishes to circumvent them are wholly inconsistent with the case law.

Contrary to LPG's assertion, the Bradlees Court did not criticize the Ames decision, but, rather, distinguished the

facts of both cases and concluded that the bankruptcy court did not have jurisdiction to interpret an earlier order of the Court because the factors present in Ames were not present in the case before the Court.

LPG's heavy reliance on the 1983 Federal Shopping Way case is equally misplaced. The Ninth Circuit's decision is a Chapter 10 bankruptcy case that has no application to the issue of subject-matter jurisdiction following a Section 363 sale and confirmation of an interrelated Chapter 11 plan.

Moreover, the Court determined that enjoining the state court action to quiet title was not necessary to protect or effectuate its earlier sale order, importantly, because the sale order itself did not involve, much less determine, the issue of title to the property which was the subject of the state court lawsuit.

Through the emergency motion, Compass seeks enforcement of the protections afforded to it as the purchaser of substantially all the debtor's assets under the plan and this Court's confirmation order.

The relief sought in the emergency motion includes, one, requesting the Court to interpret and enforce the confirmation order and plan and find that LPG has not complied with the terms of the loan-servicing agreements as it is required to do so under Article 4-F of the plan and paragraph 47 of the confirmation order in attempting to terminate Compass as

servicer of more than 50 loans without any notice or showing of cause.

THE COURT: Now, tell me again. Say again what you're requesting. Your original motion said an order that everyone that the -- everyone abide by the orders of the Court, and I think my question to you at the last hearing was I think everybody agrees that I can order everybody to abide by the confirmation of the plan, but what does that mean? What specifically are you requesting? So tell me again what --

MR. DAVIS: Well, I'm going to go through each of those, and we seek several forms of relief in the emergency motion. The first is, as I have mentioned, interpreting and enforcing the confirmation order and the plan, in particular, those provisions that I've mentioned.

I'll go through the others. And if your Honor still has questions or I can --

THE COURT: Right. Well, let me go through --

MR. DAVIS: -- (indiscernible) --

THE COURT: -- the first one --

MR. DAVIS: -- I'll be happy to do it.

THE COURT: -- one at the time --

MR. DAVIS: Sure.

THE COURT: -- the one you just mentioned. All right. Tell me exactly what you're asking. Do you mean --

MR. DAVIS: We are --

THE COURT: Let's --

MR. DAVIS: -- asking --

THE COURT: Let's assume -- are you saying -- let us assume that we didn't have the attempted termination, and that they had sent notice in a timely manner, and the only issue was whether or not there was cause. Are you saying that I would have subject-matter jurisdiction to do that or are you saying -- tell me exactly what you're saying in that context.

MR. DAVIS: Okay. Obviously, that's a different factual situation than what we're faced with. Okay?

THE COURT: Okay.

MR. DAVIS: You have jurisdiction here, and then I'll get to your question of whether you would in that other hypothetical.

You have jurisdiction here because your order says thou shalt comply with the terms of the loan-servicing agreements posteffective date. All direct lenders are bound by that provision of your order. There is an exact same provision in the plan.

What they should have done if they felt that they had the right under an administrative code, Nevada Administrative Code, Section 645, to do what they did without complying with the terms of the loan-servicing agreements, they should have come to your Honor for relief from the order and asked for a ruling that, in fact, they could do that.

THE COURT: Okay.

MR. DAVIS: Okay?

THE COURT: That --

MR. DAVIS: That they --

THE COURT: That was the question I hadn't --

MR. DAVIS: -- didn't do.

THE COURT: You weren't clear about whether or not -- you meant merely the lines on the 50-percent clause to say we can do it without cause, period, end of story.

MR. DAVIS: That is --

THE COURT: Okay.

MR. DAVIS: -- inconsistent with the plan --

THE COURT: Okay.

MR. DAVIS: -- and your Honor's confirmation order.

Second, your Honor, the emergency motion also requests the Court to interpret and enforce the confirmation order and plan and find that the specious defaults alleged by the LPG as a basis determining Compass as servicer of over 50 loans just three months after the closing of the sale transaction violate among other things the injunction contained in paragraph 25 of the confirmation order as they are mere pretext for longstanding plan to avoid the effect of the sale transaction approved by this Court in order to be free of the restrictions of the LSAs.

Third, because the actions taken by LPG were improper and

violative of the plan and the confirmation order, the emergency order seeks a ruling that such actions are ineffectual, and that Compass remains the servicer of the loans until properly terminated in accordance with the terms of the loan-servicing agreements.

Four, recognizing that the LPG will not quit in its pursuit to unwind the sale transaction, the emergency motion also seeks an injunction maintaining the status quo pending a determination by this Court after an evidentiary hearing that cause exists to terminate Compass as servicer with respect to each loan.

Fifth and finally, because LPG knowingly and intentionally failed to comply with the notice-and-cause requirements of the loan-servicing agreements, the terms of the plan and the terms of your Honor's confirmation order, the emergency motion seeks an award of sanctions for their violation of the plan and the confirmation order.

Importantly, your Honor, as I've mentioned, this dispute could have been avoided if LPG had come to this Court for relief from the requirements of the plan and confirmation order in their attempt to terminate Compass under Section 645B of the Nevada Administrative Code.

Interestingly, in its reply brief, the LPG does not even address the arguments or legal authorities at pages 5 through 7 of Compass' supplemental breach to the effect that paragraphs 3

and 8 of the loan-servicing agreements are entirely consistent with Nevada law.

THE COURT: Well, in fairness, I basically asked everyone to limit their pleadings to the issue of subject-matter jurisdiction.

MR. DAVIS: Okay. Then, your Honor, there'll be an opportunity for them to address that issue.

Compass is entitled to the protections it negotiated for, obtained, and relied upon in the APA, the plan, and the confirmation order. These rights are as in Petrie and Ames rights specifically established by the plan and this Court's confirmation order.

This Court having confirmed the plan and granted those protections in its confirmation order has subject-matter jurisdiction to interpret and enforce that order.

Indeed, at pages 7 and 8 of their reply brief, the LPG concedes that arising-in jurisdiction may provide a mechanism to protect or effectuate a bankruptcy court's prior orders. They claim that's not what we're seeking. That's exactly what we're seeking.

Neither Compass nor any other purchaser for that matter would have closed the sale transaction and paid $67,000,000 to these estates if it thought the very assets it was purchasing could be stripped away without notice or a showing of cause.

If LPG is permitted to get away with this despite the

terms of the plan and confirmation order, Compass may be compelled to seek recision of the APA and to revoke the plan.

THE COURT: Now, what basis? What's the legal basis that you would seek recision?

MR. DAVIS: The legal basis is fraud, your Honor.

(Colloquy not on the record.)

MR. DAVIS: At the confirmation hearing, we had a full discussion on December 20th as to whether or not this Court would retain jurisdiction over disputes concerning postclosing termination of Compass as servicer.

Mr. Smith asked the question, your Honor, does that include retention of jurisdiction for termination of Compass under Section 8 of the loan-servicing agreements.

Counsel for the Direct Lenders Committee stood up and said, your Honor, it includes all of the provisions of the agreement, and Mr. Smith said okay.

Had Mr. Smith made a representation to this Court to the extent that there was and which was relied upon by Compass in determining to close that it had the protections afforded in the loan-servicing agreements and at least that there was a process by which, you know, any attempt to terminate it would be dealt with, rather, if it was his intention as when we take discovery, I think we will find that, in fact, they thought, but, yet, never mentioned at the court hearing and never mentioned anytime during confirmation that there was an

independent basis separate and apart from complying with the loan-servicing agreements to terminate Compass under a Nevada Administrative Code, he was duty-bound at that point to raise it, number one, because he didn't object to the provision -- and he should have -- in the plan and the confirmation order that said the direct lenders are bound by the terms of the loan-servicing agreements.

If he thought there was a basis not to comply with them, that was the time to raise that as an argument. Failing to do so and having us having relied on the protections of the plan, the loan-servicing agreements, and the order, that constitutes fraud.

We are still within the 180-day period for revocation under 1144 -- not a single case that the LPG has cited involves a situation where the party who went back before the Court still was in the time, the 180-day time frame, with an 1144 to revoke the plan.

Your Honor, may I just --

THE COURT: Right. And I had --

MR. DAVIS: -- have one second?

THE COURT: Yes, sir. While you're doing that, what about the dispute -- and I use the word "dispute". Obviously, since I don't know the allegations between the parties, it's sort of a simmering dispute if you will -- as to how payments from a borrower are to be allocated as between the direct

lenders and the servicer?

Are you seeking to enjoin them from seeking a termination as to that in some other court or are you -- what's your position on that?

And let's assume that we're not talking modification. We're just talking about a litigation to determine under the contract and under Nevada law how those payments should be applied.

MR. DAVIS: That's not an action that's before your Honor, and I don't believe --

(Colloquy not on the record.)

MR. DAVIS: Well, but --

(Colloquy not on the record.)

MR. DAVIS: But --

(Colloquy not on the record.)

MR. DAVIS: I mean, but I --

THE COURT: Well, listen --

MR. DAVIS: We are not --

THE COURT: -- I'm not going to have any of this town hall. You're in a courtroom. You behave.

MR. DAVIS: If they want to bring that, they are perfectly entitled to, and the question is in my mind rather than bringing it, if there was a dispute, they simply -- now, we haven't applied. We haven't collected proceeds or applied it to default interest on every loan; yet, they have taken an

example of one loan as a basis which there's a legitimate dispute.

And maybe a court of competent jurisdiction, your Honor, or some other Court will determine who's right and who's wrong, and that's fine, but that doesn't create a basis to terminate 50-some-odd loans three months after --

THE COURT: Okay. But I --

MR. DAVIS: -- bankruptcy.

THE COURT: What I'm saying is --

MR. DAVIS: And --

THE COURT: -- you're not attempting -- by this order, you're not seeking to enjoin them from seeking that legal determination --

MR. DAVIS: No. No, your Honor.

THE COURT: -- in some court, and I guess --

MR. DAVIS: Neither this court --

THE COURT: -- would you say --

MR. DAVIS: -- or in any other court --

THE COURT: -- I had subject --

MR. DAVIS: -- of --

THE COURT: Would I have --

MR. DAVIS: -- competent jurisdiction.

THE COURT: So you'd say I have subject-matter jurisdiction to determine how it's to be applied.

MR. DAVIS: Yes. What we are seeking, fundamentally,

is a recognition that the actions that they have taken were inconsistent and violative of the plan and the confirmation order, accordingly, are of no legal effect. As a result, Compass remains the servicer.

If they are able to terminate us consistent with the terms of the loan-servicing agreements on notice for cause, that's their right. Your Honor's confirmation order didn't prevent in any way their right to do that.

The question is is there cause. We think the allegations are absolutely specious, and there is no cause, and this is simply a -- this is something that has long been in the works dating back to the time of the confirmation hearing to try to get to 51 percent on every loan simply to unwind the transaction.

They do not want Compass to be the servicer. That's why Silver Point is here, okay, because they'd like to step into our shoes having paid these estates zero.

THE COURT: And gotten a million-five back.

MR. DAVIS: Exactly. Your Honor, the next point I'd like to make, your Honor has related-to jurisdiction to hear the emergency motion. Although the Court may not reach this conclusion, related-to jurisdiction also exists.

The Ninth Circuit has held in the Pegasus Gold case that bankruptcy courts have related-to jurisdiction over postconfirmation matters if there is, quote, "a sufficiently

close nexus," close quote, between the dispute and the bankruptcy case.

The Ninth Circuit held that matters affecting, quote, "interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the required close nexus," close quote.

As in Pegasus, here the terms of the agreement between the debtors and Compass were the subject of intense negotiations and incorporated into the plan in which the Court's exclusive jurisdiction was retained.

In Pegasus, the Ninth Circuit determined that because the postconfirmation claims raised, quote, "will likely require interpretation of the settlement agreement and plan. And because these claims and the attendant remedies sought could affect the implementation and execution of the plan itself," close quote, the bankruptcy court had jurisdiction to adjudicate the dispute. The same considerations are at issue here.

To determine if the LPG is in compliance with the plan and the confirmation order, the Court will have to interpret those documents. For example, the Court will have to determine whether LPG has complied with the plan and the confirmation order by providing notice and demonstrating cause in accordance with the requirements of the loan-servicing agreements relating to each and every loan.

In addition, if LPG is successful in terminating Compass' rights to each of the loans without a proper showing of cause and in the absence of notice to Compass, Compass will be left without the assets for which it paid significant consideration and will seek to rescind and revoke the plan. The potential for recision provides another basis to find a close nexus between the emergency motion and the debtor's bankruptcy proceedings.

Given that the conduct of LPG is effectively a collateral attack on the APA, the plan, and the confirmation order, the issues raised in the emergency motion have more than a close nexus to the bankruptcy cases, and, therefore, this Court has related-to jurisdiction over the matters raised therein.

LPG relies on several older cases from outside the Ninth Circuit for its arguments against related-to jurisdiction, including federal, the Zerand-Bernal case, FedPak, and Zale. These cases tend to focus on the potential for the postconfirmation dispute to impact the estate, rather than the close-nexus test adopted by the Ninth Circuit.

In any case, none of the cases cited by LPG involve the potential for revocation of the plan under Section 1144 of the bankruptcy code because in each case the time for doing so have long since passed.

I've already distinguished Federal. That's the Bankruptcy Act case I talked about before.

In Zerand, a third-party purchaser of the debtor's assets sought relief in the bankruptcy court four-and-a-half years after the Court confirmed the debtor's plan and closed the case.

At issue was a sale order entered prior to confirmation of the plan which enjoined any products-liability actions against purchaser to the extent such actions related to equipment sold by the debtor prior to the sale.

The third party threatened recision against the debtor much like Compass, but the major difference is that the 180-day window in which to seek revocation of the plan had long since expired. Had the third party in Zerand moved within that window, the Court suggests the outcome would be different.

Quote, "An attack on a sale agreement that is the core and premise of the plan of reorganization is an attack on the plan itself. Because the sale could not be undone without rescinding the plan, and an order revoking the plan becomes irrevocable 180 days after its entry which is years before Zerand filed its adversary proceeding," close quote, the Court found it did not have jurisdiction.

Kmart, another case relied upon by LPG, makes the same point about the importance of the 180-day revocation window.

In FedPak, the bankruptcy court issued an order in connection with an adversary proceeding between a debtor and a creditor over rights to intellectual property. The debtor

subsequently sold its rights to a third party.

More than two years later, the third party sought clarification of the bankruptcy court's order in the adversary proceeding and not regarding the sale order. The Court found there was no subject-matter jurisdiction because there could be no impact on the estate.

In Zale Corp., Zale Corp. stands for the proposition that whether there is subject-matter jurisdiction over nondebtor parties is fact specific and requires a showing of a potential impact on the estate.

The Fifth Circuit found that some of the claims could have a potential impact on the estate so as to satisfy the related-to tests, and others did not.

The Court did not have jurisdiction to enter an injunction against third-party tort claimants which would not be paid out of policy proceeds and would not in any way affect the bankruptcy estate.

The bankruptcy court did have jurisdiction to enjoin third-party contract claims, but found that the permanent injunction against third-party contract claims requested effectively discharged debts of a nondebtor and was, accordingly, beyond the scope the Court's authority.

The Ninth Circuit's decision, 2006, Valdez Fisheries decision which is addressed at page 19 and 20 of our brief, is equally unavailing to LPG.

In Valdez, the Court determined that it did not have related-to jurisdiction over a dispute between two creditors requiring the interpretation of a settlement agreement because the debtor -- well, I'm sorry -- the interpretation of a settlement agreement between the debtor and one of the creditors because the case was dismissed, and there was no confirmed plan, and, two, there was no claim that the dispute between the two creditors could have an impact on the then-closed case.

The Court also determined that it did not have ancillary jurisdiction to enforce the settlement agreement where the agreement led to the dismissal of the case, and the Court did not explicitly retain jurisdiction over the agreement.

Given that the Valdez Fisheries case, there was no confirmed plan, the Court had already entered a final decree and dismissed the case, and there was no retention of jurisdiction in the order approving the settlement, LPG's contention that the postconfirmation aspect of this case is dispositive of the issues before the Court is simply wrong.

Here, if the Court did not enforce the confirmation order and enjoined LPG from undermining the effectiveness of the confirmation order and the plan, there would be a likely impact on the estate based upon a claim of recision or for other claims that might be asserted.

Finally, your Honor, your Honor has jurisdiction, inherent

jurisdiction, to enforce its own orders which is the relief the emergency motion seeks. Bankruptcy court's have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under Title 28, USC, Section 1334.

In its 2006 Valdez Fishery case, the Ninth Circuit held that bankruptcy courts have ancillary jurisdiction to, one, permit disposition by a single Court of factually-interdependent claims or, two, to enable a Court to vindicate its authority and effectuate its decrees.

The Ninth Circuit went on to hold that a bankruptcy court has jurisdiction to vindicate its authority and enforce its decrees if, one, the Court's order explicitly retain jurisdiction or, two, incorporated the terms of the agreement into its order.

This, your Honor, is also supported not only by Section 105(a) of the bankruptcy, in addition, the Hawaiian Airlines case. A 2006 District Court of Hawaii case reached a similar conclusion regarding ancillary jurisdiction. Here both predicates of the Valdez Fishery case are satisfied.

The Court explicitly retained jurisdiction in the plan and the confirmation order over the loan-servicing agreements and to interpret, enforce, and enter orders in furtherance of the plan and the confirmation order. In addition, both the plan and confirmation order mandate the direct-lenders'

posteffective-date compliance with the loan-servicing agreements.

For these reasons and based on binding Ninth Circuit precedent, this Court has ancillary jurisdiction to interpret and enforce the confirmation order and the plan consistent with the relief sought by Compass in the emergency motion.

Your Honor, those are the points I wanted to make about your Honor's jurisdiction. There are a number of other points that were raised in Mr. Smith's papers I would like to address.

First, Mr. Smith claims that Compass cannot seek an injunction under Section 105(a) of the bankruptcy code because a nondebtor party cannot seek relief under Section 105.

First, I would note the debtor has joined in the emergency motion, so this is not an action simply by a nondebtor third party.

Second, I would say that Compass, given the fact that it was integrally involved in the plan itself and is the primary funding source of the plan, this is not some, you know, simple unrelated party to the bankruptcy case.

In addition, your Honor, you have the ability sua sponte under Section 105(a) of the bankruptcy code to enter orders in furtherance of orders that you have entered and issuing injunctions in furtherance of existing orders the Court.

Section 105(a) is clear, and it provides as your Honor is well-aware no provision of this title providing for the raising

of an issue by a party in interest shall be construed to preclude the Court from sua sponte taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules or to prevent an abuse of process.

THE COURT: But why not file an adversary and seek an injunction?

MR. DAVIS: Your Honor, we're happy to do that. And if that's the appropriate -- if the determination is that this should be pursued, you know, in connection with an adversary proceeding, number one, your Honor can -- we can all agree that the adversary proceeding, your Honor, can convert the existing motion into an adversary proceeding. There is plenty of Ninth Circuit law to that effect.

In addition, your Honor, the Courts in the Ninth Circuit apply in connection with disputes over whether or not something should have been brought by a motion or by adversary proceeding they apply a harmless-error test. That is -- just bear with me for a second, your Honor.

For that proposition, I would cite your Honor to in re Munoz at 287, B.R., 546, the Ninth Circuit BAP case, 2002, decided by Judge Riblet as well as in re Decker, 199, B.R., 684, also a Ninth Circuit Bankruptcy BAP case, 1996.

Here, your Honor, we had to proceed expeditiously. We were faced with a situation with no notice to us where letters

went out to every borrower saying that we were no longer the servicer. We quickly dashed off an emergency motion for your Honor to enforce your order.

Only part of the relief sought in that motion is an injunction maintaining the status quo until your Honor or another court of competent jurisdiction can deal with the issues of whether there is or isn't cause to terminate Compass.

There has been nothing that has prejudiced the rights of the LPG to date. The issues that have been before your Honor have been entirely legal issues about jurisdiction, and Mr. Smith has already consented to the briefing schedule related to that.

The emergency motion with respect to enforcement of the order and compliance with the terms of the plan and confirmation order are also entirely legal issues. The issue as to whether or not that's been raised, whether or not Nevada Administrative Code, Section 645B somehow trumps the confirmation order and the plan also a legal issue.

There has been no prejudice whatsoever to any party. And if going forward in connection with this matter it's determined that it should be in the nature of an adversary proceeding, we will happily commence one immediately or your Honor can as I said deem this motion to be converted into an adversary proceeding.

The next issue that's raised by LPG is that subject-matter

jurisdiction must be decided as a threshold matter and cannot be consented to or waived. That appears in their reply brief at pages 2 and 5 and 6.

I would say, your Honor, that we certainly agree that subject-matter jurisdiction is a predicate issue. I would say that there is authority that parties can consent to subject-matter jurisdiction.

In that regard, I would cite the Court to footnote 46 of the Zale decision at page 756. I would also cite the Court to the federal Shopping Way case, Ninth Circuit, 1983, at page 1272.

And, clearly, your Honor, at footnote 8 of our brief and as I've described, already, we have already, you know -- Mr. Smith has already in connection with the confirmation hearing of December 20th consented to this Court's jurisdiction to enforce and deal with any issues or attempts to terminate Compass under the paragraph 8 of the LSAs.

The next issue that's raised by LPG is that it is impossible to enjoin the majority of direct lenders when only a small portion are before the Court. Your Honor --

THE COURT: Well, doesn't --

MR. DAVIS: -- I think --

THE COURT: In going back to consent, isn't that the whole point of Valdez? That the parties couldn't consent? I mean, wasn't the basis of the ruling? I mean, those parties

had agreed that the bankruptcy court could settle, could hear the settlement.

MR. DAVIS: But the bankruptcy court found that it didn't retain jurisdiction in its order.

THE COURT: Right. And wasn't the whole position that they didn't have subject-matter jurisdiction, then, because they couldn't consent? Isn't that --

MR. DAVIS: You --

THE COURT: -- basically what Valdez said?

MR. DAVIS: Well, for two reasons. One, because the Court's order didn't incorporate the settlement and, two, because the Court's order didn't retain jurisdiction, and --

THE COURT: Right. I mean, I recognize that the Court found that it didn't have subject-matter jurisdiction, and I recognize that you're saying that's different factual circumstances.

But my point is as a legal matter, obviously, the Court held you couldn't consent or they wouldn't have gotten there because the point was they had consented to jurisdiction. Right?

MR. DAVIS: We'll go back and reread that aspect of the case, your Honor. I'm --

THE COURT: Okay.

MR. DAVIS: Okay. The next point that's raised by LPG is that it's impossible to enjoin the majority of direct

lenders when only a small portion are before the Court. Your Honor, I think, number one, that is essentially an issue with respect to adversary proceeding versus a contested matter.

And as I've said, we will certainly convert this into an adversary proceeding. I think the fact that the courtroom is absolutely packed with direct lenders speaks volumes as to the fact that this is not a viable argument.

I would also say that, clearly, the manager -- that the letters of termination were sent on behalf of the LLCs, the direct-lender LLCs. Donna Cangelosi is the manager or essentially controls the manager of the direct-lenders' LLCs. She is clearly before the Court.

Counsel for all of the plaintiffs in the district court action are clearly before the Court. That's Mr. Smith. And as I've said, your Honor, to date, we are talking entirely about legal issues, and there's been no prejudice.

The next point that's raised by LPG is that Compass assumed the risk when it acquired the LSAs, including the risk of immediate termination under Nevada law. Your Honor, this is a crazy argument.

We did not assume the risk of direct lenders who are expressly bound by the plan and confirmation order would knowingly and intentionally violate the terms of the plan and this Court's order.

We did not take the risk that direct lenders would not be

bound by the LSAs when the plan and confirmation order expressly provide otherwise.

We did not take the risk that the Court would not enforce the plan and confirmation order when it expressly reserved jurisdiction to do so.

The argument has no bearing on the issue of this Court's subject-matter jurisdiction.

The next argument that's raised is the Doctrine of Judicial Estoppel prevents Compass from asserting jurisdiction as proper in this Court when it previously brought an action against Ms. Cangelosi and certain others in Nevada State Court.

Your Honor, first, LPG fails to mention that the state court action was voluntarily dismissed by Compass.

Second, the state court action was brought alleging discrete relief relating to disparagement and similar claims for defamation and liable for totally-false statements made by Ms. Cangelosi and other direct lenders in an attempt to get direct lenders to coalesce, come together, and attempt to terminate Compass.

That's what it dealt with, and it was brought before the effort and the notices were given to all borrowers and Compass that they were terminated under the LSAs.

Clearly, the issues and the importance, you know, of the issues relative to the plan and the confirmation order and their failure to comply with those documents is the reason why

we are before your Honor and why we dismissed the state court litigation which, frankly, didn't raise any of those issues because it was filed before they even had attempted to terminate us.

LPG concludes that the same nucleus of operative facts is in the state court action and the emergency motion, but fails to mention a single such operative fact, so there is nothing before the Court that would permit a finding of judicial estoppel, your Honor.

The next -- and I think this is the final point. I've addressed all of their points, but the last point is that Compass only paid a small fraction of the $67,000,000 for the loan-servicing agreements.

Your Honor, I would point your Honor to paragraph 2.2 of the asset purchase agreement which provides that the total purchase price, quote, "shall be valid only with regard to all assets as a whole and is not separable to any extent," close quote.

It also provides that the allocations in the APA may be adjusted at Compass' discretion. Compass also paid $11,000,000 under the APA which was unallocated.

All of these things go to the point that we've paid these estates $67,000,000 for the rights that we acquired, including the right to become the loan servicer and all of the accrued rights to servicing fees, your Honor, so this is a $67,000,000

issue, not an $8,000,000 issue.

Your Honor, I think I have addressed -- unless your Honor is aware of any point that has been made by LPG that I have not addressed, I think I have addressed every point --

THE COURT: Okay.

MR. DAVIS: -- that they've raised.

THE COURT: Thank you.

MR. DAVIS: And I would reserve the right for a rebuttal if new points are raised.

THE COURT: All right. Mr. Smith.

MR. A. SMITH: Thank you, your Honor. I went back, first, as a starting point to look at exactly what Compass is asking for under their pleadings because I think that's the issue that determines what we have before this Court and what are the issues for which jurisdiction is sought, and paragraph 34 of Compass' original motion states as follows:

"Compass respectfully requests that the Court enter an order, one, directing Cangelosi, Hansen, LPG, L2L, and parties acting in concert therewith to comply with the terms of the confirmation order; two, directing Cangelosi, Hansen, LPG, L2L, and parties acting in concert therewith to comply with the terms of the loan-servicing agreements; three, directing Cangelosi, the LPG, L2L, Hansen, and the parties acting in concert therewith to issue letters immediately to each borrower and direct lender indicating that by order of this Court the

threat letters and termination letters have no force and effect, and that Compass will continue to be servicer of the loans until further order of the Court; and, four, enjoining Cangelosi, the LPG, L2L, Hansen, and parties acting in concert therewith from communicating with borrowers under the loans pending further order the Court."

I think that becomes important as we go through this analysis. I think it's important there that, specifically, there's no mention of exactly what the Court order is or how they're seeking to implement it, and, specifically, I think it's important that there's no mention of surviving the Section 3 right which I'll get to later.

Of course, the surviving Section 3 right was a provision specifically negotiated between Compass and the committees, one or more of the committees, and it's very specific and limited, and it says, "Other than any right that existed and was matured and exercisable as of the petition date to effect a substitution of USACM as loan servicer under Section 3 of any loan-servicing agreement as well as any defenses of the loan servicer thereto which is defined as a surviving Section 3 right."

THE COURT: Okay.

MR. A. SMITH: This is specifically not an issue involving a Section 3 right. If it were, I would agree that this Court would have arising-in jurisdiction to enforce its

own order.

THE COURT: But why isn't the contention that the agreements could be terminated without cause a claim that arose certainly preconfirmation and prepetition because what you're arguing is as a matter of the contract we can terminate without cause despite the language to the contrary in the contract.

MR. A. SMITH: Right.

THE COURT: So why wouldn't that be a prepetition claim or I guess a surviving Section 3 because (indiscernible) the right had matured because there's nothing new.

MR. A. SMITH: Right.

THE COURT: I'm putting aside things that Compass did. I'm putting that aside. We're talking about strictly the argument that you can cancel because the agreement doesn't require cause.

MR. A. SMITH: Right. And the point for me bringing up this specific provision is it's very narrowly drafted. It was drafted by Compass and the committees. It wasn't noticed to all the creditors. It was something that was negotiated on the side.

My point in bringing it up is, accordingly, it should be narrowly construed. They drafted it. It shouldn't be drafted any broader than it exists.

And if you look at what a surviving Section 3 right is, it is a right to effect a substitute loan servicer under Section 3

of the loan-servicing agreement, and it relates to actions of USACM, not actions of Compass. And if you look back at the loan-servicing agreement under Section 3, it specifically says for cause based upon actions of USACM, for cause based upon actions of USACM.

We're not seeking any order of relief for cause based upon actions of USACM, and I think specifically excluded from that section is all the other rights that all these parties retained under the contract, and I'll get to that a little bit later. But except for this provision that was carved out and entered into your order, no other provision was specifically entered with regard to rights of Compass, and I'll address that also further a little bit later.

So the point being, your Honor, this surviving Section 3 right, Compass admits that this action is not one that falls within that category.

We then go the supplemental brief. It explains a little bit further what Compass believes is at issue, and this is found at page 1. Paragraphs 3 and E of the form loan-servicing agreement which contain replacement of the loan servicer upon both a demonstration of cause which I just mentioned and 30-days' written notice were critical components of the assets Compass acquired from the Chapter 11 estates for cash consideration of approximately $67,000,000.

By the way, I appreciate counsel's comment, but we all

know here that a great deal of the value purchased by Compass was the beneficial interest in the First Trust Deed Fund which originally had a value somewhere in the mid $40,000,000 range.

Number two, Compass says the plan, the asset purchase agreement, and the confirmation order, unequivocally require that all direct lenders comply with the express terms of the LSAs, and, three, paragraph 3 in the LSA are consistent with applicable Nevada law.

And as I'll get to, those are not issues involving enforcement of any order of this Court. Those are not issues related to any matter before this bankruptcy court.

So, in essence, Compass asked for a mandatory injunction directing everyone to comply with the LSAs and forever to have this Court enforce that, and an order that the LSAs cannot be terminated, and asking Cangelosi, LPG, L2L, Hansen, and other parties be enjoined from communicating with borrowers. What's missing is no direct connection with any specific order of this Court.

Now, I didn't mention the that these are, in effect, mandatory injunctions which I don't think there's any authority to grant.

I disagree with counsel that the 105 problem is solved by the mere fact that the debtor has joined in this motion. A joinder does not solve the problem. It is not the debtor's motion, and I don't agree that it can be corrected just by

saying, well, let's deem this motion an adversary proceeding.

I think they have failed to comply with the rules. The procedural rules are specific. That alone is a fatal mistake.

But I realize, your Honor, that's not why we're here. We're here because this Court asked that the parties brief in detail and consider in detail jurisdictional issues because that is the threshold matter.

And if you rule that there is no jurisdiction, we need go no further. If you rule you do have jurisdiction, I assume then at that point we'll address some of these other issues.

So what I have done in my brief and what I'd like to elaborate on a little bit here is looking at each claim asserted by Compass and, in fact, each claim that may be available under the law to create jurisdiction for this Court, and the first one is waiver or consent, and your Honor brought this up at the last hearing.

I believe it cannot be disputed that waiver or consent cannot create jurisdiction. It either exists or it doesn't exist under 28, USC, 1334. There is no other magical statute. There is no back door.

This footnote 46 of the decision which I just looked at, frankly, does not say what counsel says it says. It doesn't not create a jurisdictional exception.

The cases are unanimous, and I think they're fairly represented by the Sixth Circuit case of the Zerand-Bernal

Group which is cited on page 6 of my brief, and what that case says is neither the bankruptcy court nor the litigating parties can write their own jurisdictional ticket.

And in Zerand, the Court reserved jurisdiction to enforce the agreement concerning the sale of assets, kind of similar to the argument here where they say, well, this Court gave us some sort of assurances that there wouldn't be any breaches, et cetera, et cetera, so any matter concerning this agreement properly belongs before this Court.

The Seventh Circuit says, though, that's not the case, and I think other circuits as I've cited --

THE COURT: Well, but --

MR. A. SMITH: -- in my --

THE COURT: -- that's a problem. The Seventh Circuit isn't in akin with Ninth Circuit law.

MR. A. SMITH: I don't see it as any different, your Honor.

THE COURT: Well, I know you said that in your brief, but fights?

MR. A. SMITH: Well, that's really a related-to. I mean, as I look at it, I realize all these sections are interrelated.

THE COURT: Oh, you're saying the Seventh Circuit only as it relates to arising-in or arising-under --

MR. A. SMITH: Consent.

THE COURT: Oh, consent.

MR. A. SMITH: Right.

THE COURT: Okay.

MR. A. SMITH: Okay.

THE COURT: Only as it relates to consent.

MR. A. SMITH: Right.

THE COURT: Okay.

MR. A. SMITH: And what I intend to do, your Honor, is just go through each one --

THE COURT: Um-h'm.

MR. A. SMITH: -- because I think the problem is if you do a broad brush like opposing counsel has done, it sort of looks like maybe there's something there.

But I think if you look carefully at each jurisdictional component each of them can be specifically ruled out without question. They aren't even close calls.

The Zerand Court said -- and I quote -- "Bankruptcy is a system of entitlements of both debtors and creditors created by federal law, but a dispute over the meaning or validity of an agreement between the purchaser at a bankruptcy sale and some third party likewise arises under state, rather than federal law," citing several other cases.

The Court goes on to say, "Otherwise, anyone who could trace his title to a bankrupt could invoke federal jurisdiction to settle disputes affecting that property."

THE COURT: Well, that's certainly true -- here you have two interpretation arguments I guess or --

MR. A. SMITH: Um-h'm.

THE COURT: -- one is the interest rate, but that's (indiscernible), but aren't you seeking to avoid a portion of the contract rather than interpreting it by saying that 51 percent --

MR. A. SMITH: No.

THE COURT: -- with consent doesn't mean you got to have -- excuse me -- with cause doesn't mean you have to have it with cause?

MR. A. SMITH: Uh-uh.

THE COURT: You're not seeking to interpret it. You're seeking to avoid it.

MR. A. SMITH: Actually, it's two things we're seeking to do. I mean, one is a law that's created under state law that gives these direct lenders a right.

THE COURT: But this contract clearly doesn't say that, right? The contract clearly calls for cause.

MR. A. SMITH: The contract clearly calls for cause.

THE COURT: Okay.

MR. A. SMITH: That's the second basis. The second basis is cause, but not the debtor's cause or what the debtor did. The cause is what Compass has done since closing, and that's why as I'll get to later --

THE COURT: Okay.

MR. A. SMITH: -- that's where you --

THE COURT: I understand, and I'm taking --

MR. A. SMITH: That's why --

THE COURT: -- yours separate, too, because in your motion you said, first of all, we have the absolute right to cancel --

MR. A. SMITH: Right.

THE COURT: -- because of Nevada law.

MR. A. SMITH: Right.

THE COURT: Then you say, well, we've got cause, anyway, so I'm doing --

MR. A. SMITH: Right.

THE COURT: -- exactly what you suggested --

MR. A. SMITH: Sure.

THE COURT: -- go through each element.

MR. A. SMITH: Right.

THE COURT: So the first, though, is saying we have the absolute right to cancel because of Nevada law. Aren't you seeking to avoid as opposed to interpret the contract? The contract's clearly what it says.

MR. A. SMITH: I'm not sure you're seeking to avoid the contract. I think it's a right that exists that the direct lenders --

THE COURT: But you're not interpreting it, right?

MR. A. SMITH: Interpreting the contract?

THE COURT: Right. Because the contract --

MR. A. SMITH: I would say no.

THE COURT: -- as to that particular issue --

MR. A. SMITH: It's not interpreting --

THE COURT: Okay.

MR. A. SMITH: -- the contract --

THE COURT: As to that particular issue.

MR. A. SMITH: -- as to that particular issue, but, also, it's my argument that that particular issue doesn't fall within the context of any order issued by this Court. In fact, Compass doesn't argue that.

It is not a surviving Section 3 right. It's a right that exists between the direct lenders and Compass. And as I'll get to, Compass bought a contract. It never got any guarantees.

The Zerand Court goes on to state, "The fact that the bankruptcy court in the order approving the bankruptcy sale and later in the plan of reorganization purported expressly to assume jurisdiction to entertain such proceedings could not confer jurisdiction, the Court cannot write its own jurisdictional ticket," and you mentioned that the last time we met.

And, in fact, that's exactly consistent with Section 1334, 28, USC which says there's three ways, arising-under, arising-in, or related-to.

So to the extent that Compass reads the confirmation order or plan as creating some type of catchall jurisdiction, so that all matters regarding the direct lenders and Compass always come before this Court for the life of the contract because somehow they were guaranteed there would be no breaches of the contract is in error. Even if that does exist, that does not create jurisdiction under Section 1334, and that can unequivocally be ruled out.

And I just want to address the second one, your Honor, because I think it's extremely clear. It really hasn't been argued by counsel.

But arising-under jurisdiction, Compass sort of gives this short shift in its brief claiming at page 11, "Confirmation of a plan under Chapter 11 and the sale of assets free and clear of liens are examples of actions that trigger arising-under jurisdiction." Wrong. That is not the case. It does not exist.

Arising-under jurisdiction means any matter in which a claim is made under the bankruptcy code. It does not exist between nondebtors.

As Collier states, "What this language seems to mean is that when a cause of action, one, which is created by Title 11, then that civil proceeding is one arising under Title 11." Collier's goes on to say, Section 522, 364, 362, et cetera, those are all federal statutes.

When an action is brought under those Title 11 federal statutes, that is an arising-under jurisdiction. That does not exist here.

THE COURT: Now, putting aside the point, this is just something to point out, a typographical error, to the extent that you used these -- you know, just to point this out, you've got your underlying part in Section B as a quote from Zale.

MR. A. SMITH: Did I --

THE COURT: That is not --

MR. A. SMITH: -- misquote it?

THE COURT: -- a quote from Zale.

MR. A. SMITH: Oh, all right.

THE COURT: Zale may stand for that proposition, and I'm not arguing with you whether it does or doesn't.

MR. A. SMITH: Okay.

THE COURT: But you've got it shown as a quote. Just be -- I know you put this together quickly. Just be careful of that kind of thing --

MR. A. SMITH: Can I blame it --

THE COURT: -- because that kind of --

MR. A. SMITH: -- on someone else or do I have to take --

THE COURT: Sure. You can blame it on anybody you want, and I just --

MR. A. SMITH: I apologize.

THE COURT: -- want to alert you of that --

MR. A. SMITH: I have to be --

THE COURT: -- because I know you wouldn't do that because when you're looking for the quote you go wait a minute, and that tends to think wait a minute, what am I not seeing.

MR. A. SMITH: Right.

THE COURT: So you're --

MR. A. SMITH: Yeah.

THE COURT: -- detracting from your statement --

MR. A. SMITH: I --

THE COURT: -- when you --

MR. A. SMITH: I apologize --

THE COURT: -- show the quote.

MR. A. SMITH: -- for that, your Honor. Now we get to the meatier provisions, I mean, the related-to and the arising-under, and I'll start first with the related-to jurisdiction.

Compass argues that what is required is a close nexus to the bankruptcy case, and all that's required is that the dispute be tangentially related. That's not the law under the Ninth Circuit or I think I've cited more than a dozen other cases of other circuits that are essentially unanimous.

Bankruptcy courts have no related-to jurisdiction over disputes between nondebtors, over nonbankruptcy assets, and

matters that don't affect the bankruptcy estate. And in this case, we have nondebtors, assets that are not in the bankruptcy, and the outcome does not affect the bankruptcy estate.

And, instead, as stated in the Lemco Gypsum decision on page 12 -- and, hopefully, I quoted this correct. This is my writing -- "Once the property is sold, further disputes have nothing to do with the bankruptcy estate. There is no reason for the bankruptcy court's jurisdiction to linger."

Here this dispute has no effect on the bankruptcy estate, and I say that because the money's been paid. The sale has closed. This Court has done its job. This Court's job is to oversee reorganization cases -- and I agree -- to enforce its own orders.

As to disputes between Compass and direct lenders that arise after the sale has closed, it's my position that is not the Court's job, and the Court does not have jurisdiction to address those issues.

THE COURT: Going back to enforce orders for a second --

MR. A. SMITH: Okay.

THE COURT: -- so that I understand, let's assume that you had the right to change the servicer for one reason or another, and you changed servicers.

MR. A. SMITH: Right.

THE COURT: Are you taking the position that Compass is not entitled to the service fees which they were accrued as of the purchase price and before the agreements would be transferred to somebody else?

MR. A. SMITH: Your Honor, first of all, let me say this. I was concerned coming into this hearing that I might get sidetracked on issues of merit that really weren't related-to jurisdiction, so I'm a little concerned about having to respond to that question. I don't think we even get there if this Court doesn't have jurisdiction.

THE COURT: Well, I'll tell you why --

MR. A. SMITH: And I don't want to --

THE COURT: -- it's relevant.

MR. A. SMITH: I don't want to take a position that I might later regret because you're not here to decide that right now.

THE COURT: Well --

MR. A. SMITH: I know what the agreement says. The agreement says to the extent Compass has earned servicing fees it gets them, but I also know there's other issues involved. I mean, you've heard Compass' side, but, I mean, there's a lot of direct lenders --

THE COURT: Well --

MR. A. SMITH: -- well --

THE COURT: I'm sorry.

MR. A. SMITH: -- that disagree.

THE COURT: I'm so sorry. Go ahead.

MR. A. SMITH: A lot of direct lenders believe that what Compass has done is horribly wrong. A lot of direct lenders believes that Compass owes them damages.

So if I were to say to you, sure, Compass is entitled to servicing fees, well, that maybe is not the whole story. Maybe they are, but maybe there's other issues that offset that. And when we decide which Court has jurisdiction to hear, I mean, I think we'll get to that.

THE COURT: Well, this is the reason it relates to jurisdiction. The order, the sale -- let's assume it was a sale of --

MR. A. SMITH: Right.

THE COURT: -- the sale --

MR. A. SMITH: I --

THE COURT: -- of accounts receivable, okay, and X Company paid for the accounts receivable, and somebody comes along and tells a third party don't pay them, pay me --

MR. A. SMITH: Right.

THE COURT: -- and they then take the receivable. Why wouldn't this Court have jurisdiction to say you can't do that? It was sold to somebody else?

MR. A. SMITH: Well, two things that I was going to get to a little bit later. I mean, the first is -- and I'll

get to this in a moment -- this Court said these contracts were never changed by this Court, and I think that's a fundamental problem with Compass' position.

They somehow believe this Court enhanced their rights under the contract, gave them sort of guarantee, gave them a guarantee that nobody would mess with them or attempt to --

THE COURT: No, no. Wait. You're just speaking to the interest --

MR. A. SMITH: Right.

THE COURT: -- what they paid for. Let's just assume that accrued rights up to this date.

MR. A. SMITH: Right.

THE COURT: You're right. To the extent --

MR. A. SMITH: Right.

THE COURT: -- that they thought they were getting servicing rights for 50 years in the future after they weren't servicing, you're right. That isn't covered by -- you know, that's just a risk you take.

MR. A. SMITH: Right.

THE COURT: But as to the accrued fees which were owed to the debtor as of the filing up to the date of the servicing change, and if somebody attempted to take those rights away absent a suit for intentional interference, breach of fiduciary duty, et cetera, just trying to do it through a --

MR. A. SMITH: Okay.

THE COURT: -- gotcha clause, we're going to change servicing rights --

MR. A. SMITH: Right.

THE COURT: -- why wouldn't that impact the Court's jurisdiction?

MR. A. SMITH: Well, first of all, your Honor, I mean, our position is that to the extent these fees are actually collected from the borrower that they get them, I mean, without offsets or anything else, and so we're not attempting to contradict this Court's order, but, also, the problem with that is it falls back in that same category of this Court saying, well, no one's ever going to -- according to Compass, you can't breach this agreement. Everybody must perform under this agreement.

THE COURT: So are you stipulating --

MR. A. SMITH: So I'm sort of --

THE COURT: Now, see, that's the trouble because your LLC agreements give the default interest to somebody else.

MR. A. SMITH: Well --

THE COURT: I mean, how --

MR. A. SMITH: -- that's not --

THE COURT: -- on one hand can you say --

MR. A. SMITH: That's not --

THE COURT: -- that I'm not interfering with their rights, but you give away the very asset they paid for to

somebody else?

MR. A. SMITH: Well, that is an issue I think that a court of competent jurisdiction has to decide. I don't think that's the whole story. I don't think that's the whole story because there are --

THE COURT: You may have independent rights. I'm not suggesting --

MR. A. SMITH: No. I --

THE COURT: -- that the --

MR. A. SMITH: I'm not even saying that.

THE COURT: -- breach of fiduciary duty --

MR. A. SMITH: The servicing contract does not stand alone. I realize that Compass bought it expecting to make a whole lot of money on it. There's a whole lot of other people that looked at it as this servicer is supposed to look out for us and collect our money. And in the promissory notes --

THE COURT: So how can you challenge that by unilaterally without cause that the contract agreed for it terminate the service contracts and give that money to somebody else without a lawsuit which directly challenges those rights to fees based upon their actions?

MR. A. SMITH: Well --

THE COURT: You're just trying to take it away by giving a quitclaim to yourself. How can you --

MR. A. SMITH: Well --

THE COURT: Why doesn't that implicate, quote, "this Court's jurisdiction?"

MR. A. SMITH: Well, first --

THE COURT: I guess again my analogy is accounts receivable. You're somebody who comes along and says I don't like the guy who bought that receivable. I'm going to quitclaim that receivable to somebody else.

MR. A. SMITH: Well, I guess that's why I'm going through it point by point, your Honor. I mean, I'm not at the arising-in section which is is there an order of this Court that you're seeking to enforce.

Did you order us to do this? Did you order us to assure? Did you order us to say no matter what, they get the servicing rights? No matter what, they get the default interest? Did you --

THE COURT: Well, wait. Isn't there --

MR. A. SMITH: Is there --

THE COURT: Is there not an order that says that they purchased default interest and servicing rights as existed --

MR. A. SMITH: Right.

THE COURT: -- as of the date of confirmation, and they get the contracts, so they'd get the --

MR. A. SMITH: Right.

THE COURT: -- future servicing fees as long as they were servicer.

MR. A. SMITH: But just --

THE COURT: But isn't it clear under the agreement that they purchased those fees that had already accrued?

MR. A. SMITH: You know, your Honor --

THE COURT: They may (indiscernible) --

MR. A. SMITH: -- I --

THE COURT: -- collect them.

MR. A. SMITH: When I stand back, and I look at it, they purchased a contract. You gave them no guarantees.

THE COURT: No. Wait. They also purchased the default interest.

MR. A. SMITH: Under the contract.

THE COURT: No. Well, but why --

MR. A. SMITH: Whatever's under the contract --

THE COURT: -- isn't that a sum --

MR. A. SMITH: -- you --

THE COURT: -- of --

MR. A. SMITH: You didn't --

THE COURT: -- money?

MR. A. SMITH: As I understand it -- and maybe I'm wrong. But as every time it came up, you said the contract is unaltered.

THE COURT: Sure.

MR. A. SMITH: And that's our --

THE COURT: And then --

MR. A. SMITH: That's our fundamental basis. To the extent there's a right to default interest, they get it. To the extent they don't, they don't get it, and those are substantive rights that a court of competent jurisdiction has, and it's not an order that you made that you enforce.

THE COURT: But they purchased -- let's see. The asset purchase agreement --

(Colloquy not on the record.)

THE COURT: -- under Section 2 --

(Colloquy not on the record.)

THE COURT: Let's see. The definition of assets of US Commercial, the assets included --

MR. A. SMITH: What page are you on?

THE COURT: I'm on the asset purchase agreement.

MR. A. SMITH: Right.

(Colloquy not on the record.)

THE COURT: Definitions, I guess we'll start it that way.

(Colloquy not on the record.)

MR. A. SMITH: And what page is that?

THE COURT: 2.

MR. A. SMITH: Okay.

THE COURT: Commercial Mortgage assets means all servicing agreements for all the service loans, including, without limitation, default-rate interest, accrued servicing

fees, late charges, success fees, and other fees and sums due the loan servicer, and the servicing agreements, and all proceeds of the secure service loans, and service participation and receivables. That relates to the USACM.

MR. A. SMITH: But it --

THE COURT: So --

MR. A. SMITH: It's --

THE COURT: -- they purchased that, so --

MR. A. SMITH: But it says due under the loan-servicing agreements.

THE COURT: Right.

MR. A. SMITH: That's the key, and the key is this Court didn't say we order you to pay it. We say that the loan-servicing agreements get enforced, and that's the difference. That's why I started out with the point --

THE COURT: Right. But --

MR. A. SMITH: -- saying --

THE COURT: But --

MR. A. SMITH: -- you can't create jurisdiction by saying any disputes over these agreements are going to be heard by this Court.

THE COURT: But I would certainly agree with you if, for example, the concerns concerning this -- and I apologize for interrupting your order here -- the Standard Property.

MR. A. SMITH: I know where --

THE COURT: Certainly --

MR. A. SMITH: -- I am.

THE COURT: -- you have a right to an action for breach of fiduciary duty, those lenders do, whether or not -- I'm not suggesting there's merits or not merits.

MR. A. SMITH: Right.

THE COURT: I'm just saying, certainly, there's a right --

MR. A. SMITH: Right.

THE COURT: -- which is independent. This Court would have no jurisdiction over it. Certainly, you would have the rights I guess to, you know, dispute that.

But the first step by claiming that you can terminate with cause and give those servicing agreements to somebody else so that you can acquire these assets without paying for them under the -- it just concerns me because you are --

MR. A. SMITH: I --

THE COURT: You're using it. You're not doing it with cause. If you had cause, and that was the only issue, and there was no purported pretext, I agree 100 percent this Court would have no jurisdiction.

MR. A. SMITH: Right.

THE COURT: And I don't know why. The easiest way to have done this is if you think you have cause, why not give them notice, and then I don't have jurisdiction if that was the

only issue. I wouldn't have jurisdiction if the only issue is how should the moneys be allocated. That's an --

MR. A. SMITH: Right.

THE COURT: -- interpretation question.

MR. A. SMITH: Exactly.

THE COURT: But that's not what you've done. You're seeking to, A, terminate the contracts, notwithstanding the fact that it's an interpretation, and you also are seeking to modify I guess what the agreements say --

MR. A. SMITH: Well --

THE COURT: -- and not interpret them --

MR. A. SMITH: -- I don't --

THE COURT: -- and take away their rights to default interest --

MR. A. SMITH: Well --

THE COURT: -- or are you not?

MR. A. SMITH: Well, number one, I mean, what I'm doing and what I'm not doing is set forth in the district court action. That's --

THE COURT: Uh-huh.

MR. A. SMITH: That's what I'm seeking to do.

THE COURT: So you're seeking in the state court action --

MR. A. SMITH: And --

THE COURT: -- to modify their right to interest,

though, right?

MR. A. SMITH: Well, we're seeking declaratory relief. We're seeking all sorts of relief. I mean, it's all set forth in there, and my position is these are not no matter -- these are not issues before you.

I mean, these are not -- this is not an order you made, I mean, and it's not an order for you to enforce because you didn't make it, and you gave them no guarantees, I mean. And if you read that --

THE COURT: But if you're seeking --

MR. A. SMITH: -- in context --

THE COURT: -- to modify, I guess the analogy would be again you purchase an asset.

MR. A. SMITH: Right.

THE COURT: And all of a sudden, somebody comes along and says, oh, you know what, that doesn't really mean --

MR. A. SMITH: Right.

THE COURT: -- that in there that that's what you purchased.

MR. A. SMITH: Right.

THE COURT: Since there's a bankruptcy court order of purchase, isn't it the bankruptcy court's determination about what was purchased and the extent of that purchase?

MR. A. SMITH: Well, your Honor, I mean, if you say that they didn't get the -- I mean, that part is clear. You

made it clear. It came up numerous times. They bought the contracts.

THE COURT: Right. And the contracts --

MR. A. SMITH: We all agree --

THE COURT: -- gave them the right --

MR. A. SMITH: -- on that.

THE COURT: -- to default interest.

MR. A. SMITH: You didn't give them any -- I don't know. If you think -- my reading of it weren't any guarantees. When you were asked, there weren't any guarantees.

You didn't say I guarantee these won't be breached. I guarantee that you'll get default interest. I guarantee. You said if you read that in context --

THE COURT: Right. You could certainly --

MR. A. SMITH: -- that the parties --

THE COURT: -- sue them by claiming they haven't performed under the agreement, not for declaratory relief.

MR. A. SMITH: Exactly.

THE COURT: You could sue them --

MR. A. SMITH: And we have.

THE COURT: -- and say you're not performing.

MR. A. SMITH: And we have. We've done that --

THE COURT: No. You've asked --

MR. A. SMITH: -- as well.

THE COURT: -- for declaratory relief claiming the

contracts don't say what they say.

MR. A. SMITH: And more and also sued them for damages --

THE COURT: Okay.

MR. A. SMITH: -- under those same --

THE COURT: Well, but not under a tort theory.

MR. A. SMITH: A tort theory as well.

THE COURT: I guess one cause of action was, but the rest were to declare what these contracts say and, in essence, declare they don't say what they say --

MR. A. SMITH: Well, again --

THE COURT: -- because of a --

MR. A. SMITH: Again, I believe with all due respect that's the cart before the horse because before you get there -- and I mean this respectfully.

THE COURT: No. I understand.

MR. A. SMITH: And I can't say it any other way.

THE COURT: It's subject-matter jurisdiction. Exactly.

MR. A. SMITH: Before you --

THE COURT: It was an issue --

MR. A. SMITH: -- get there --

THE COURT: -- we needed to decide.

MR. A. SMITH: -- you got to say --

THE COURT: Sure.

MR. A. SMITH: -- I have the right to interpret --

THE COURT: Sure.

MR. A. SMITH: -- and decide these contracts because it fits with one of these four categories.

THE COURT: Of course.

MR. A. SMITH: Okay? And I say it doesn't fit with any category, period, and I realize you have some feelings about it, and that's okay, and I've experienced this before, but that doesn't change whether or not you have subject-matter jurisdiction.

You only have subject-matter jurisdiction if it falls within these categories, and I'm going to get to the arising-under. I was on --

THE COURT: Yes. And I apologize.

MR. A. SMITH: -- the related-to.

THE COURT: Go ahead.

MR. A. SMITH: On the related-to, we talked about some other cases. We've talked about the Pegasus case. We talked about the Ames case. Those all are pretty clear, very distinguishable from what we have here.

I mean, the Pegasus case created an entity under the plan called RSC which was to perform certain reclamation work. The debtor was to fund that entity in order to implement the plan.

And following confirmation of the plan, the state -- I think it was Montana or I think that's what it was, Montana --

fired them, and the trustee and RSC sued in bankruptcy court, and the bankruptcy court said, "Moreover, these claims and the attendant remedies sought could affect the implementation and execution of the plan itself which specifically called for the creation of RSC and the transfer of the debtor money to fund it. We, therefore, conclude these claims have a sufficiently-close nexus for the bankruptcy proceeding and to uphold related-to jurisdiction."

Again, this is fairly commonsensical. If these claims somehow impact the estate, an order that this Court needs to enforce in order to preserve its integrity, money that the creditors get somehow like the Fietz case, is there a connection, does it hurt the estate, does it harm the estate, then, yes, you have related-to jurisdiction. That does not exist here.

Cases are replete that when a purchaser buys an asset, and there is disputes between if the asset's a contract, parties to the contract, if the asset is a product somebody sues for product liability, when a purchaser buys that, they have no guarantees from the bankruptcy court unless the Court specifically gives them guarantees as part of the order, for example, what happened in the Ames case.

The Court specifically said these leases can be assigned. And despite what the lease agreements say, the purchasers can do improvements to the leasehold premises.

That was specifically in the bankruptcy court order. It was a specific order. The Ames Court said we have jurisdiction to implement that order --

THE COURT: But I --

MR. A. SMITH: -- or there --

THE COURT: I guess I still don't get how you can -- what you're trying to do is they bought the right to default interest. Now, there may be zero dollars payable to them as default interest --

MR. A. SMITH: Right.

THE COURT: -- either because a borrower never pays or either because some Court determines that that's paid after everything else is paid.

MR. A. SMITH: Right.

THE COURT: So they may be entitled to zero dollars.

MR. A. SMITH: Right.

THE COURT: But they're entitled to that component, but your LLC agreements give that default interest to Ms. Cangelosi. How can you do that?

MR. A. SMITH: Well, your Honor, again, I mean, obviously, a Court's going to decide that, and I --

THE COURT: But that's what's happening, right?

MS. KNOLES: Your Honor, may I approach?

THE COURT: No.

MR. A. SMITH: No.

(Colloquy not on the record.)

MR. A. SMITH: Your Honor, I think -- and, again, that's really not the issue, and I feel like I get sidetracked a little bit here, and I appreciate the Court's concern.

I don't think that relates to jurisdiction, but I think the way the agreements read -- and I can pull them out, and I think Mr. Darby here is intimately familiar with them. I think the way it reads is they reserve it for Compass and provide that it is put in an escrow account I believe until the issue is resolved.

I mean, we all realize that a court of competent jurisdiction's going to look at this. I mean, our only point is it's not this Court to decide all those issues. This Court is not the Court to be flooded with lawsuits between Compass, the direct lenders.

I mean, we're just one. There's other direct lenders that have disputes. There's other lawsuits that have already been begun between the borrowers and Compass. Those are likely going to involve cross-claims. You know, my position is is this Court as a bankruptcy court should not be flooded with that type of third-party litigation that doesn't affect the estate.

THE COURT: And I apologize. One question I forgot to ask, and I really do apologize for taking you out of order, but you're doing a very good job.

Under the LLCs and the limited-liability companies, do they still intend to net prepaid interest that's due --

MR. A. SMITH: Yes.

THE COURT: -- under the plan?

MR. A. SMITH: Absolutely.

THE COURT: Okay.

MR. A. SMITH: Yes. There's no doubt about that.

THE COURT: So they would intend to comply with that provision --

MR. A. SMITH: Right.

THE COURT: -- under the plan.

MR. A. SMITH: And that's not even in dispute. We're not --

THE COURT: Well --

MR. A. SMITH: Nobody's argued --

THE COURT: -- and nobody had raised it, but I --

MR. A. SMITH: -- that.

THE COURT: Just that was one thing I wanted to be clear on one way or the other.

MR. A. SMITH: So the point being in related-to is nothing Compass does is affecting money to the estate, distribution by the estate, this reorganization case.

Now, as to the threat, to say that -- essentially, what they have said is if we don't get what we want, we're going to sue the debtor. Now, I'd look at -- I look at this like --

I've read their Web site.

Compass are sophisticated people. They represented to this Court they were sophisticated people. They were well-represented. They had counsel here. They weren't tricked.

They never asked this Court for additional guarantees. They never said we want to be assured that we'll always be servicer for these people. We want to be assured that any dispute comes up was heard in this court. We want to be assured that they always have to give 30-days' notice no matter what they do.

They never asked for any of that. That's not in any court order. They asked for one --

THE COURT: But the contract says that.

MR. A. SMITH: That's the contract. By the way, it doesn't say 30-days' notice for a Section 3. That's only in your confirmation order.

THE COURT: No, no, no. In the --

MR. A. SMITH: Section 8 --

THE COURT: Forget Section 3 servicing rights. I'm talking about --

MR. A. SMITH: Section 8?

THE COURT: -- Section 3 and 8, and then if it's -- you know, lender may by 30-days' written notice terminate this agreement and the power of attorney if one is granted if USA

fails to perform its obligations hereunder.

MR. A. SMITH: Yeah. And that's not even --

THE COURT: And then Section 3 --

MR. A. SMITH: That's --

THE COURT: -- says --

MR. A. SMITH: Yeah. Section 8 is not even at issue. There has been no termination under Section 8. The termination is under Section 3 which doesn't have a 30-day notice, except for the surviving Section 3 right in which you created --

THE COURT: Well, it certainly --

MR. A. SMITH: -- that --

THE COURT: -- is a contract issue about whether or not --

MR. A. SMITH: Absolutely.

THE COURT: That's an interpretation issue.

MR. A. SMITH: Absolutely.

THE COURT: I understand that.

MR. A. SMITH: It's a contract issue.

THE COURT: But Section 3 requires cause. Let's assume Section 8 --

MR. A. SMITH: Absolutely.

THE COURT: -- does require 30-days' notice.

MR. A. SMITH: Absolutely.

THE COURT: Okay.

MR. A. SMITH: And the distinction is cause of

Compass postclosing which the Court has no jurisdiction over or cause of USA --

THE COURT: But you're saying that provision is void.

MR. A. SMITH: No. I am saying --

THE COURT: You're saying that the words "cause" are not in this contract.

MR. A. SMITH: I'm saying there's an -- okay. Again, we're off course, but you're right. I'm saying that there is a statutory legal right that the direct lenders have not to be forced to be stuck with a servicer that they don't want, and somebody's going to have to decide if I'm right. I'm going to be before a Court, and --

THE COURT: But that was a claim that you held prepetition.

MR. A. SMITH: But not based upon any actions of USACM. See, why --

THE COURT: No, no, no. The issue of whether or not one is required to do by cause or not cause is a prepetition issue.

MR. A. SMITH: The prepetition issue that was reserved was specifically actions by USACM that would create cause to terminate --

THE COURT: I'm not --

MR. A. SMITH: -- the --

THE COURT: -- being clear.

(Colloquy not on the record.)

MR. A. SMITH: Okay. It --

THE COURT: An issue --

MR. A. SMITH: That right existed.

THE COURT: -- as to the interpretation of the contract saying --

MR. A. SMITH: Right.

THE COURT: -- this provision of the contract. Let's assume it was some other provision. Let's assume that you claimed that --

MR. A. SMITH: No. You're right.

THE COURT: -- under Nevada --

MR. A. SMITH: It existed.

THE COURT: Yeah. That's a claim that -- let's assume that under Nevada law you claim that they had to provide statements daily.

MR. A. SMITH: Right.

THE COURT: Okay? And it said quarterly.

MR. A. SMITH: Right.

THE COURT: Isn't that an issue which was extant as of confirmation and as to --

MR. A. SMITH: Yep.

THE COURT: -- a claim?

MR. A. SMITH: Yep. It did.

THE COURT: Okay.

MR. A. SMITH: But it's not an issue that you specifically reserve jurisdiction over, and that's --

THE COURT: But prepetition claims are discharged.

MR. A. SMITH: But you didn't change the parties' rights. You didn't say the direct lenders have no further rights after we close escrow. Those are all discharged. The only thing you discharged was claims based upon USACM's actions.

THE COURT: But wouldn't it be a claim because it's a right to equitable relief, a right to claim a provisional contract is void?

MR. A. SMITH: Your Honor, I don't think so. It's a contractual legal right that existed. I don't think you could transfer a contract and deprive a party of their legal or contractual rights. I think it's impossible.

I think the sale free and clear of liens was meant to say if someone else has some sort of claim or some sort of method to interfere with the contract as a result of USACM's action, we're done with that. It's free and clear of that. But as to the rights of these people --

THE COURT: But they did. They sold free and clear of the claims. So your claim, why wouldn't that be something that -- the issue is subject-matter jurisdiction. I'm not saying that you are wrong --

MR. A. SMITH: Right.

THE COURT: -- or you're right --

MR. A. SMITH: Right.

THE COURT: -- or whether or not that particular issue had been discharged.

MR. A. SMITH: It --

THE COURT: But why doesn't it go to the very core of a prepetition issue? We're not interpreting. You have agreed with me --

MR. A. SMITH: Right.

THE COURT: -- that it says cause.

MR. A. SMITH: Right.

THE COURT: The question is is that provision void or invalid under Nevada law.

MR. A. SMITH: No. It's not void, and it's in addition to the rights under the contract. And when you sold free and clear, you did not change the rights of the direct lenders to enforce anything.

You specifically said these contracts are what they are, except for surviving Section 3 rights. You didn't say direct lenders can't do this. Direct lenders can enforce state law provisions.

I mean, I don't think this Court ever had the power to do that, and I think you recognize it because every time it came up you said you got what you got. These are the contracts.

And that's my whole point. This threat to say fraud, we

were defraudued, is absolutely ridiculous. I mean --

THE COURT: Well, why didn't you --

MR. A. SMITH: -- Compass --

THE COURT: -- raise this issue prepetition?

MR. A. SMITH: Well, your Honor, I didn't know what we were going to do prepetition. First of all, a lot of these people -- some of them are present here -- want to see what Compass did.

I mean, maybe they would have kept Compass as servicer. Nearly all of them as you can see by the results average over 60 percent don't want Compass. Even the people that have filed briefs opposing to me say the one thing we're agreed with is we don't want Compass --

THE COURT: But isn't --

MR. A. SMITH: -- brought --

THE COURT: -- that --

MR. A. SMITH: And is it a waiver if I don't bring up every -- I relied on this Court's order. This Court's order was very specific. It did not require me to bring that up. It is not part of the sale free and clear of liens, and your Honor said repeatedly I'm not changing the contract. Also --

THE COURT: So why not sue and why not seek to terminate for cause? If you think you have cause --

MR. A. SMITH: I have.

THE COURT: -- why not go the right, and that's do it

the way you have?

MR. A. SMITH: I have. That's in there as well.

THE COURT: Well --

MR. A. SMITH: It's both. No. It's clear as a bell.

THE COURT: Your letter kind of says we're terminating because we have the absolute right to. And by the way, you've done some things we don't like.

MR. A. SMITH: Right.

THE COURT: It's --

MR. A. SMITH: Well, I --

THE COURT: You know, I don't think --

MR. A. SMITH: I think --

THE COURT: -- that's going to fly on any Court as to what that is.

MR. A. SMITH: Well, you know, it may --

THE COURT: Well, if you --

MR. A. SMITH: I mean, I --

THE COURT: -- have cause, specify it. Just do it.

MR. A. SMITH: Well, your Honor, I mean, I realize that, but, again, I feel like we're off the subject --

THE COURT: Well, I --

MR. A. SMITH: -- of jurisdiction.

THE COURT: I apologize.

MR. A. SMITH: Who decides that? Who decides that? And my whole point is --

THE COURT: And I guess the reason it leads to jurisdiction --

MR. A. SMITH: My whole --

THE COURT: The reason it leads to jurisdiction is the cases that suggest the pretext where one is attempting to take an action which otherwise is legitimate, but it's nothing more than a pretext for -- I don't want to -- I use the word "illegal" only in the sense of it not being --

MR. A. SMITH: I --

THE COURT: -- a --

MR. A. SMITH: You know what? Here's the way I look at it.

THE COURT: -- contrary --

MR. A. SMITH: Here's the way --

THE COURT: -- to the contract.

MR. A. SMITH: Here's the way I look at it. Nevada statute says -- my interpretation -- 51 percent can get rid of their loan servicer in the event of default or for other reason requiring action. All right? That always existed. It existed --

THE COURT: Well, it doesn't say --

MR. A. SMITH: -- at the time.

THE COURT: -- loan servicer. Doesn't it say mortgage broker?

MR. A. SMITH: It says loan servicer.

(Colloquy not on the record.)

MR. A. SMITH: Right. So I look at it that that existed.

(Colloquy not on the record.)

MR. A. SMITH: I don't think you took that away. I don't think you took that right away. And so all these people who have Compass, they're entitled to wait and see.

Maybe they want Compass. But if they don't, that's certainly a legal right that they have, and to enforce that legal right belongs -- it doesn't involve the estate.

THE COURT: And --

MR. A. SMITH: And I --

THE COURT: And I don't think --

MR. A. SMITH: I --

THE COURT: -- anybody disagrees with that.

MR. A. SMITH: Right. And you did not specifically say in your order this can't be done.

(Colloquy not on the record.)

MR. A. SMITH: One item is carved out. It was specifically negotiated. Compass was well-represented. They could have asked for other assurances, other conditions. It didn't. They didn't because you couldn't grant them because you cannot change the contracts. You cannot change the parties' rights.

It was not sold free and clear of the right of a direct

lender to assert their state law right. I mean, that's not the way I read your order. I think you said, clearly, they are not changed. Their rights are not changed, and they're not altered.

And I think the problem here is Compass. They're big boys. I mean, they got a lot of experience. If you buy contracts, everybody knows you buy risks. You buy risks that you're going to get sued. You're going to get embroiled in lawsuits. That's part of the deal. I mean, they got what they got.

The fact that they now have a whole bunch of unhappy direct lenders is not your problem. Nobody was deceived. Compass knew what they were doing. Here they are.

They're upset about things. They run to the bankruptcy court thinking this may be the court of friendly jurisdiction. That maybe they'll get to enforce the order, but there is no order to enforce.

And the threat is simply an empty threat. It's nothing but a hypothetical right now to say if you don't do what we want, we're going to sue the debtor. That's meaningless, and it should be of no effect to this Court.

I mean, I respectfully submit that this Court shouldn't respond to threats. And if they're going to do it, let them do it, then we'll see if there's any connection. My feeling is there's no connection.

If they bring some sort of action under Section 1144, what does that have to do with the direct-lenders' rights under the contract or under state law?

(Colloquy not on the record.)

MR. A. SMITH: I mean, are they going to say they were deceived about that? They're deceived because they didn't look into it carefully enough. They should have analyzed this.

I mean, we brought up the statute, repeatedly. It's been in court. It's been quoted. It's no surprise. Everybody knew about it.

So, your Honor, the threat that Compass is going to do something unless you help them out and issue the injunction is an empty threat and doesn't create anything. And as the Court said -- I think I cited the case of Zerand-Bernal -- Courts are not much impressed with threats to rescind the plan and rip the bankruptcy case open.

THE COURT: I think you answered this, but I don't recall your answer, and I apologize. On your declaratory relief --

MR. A. SMITH: It's --

THE COURT: -- I guess your action -- you're not willing to limit that to a determination as to how default interest should be applied and whether or not there's --

(Colloquy not on the record.)

THE COURT: -- cause to remove Compass such that you

would abandon your arguments that you're entitled to modify the agreements --

MR. A. SMITH: Okay.

THE COURT: -- and erase default, other than to the extent you seek damages.

MR. A. SMITH: You know, I don't know, your Honor. I --

THE COURT: Okay.

MR. A. SMITH: I've put a lot of time into -- my partner and I -- drafting the complaint. And to say right now are we willing to limit it, are we willing to say that, you know, we're going to just give up some rights that the direct lenders have under applicable law, you know, at this point, I mean, I don't think so.

I mean, I don't think that those rights are contrary to the contract. I think they're just additional rights. I mean, statutes create additional rights.

THE COURT: Well, how would you have the right to modify the agreement that provides --

MR. A. SMITH: Well --

THE COURT: Well, let's assume the agreement was 100-percent clear. Let us assume the agreement said, and the loan-servicing agreements, that notwithstanding the fact that the borrower never pays anything, and he pays $5, the first $5 goes for default interest. Let's assume the contract

absolutely was 100-percent clear and said that.

MR. A. SMITH: Right.

THE COURT: So it's not a contract interpretation issue. What right would you have to modify that contract --

MR. A. SMITH: Well --

THE COURT: -- or are you merely seeking an interpretation of what the contract says?

MR. A. SMITH: Right. And an interpretation that that right exists because it's a state statute, and the state statute says this is a right that all direct lenders have.

THE COURT: No, no, no. I'm not talking about cancellation. I'm talking about modifying the rates.

MR. A. SMITH: Oh, modifying the rights of default interest? Well, your Honor, again, I mean, I realize that you want to get at the meat of this, and I --

THE COURT: No --

MR. A. SMITH: I apologize.

THE COURT: -- because I think it relates to jurisdiction --

MR. A. SMITH: Well --

THE COURT: -- because, you know, if you say there's some independent right, then what is that?

MR. A. SMITH: I'm saying that the servicing agreement doesn't stand alone. It has to be read in the context of the various notes and the various deeds of trust.

Those create different provisions. For example, the notes say that the direct lenders can waive default interest.

THE COURT: Uh-huh.

MR. A. SMITH: And, obviously, that would be the case. For example, you have a situation where let's say there's $10,000,000 owed on a principal loan, and the borrower can only pay $10,000,000. The direct lenders are going to waive default interest. If that's all they can get --

THE COURT: Okay.

MR. A. SMITH: -- they're going to get it. The problem is --

THE COURT: But --

MR. A. SMITH: -- Compass --

THE COURT: So you're not trying to modify the agreement. You're really seeking an interpretation.

MR. A. SMITH: Yeah. Exactly.

THE COURT: Okay.

MR. A. SMITH: The problem is Compass says no. No. Somehow we're guaranteed by this Court. We get default interest first.

And as I said before, the actions that they've taken, for example, on the Standard loan is they deduct the default interest, and they reduced the amount of money that the direct lenders recover. We disagree with that. Some Court's going to look at that.

I'm saying you don't have to because that's a dispute that doesn't involve the bankruptcy estate, the assets of the bankruptcy estate, the plan. It's just simply a dispute that we have, and there is a Court out there.

If your Honor says I don't have jurisdiction, we don't all go into a void. We just go into another courtroom, and I imagine there's going to be a lot of litigation.

THE COURT: But I guess --

MR. A. SMITH: I don't imagine --

THE COURT: -- the question is if your intent is to modify what these agreements are before seeking some interpretation, that directly impacts what the orders were and what was purchased at the sale.

MR. A. SMITH: Well, I say we're --

THE COURT: If you wanted to go ahead and interpret --

MR. A. SMITH: But --

THE COURT: -- the contracts --

MR. A. SMITH: But you --

THE COURT: -- go for it.

MR. A. SMITH: But that would require you to say that you're modifying the agreements. And to get there, you'd have to say --

THE COURT: Why?

MR. A. SMITH: -- you have subject --

THE COURT: Why would I say that? Why?

MR. A. SMITH: Well --

THE COURT: I mean, not why would I. What? I don't understand what you're saying.

MR. A. SMITH: Well, in other words, I come back to the same thing over and over again. Subject-matter jurisdiction either exists or it doesn't.

THE COURT: Right.

MR. A. SMITH: If it exists, let's talk about it. If it doesn't exist, I don't think we go there.

I don't look at it the way you do. I don't think it's a modification. I think it's an additional right that all the direct lenders have. They have always had it. Everybody knew about it. It's not a modification of the contract.

As to the default interest, I say the contract has to be read as a whole in connection with the other documents. It was never a guarantee that Compass would get a return on its money --

THE COURT: Um-h'm.

MR. A. SMITH: -- that it would double its money as it posted on its Web site. Nobody ever said that.

Compass took a risk. Every purchaser of an asset in a bankruptcy case takes a risk. People buy real estate. They go down in value. People buy sets only to have rights change, and they become worthless.

They have often come back to the bankruptcy court, and the bankruptcy court always says, you know what, you bought it. There's no guarantees in it. I'm out of the picture. If you want to sue somebody, the state or whatever, go sue them somewhere else, but this is not a court to remedy all the rights, just like the Ames Court said.

In the Ames Court, they talked about the lease giving the right of the purchaser to modify the lease to add improvements. The Ames Court was very careful. It said we're going to let you consider that provision here because we gave you that right, specifically, in the confirmation order.

But this is not an L&T, landlord-and-tenant court. You can't bring up rent. You can't bring up other issues under the contract. We don't have jurisdiction over that.

(Colloquy not on the record.)

MR. A. SMITH: All I'm saying is this Court did not create any additional right for Compass.

THE COURT: Okay.

MR. A. SMITH: Compass says -- and if I could just finish to the --

THE COURT: Sure. Go ahead.

MR. A. SMITH: -- arising-in, your Honor, and I --

THE COURT: I'm sorry.

MR. A. SMITH: And I'm winding down. I mentioned Pegasus, and I think that the problem here is a

misunderstanding that Compass has over what it got, and I say that because page 20 of their emergency motion said, "Further, the confirmation order protects Compass' ability to realize, use, and enjoy the acquired assets."

I think that's wrong. You didn't do that. First of all, no one asked for it. It wasn't heard, and you didn't order it.

Page 2 of the supplemental brief is a little more telling. Compass says what they thought -- they relied on certain facts which they thought they got from an order the Court -- this is on page 2 of the supplemental brief -- and those facts are relied upon as Compass could not be removed as servicer unless it failed to act or meet its obligations under the LSAs. No.

This Court didn't give any guarantee of Compass as to that. The only thing this Court said is you got what you got, or Compass says that no termination could take place absent 30-days' prior written notice. Well, that's ludicrous.

Section 3 does not require 30-days' written notice and only if it's a surviving Section 3 right which isn't applicable here does that 30-day notice come into play.

They didn't ask for these guarantees. You didn't give these guarantees.

And, quite the contrary, you repeatedly stated -- and Compass even agrees. In their brief on page 2 and 3, they say, "Indeed, not long after Compass appeared in these Chapter 11 cases, it became well-aware of the fundamental understanding

among the Court and all the parties in interest that the LSAs are what they are, and were not being modified in any respect." The hearing transcripts, confirmation order, plan, and APA are replete with statements to this effect.

This Court didn't enhance the contracts. There's no court order to enforce to say that jurisdiction cannot be just created, and it's not a surviving Section 3 right, so it doesn't fall within the arising-under or arising-in jurisdiction.

Your Honor, just in conclusion, this Court has confirmed a very complicated Chapter 11 plan. It was very involved, hotly contested. I appeared near the latter end of it.

You approved a sale of assets to Compass. That sale is closed. The money have been paid. There was no guarantees given to Compass as you repeatedly said. Compass people are sophisticated people.

The threat that they will sue to set aside something is an idle threat. It's ridiculous. They asked for and got what they want. What they asked for was a surviving Section 3 right. They got it.

This is not a court of general jurisdiction. Respectfully, it's not this Court's job to oversee the disputes among the direct lenders and Compass for the life of these agreements and for good reason. The bankruptcy court has a job to do, and it's related to reorganization of debtors and other

bankruptcy-related matters.

Courts have repeatedly said the court should not be clogged the types of third-party lawsuits that would seriously hamper the Court's affectability to deal with other reorganizational-related matters.

This is not an arising-under, arising-in, or related-to jurisdiction matter, and I sympathize with the Court's concern over the merits, but there is a court of competent jurisdiction I submit that is available and will hear all these issues, so these issues will be resolved.

THE COURT: And what court?

MR. A. SMITH: That's going to be in my opinion the United States Federal Court.

THE COURT: I thought there was a question of diversity if you -- if there's no subject-matter jurisdiction, then there has to be one on another basis.

MR. A. SMITH: Well, there may be a question, but it hasn't been raised. I mean, we filed it, alleged diversity. I think complete diversity exists. I suppose if that's an issue, Compass will raise it. And I suppose if that doesn't work, they'll be in a state court --

THE COURT: I mean --

MR. A. SMITH: -- somewhere.

THE COURT: -- the point is if there's no diversity, you're lacking subject-matter jurisdiction.

MR. A. SMITH: Well, that's true.

THE COURT: So there isn't a court.

MR. A. SMITH: Well, there is diversity.

THE COURT: Okay. And so only if --

MR. A. SMITH: And if --

THE COURT: -- there's complete diversity.

MR. A. SMITH: -- there isn't diversity, I mean, that doesn't by itself create jurisdiction of this Court.

THE COURT: No, no, no.

MR. A. SMITH: Obviously --

THE COURT: I understand.

MR. A. SMITH: Obviously --

THE COURT: You have been saying there's a court of competent jurisdiction. I'm just saying --

MR. A. SMITH: Oh, okay.

THE COURT: -- if you want this resolved --

MR. A. SMITH: You're saying --

THE COURT: -- as a practical issue --

MR. A. SMITH: -- that there's a question.

THE COURT: Yeah.

MR. A. SMITH: Well, you know, I suppose if this Court says there's no jurisdiction, and we do that battle in the United States District Court, and they say we have no jurisdiction, then we'll end up at state court.

(Colloquy not on the record.)

MR. A. SMITH: But it's my position we won't end up back here because it simply doesn't affect this bankruptcy estate.

THE COURT: Okay.

MR. A. SMITH: Thank you, your Honor.

THE COURT: All right. Thank you.

Mr. Dreitzer.

MR. DREITZER: Yes, your Honor. I'm sorry to interrupt his closing argument. I just --

THE COURT: Um-h'm.

MR. DREITZER: I wanted to make one point with regard to licensing.

THE COURT: Um-h'm.

MR. DREITZER: As the Court knows, servicing requires a license under Chapter 645(a).

THE COURT: Now, why do you say that? It says a mortgage broker or agent.

MR. DREITZER: Well, there if you look at -- NRS Chapter 645(a) deals with the servicing rights and the ability to conduct servicing.

THE COURT: But it doesn't --

MR. DREITZER: And --

THE COURT: It says --

MR. DREITZER: So that's --

THE COURT: Oh, 645(a). Okay.

MR. DREITZER: Right.

THE COURT: Not B.

MR. DREITZER: Correct.

THE COURT: Everybody's been quoting B as opposed to A.

MR. DREITZER: Oh, yes. B is simply brokers and agents.

THE COURT: Oh, okay.

MR. DREITZER: And A is for the -- it's called escrows.

THE COURT: Um-h'm.

MR. DREITZER: But it deals with servicing rights, anybody who holds money.

THE COURT: Um-h'm.

MR. DREITZER: The issue is, you know, we don't have a preference in terms of how this motion comes out.

What I just wanted to point out for the Court is -- and I think I filed a brief with the court to this effect -- there was an order that was issued against Compass for cease and desist because it had engaged in activity in violation of 645(a). That's our position. Its position is now that it has taken its servicing out of state, therefore, not needing a license from us.

The problem is in terms of bandying about who's getting the servicing rights, if the Lender Protection Group continues

to, essentially, do what it's been doing, our position is that the L2L entity is itself also engaging in servicing, so we may be issuing a cease and desist as against them. I just wanted the Court to have that consideration in mind --

THE COURT: Yeah. I was concerned.

MR. DREITZER: -- as this goes forward.

THE COURT: I mean, there's been a lot of that around. I thought, well, you know, so there's -- you can't say because they don't have a -- at one point, the issue was raised that they don't have licensing, so that's a problem, but the next point was made, well, does the other group have it, so --

MR. DREITZER: Right. And I wanted the Court to know that we're aware --

THE COURT: Okay.

MR. DREITZER: -- of all of this.

MR. A. SMITH: And --

MR. DREITZER: So --

MR. A. SMITH: And just so --

MR. DREITZER: And I --

MR. A. SMITH: -- you have the complete picture, your Honor, I wanted you to know that we're totally aware of the problem. We have a license servicer that we're --

THE COURT: Is it --

MR. A. SMITH: We're --

THE COURT: -- Silver Point?

MR. A. SMITH: No. It's completely independent.

THE COURT: Okay.

MS. JARVIS: Your Honor, this is Annette Jarvis. At the appropriate time, I also would like to be heard --

THE COURT: All right. Go ahead.

MS. JARVIS: -- because we did file --

THE COURT: I --

MS. JARVIS: -- a joinder.

THE COURT: Or Mr. Schwartzer is here as well. Anything else, Mr. Dreitzer? I'm sorry.

MR. DREITZER: That was it, your Honor.

THE COURT: Okay. Thank you very much.

MR. SCHWARTZER: Your Honor, Ms. Jarvis and I both want to say the same thing, and it might be easier if I go first, and then if she has something in addition.

(Colloquy not on the record.)

MR. SCHWARTZER: As you know, the debtor did file a joinder in this motion, and the reason is is that we believe that the Court has jurisdiction to enforce and to interpret its own order.

And, in particular, I look at the surviving Section 3 right provision of the confirmation order that may specifically be applied to the Court's determination of whether or not this new statutory right is a claim that was taken care of in paragraph 14 of the confirmation order.

But, in addition, we believe that the retention of jurisdiction over the plan, over the plan and confirmation, is important.

What we want to avoid -- and there's a practical reason. What we want to avoid is being in a situation where some third Court interprets your order one way which is contrary to the way that benefits the bankruptcy estate. We would like to keep the interpretation of your order, in particular, what Section 3 rights are in this court.

And once you come to the conclusion that that is something that this Court should retain jurisdiction over, then you have the issues of ancillary jurisdiction which gives this Court, basically, the idea of keeping control of the whole case and not limiting itself to this one narrow point when you have a whole bunch of other issues that are based upon the same factual and legal circumstances, so we think it would be best that this Court retain this.

We think the meaning and the terms of the confirmation order is something this Court has to determine. That if there was any waiver or implied consent to not claiming the right to use this new statutory theory to unilaterally terminate these loan-servicing agreements without there being any post-sale breach is something that this Court should retain jurisdiction of.

Now, what I'd also --

(Colloquy not on the record.)

MR. SCHWARTZER: And as a minor point and is mostly as an aside, we want to make sure that the debtor by agreeing that this Court has interpreted that it has the right to hear this case, and the fact that we didn't argue otherwise, we're not consenting or agreeing that there are any grounds for recision of the confirmation of the sale.

(Colloquy not on the record.)

MR. SCHWARTZER: And that all the allegations that we've heard so far do not arise to fraud by the debtor which could possibly give right to an 1144 recision action.

So based upon that, your Honor, we would -- you know, basically, I think your analogy about the sale of accounts receivable is applicable here.

Something was sold. This Court has to make an interpretation saying I intended -- the order says this is what we're selling, don't tell me we didn't sell what I said we're selling, and I think this Court retains jurisdiction to make that determination.

THE COURT: Okay.

MS. JARVIS: Your Honor, if I could just add one other point? I think your Honor focussed really on what clearly makes this fall at least within the related-to jurisdiction under the Pegasus case because the next step is clearly met because the attempted termination without cause is

based on preconfirmation and prepetition activity of the debtor which is the entering into these contracts that they are now saying they are not enforceable in a certain extent.

Now, these same arguments have been raised in the appeal for the first time of the confirmation order. Now, we believe they've been waived, but they are being raised in connection with the confirmation order which clearly means that they have admitted, and that these meet the nexus test because they are related to the ongoing enforcement and defense of the plan and confirmation order.

(Colloquy not on the record.)

MS. JARVIS: Secondly, because they involve preconfirmation, prepetition issues, there also is the likelihood that there will be overlap in the claims litigation. And, therefore, because of those issues, the nexus test is clearly met, and this Court has subject-matter jurisdiction.

THE COURT: Okay. All right. Let's take a five-minute break, and then we'll take the reply.

MR. DAVIS: Great.

THE COURT: I --

MR. DAVIS: Thank you, your Honor.

THE COURT: I'll probably give a ten-minute break, so my staff can take a short break because we have to start at 1:30 again in other matters.

(Colloquy not on the record.)

THE CLERK: All rise.

(Recess at 12:50:25 p.m.)

(Court reconvened at 01:05:55 p.m.)

THE COURT: Be seated. Excuse me. Mr. Davis.

(Colloquy not on the record.)

THE COURT: Oh, we lost it.

(Colloquy not on the record.)

MR. A. SMITH: I'm sorry, your Honor.

THE COURT: Oh, well, I'm missing Mr. Davis, too. I --

MR. A. SMITH: Oh, okay.

THE COURT: I didn't know you were both still out. I'm sorry.

MR. A. SMITH: We tried to time it, but --

THE COURT: No. That's fine. I just didn't realize you were both out.

(Colloquy not on the record.)

THE COURT: Okay. Go ahead, Mr. Davis.

MR. A. SMITH: Your Honor, would the --

THE COURT: Sorry.

MR. A. SMITH: May I address the Court, briefly? It's not argument.

THE COURT: Yeah.

MR. A. SMITH: But I wanted to just clarify something

because it may impact where we go --

THE COURT: Sure.

MR. A. SMITH: -- from here. Two things. Number one, your Honor, the default interest as far as Compass' right to default interest is not modified under any agreement that we've done, and I'm not sure what agreement you've seen or looked at because we haven't filed any, but they've been changed a number of times, but I wanted to clarify that.

To the extent that default interest has accrued that Compass is entitled to, they get it. I think the agreement says that to the extent default interest is earned, thereafter, that doesn't go to Compass, so I wanted to clarify that issue.

THE COURT: Okay.

MR. A. SMITH: Two, to discuss what your Honor brought up, the concern about the statutory right to terminate potentially being a surviving Section 3 right or some sort of right that this Court guaranteed --

(Colloquy not on the record.)

MR. A. SMITH: -- by its order, and we have agreed to remove that claim for relief from our cause of action, so we --

(Colloquy not on the record.)

MR. A. SMITH: I mean, if the Court is inclined to go along with our position there's no jurisdiction, that could be part of the order that that is not a claim for relief for which that will be asserted in the district court for which we will

seek some sort of remedy.

THE COURT: Okay. So that I'm clear, you're agreeing that you will not seek to say the contracts can be terminated without cause.

MR. A. SMITH: Right.

THE COURT: Okay.

MR. A. SMITH: Exactly correct under the state statute that's been cited, and I see 645B I think.

THE COURT: Okay.

MR. A. SMITH: Okay?

THE COURT: And I'm just trying to be clear. In other words, without cause under that provision or any other.

MR. A. SMITH: Right.

THE COURT: Okay.

MR. A. SMITH: Our position is going to be, specifically, that we will seek to enforce the contractual provisions based solely upon postpetition conduct of Compass that is not a surviving Section 3 right that is set forth in Section 3 or any other provision of the contractual agreement. All right?

THE COURT: Run that by me one more time.

MR. A. SMITH: Okay.

THE COURT: I was --

(Colloquy not on the record.)

THE COURT: I get ahead of myself, so --

MR. A. SMITH: No, no. As a result of your comments, we agree to eliminate from our complaint any claim that we're entitled to automatically terminate Compass based upon the state statute --

THE COURT: Okay.

MR. A. SMITH: -- without cause.

THE COURT: All right.

MR. A. SMITH: All right?

THE COURT: Um-h'm.

MR. A. SMITH: We preserve all rights that are under the contract that arise postclosing that are not surviving Section 3 rights.

THE COURT: Okay. Okay.

MR. A. SMITH: Okay?

THE COURT: Yes. Thank you.

MR. A. SMITH: Thank you.

THE COURT: Okay. With that, then, Mr. Davis.

(Colloquy not on the record.)

MR. DAVIS: Your Honor, I guess the first point is I assume, then -- I mean, this is a little odd. Okay.

We have a situation where people take unilateral rights, actions, okay, based upon a Nevada statute, send out letters to hundreds -- well, I should say 50, 60 borrowers telling them that we are no longer the servicer, completely interfere with our ability to service those loans, and now come into court and

say we're not moving on that basis.

So that means, essentially, if my math is right, that there is no action to remove us because the notices that were sent were sent pursuant to Nevada Administrative Code, Section 645B.

I think Mr. Smith, perhaps, not intentionally just conceded that there has been no effort if he is undoing everything he did which, by the way, doesn't in my view and, hopefully, your Honor's view eliminate the fact that he did breach the plan and the confirmation order and the injunctions contained in that, and I'll get to that in a minute.

THE COURT: Let me ask --

MR. DAVIS: And --

THE COURT: Let's get some clarification on where this concession goes, so that we know what we're talking about here.

So, query, Mr. Smith, in light of the fact that you were going to withdraw claiming that the unilateral right to terminate, what is your position as to the notices that were sent to the borrowers, A -- and I don't mean to suggest whether or not you are liable for damages. I don't mean that. I mean as to what the effect of them is.

MR. A. SMITH: Yeah. Our position is they're effective immediately, and they terminate Compass.

And there's two bases set forth in the letters. One is an

automatic right that we asserted under the state statute, and the second right is Section 3 --

THE COURT: Oh, okay.

MR. A. SMITH: -- because there is no 30-day notice under Section 3. It's not a surviving Section 3 right, and the notices cite both of those grounds as a method to terminate Compass.

THE COURT: But the notice --

MR. A. SMITH: That's my --

THE COURT: -- was not specific --

(Colloquy not on the record.)

THE COURT: -- in any manner.

MR. A. SMITH: I didn't --

(Colloquy not on the record.)

MR. A. SMITH: I list all the grounds.

THE COURT: Well, it didn't list any.

MR. A. SMITH: Didn't list any.

THE COURT: Right?

MR. A. SMITH: That's correct.

THE COURT: You didn't list any.

MR. A. SMITH: That's correct.

(Colloquy not on the record.)

THE COURT: So you're still taking the position that those notices were effective.

MR. A. SMITH: Yep.

THE COURT: Okay.

(Colloquy not on the record.)

MR. DAVIS: Your Honor, will you indulge me one --

THE COURT: Sure.

MR. DAVIS: -- one second?

(Colloquy not on the record.)

MR. DAVIS: Your Honor, I'm reading from the notice that was sent to Compass. It says, "This termination is based upon Nevada Administrative Code, Section 645B.073 as well as various actions and inactions of Compass and Compass Partners alone," and then it goes on to say, "This termination is specifically not pursuant to a surviving Section 3 right." It says nothing about Section 3 of the loan-servicing agreements.

I would say, your Honor, I can't particularly point you to the date when this came up before your Honor, but there was an argument in court because I was here to listen to it where someone said we have a right under Section 3 to terminate Compass, and it doesn't require 30-days' notice, and we can replace the servicing.

And your Honor responded what does it mean to replace the servicer under Section 3 if it doesn't mean to terminate the loan-servicing agreement. I read Sections 3 and Sections 8 together and believe there is a 30-day requirement and a requirement for showing cause.

Both sections have a cause requirement. The issue is

really the 30 days, and that's how I think -- I think it came up in the context of dealing with a surviving Section 3 right, and the 30-day period that was embedded in that. We had the opportunity to come to court --

THE COURT: Well, in fairness --

MR. DAVIS: -- and ask your Honor for an order.

THE COURT: -- I may or may not have made that observation, but two things.

First of all, it was in the context of the other hearing which may or may not have some law-of-the-case application. And by that, you know, it may be if you will dicta to that order or it may be that since everybody wasn't a party everybody wouldn't be bound, anyway.

In any case, the fact that I may or may not have said that as far as I'm concerned doesn't end the issue until someone establishes that that was a part of the ruling and was the law of the case and/or that's the situation.

MR. DAVIS: Okay.

THE COURT: I mean, I certainly understand the issue. I certainly understand your position --

MR. DAVIS: Um-h'm.

THE COURT: -- that that means we got to have notice. I see what they're saying. It doesn't mean we have to have notice.

MR. DAVIS: Okay.

THE COURT: I'm sorry. Not notice. Yes. 30 days.

MR. DAVIS: Okay. Your Honor, in terms of arising-in jurisdiction -- and I don't believe that this last-second concession really changes anything, frankly.

There has been conduct which has gone on now since the confirmation hearing which has sought to undo this sale transaction that your Honor has approved.

When a court of competent jurisdiction hears their allegations of breaches, I am convinced -- I know your Honor can't be convinced today because you haven't heard evidence about it, but they are specious. There is no basis whatsoever to do this, and this is pure pretext to unwind the confirmation order and the sale transaction.

That's what's at the bottom here. That's exactly what was the issue in Ames, although they are with respect to one particular store lease, and the Court took jurisdiction there.

I apologize if I skip around a little bit. I did the best I could to try to take notes of all of Mr. Smith's points and the points your Honor raised, and I'll try to touch on each of those.

First of all, I don't think Mr. Smith has even remotely, you know, addressed the cases that we have cited with respect to arising-in jurisdiction.

Clearly, the Courts there, both the Second Circuit and in Ames, have found that the Court has arising-in jurisdiction to

enforce orders that it entered in connection with matters that were pending before the Court to interpret and to enforce those orders, particularly, where those orders were entered in connection with core bankruptcy functions.

Here they clearly were. We're talking about the sale, a 363 sale, and we're talking about confirmation of a plan. There couldn't be anything more core.

Your Honor's order -- and I'm going to read from three provisions of it because Mr. Smith -- the fundamental difference I think and the thing that he keeps missing and not addressing is the emergency motion seeks enforcement of your Honor's order.

This is not about two nondebtor third parties disputing over whether there was or wasn't a breach, et cetera. The emergency motion said they did not comply with your order, with various aspects of your order, and you need to enforce it.

Now, what provisions am I talking about? Paragraph 47 of the order -- and Mr. Smith said, you know, there were no guarantees. Your Honor gave them no guarantees. The guarantees are in the order itself.

The order says at paragraph 47, quote, "After the closing, the direct lenders are obligated to comply with the terms of the applicable loan-servicing agreements," close quote, the same exact provision in the plan itself. They have not done that.

We are here today because they sent a notice out pursuant to some Nevada Administrative Code and totally ignored the 30-day requirement and the cause requirement in those agreements. Okay?

The right course of action would have been coming to your Honor and saying we think we have this right. There is this provision in the order that binds us, and the order by its terms binds the direct lenders, but we want clarification. Can we go and do this based upon this Nevada Administrative Code, and your Honor could have said either you can or you can't based upon my order. Okay? They didn't do that.

Instead, they sent notices to every single borrower, okay, and they purported to terminate Compass as servicer and have entirely interfered drastically with Compass' ability to service those loans.

Second, your Honor, there are other aspects, you know, besides simply -- the district court complaint that they filed seeks several forms of relief, only one of which -- and only one count is a declaratory ruling that they have the right under Nevada Administrative Code, Section 645B to terminate Compass.

It also requests a declaratory ruling. It says, "Plaintiffs contend" -- this is in the declaratory ruling in the first claim for relief, declaratory relief. "Plaintiffs contend that a lender in a loan secured by real property" --

THE COURT: Hang on one second. Which paragraph?

MR. DAVIS: I'm sorry. I'm looking at paragraph 92 --

THE COURT: Okay.

MR. DAVIS: -- page 22 --

THE COURT: Okay. Thank you.

MR. DAVIS: -- subparagraph C, "Plaintiffs contend that a lender in a loan secured by real estate" --

THE COURT: Wait, wait, wait.

MR. DAVIS: Oh, sorry.

THE COURT: Is that the complaint for declaratory relief?

MR. DAVIS: Yeah.

THE COURT: My paragraph 92 is as a result of Compass breaching its fiduciary duties.

(Colloquy not on the record.)

MR. DAVIS: There are two forms of -- and I apologize for this, but there are two forms of complaint that either -- only one form was filed, but I think the version that we had received is a version that might be different than the one that was actually filed. Perhaps, Mr. Smith --

THE COURT: Oh.

MR. DAVIS: -- can confirm which one is the right one.

THE COURT: Oh.

(Colloquy not on the record.)

MR. A. SMITH: Your Honor, I don't know how they would have received anything, but the right one is attached as an exhibit. I think it's H to the Cangelosi declaration.

THE COURT: Okay.

(Colloquy not on the record.)

THE COURT: I was trying to economize and just use one set of the complaint, rather than all these exhibits, and not realizing there were two separate ones here.

(Colloquy not on the record.)

THE COURT: Okay. I have hers, so --

(Colloquy not on the record.)

THE COURT: On 92, I've got an actual (indiscernible) controversy has arisen?

MR. DAVIS: That's correct, your Honor. Now --

THE COURT: That's the paragraph you're reading from.

MR. DAVIS: That's correct.

THE COURT: So the complaint that you attached to your pleading isn't correct?

(Colloquy not on the record.)

MR. DAVIS: That is the complaint that we had received, and we attached the only copy --

THE COURT: Oh --

MR. DAVIS: -- that we had.

THE COURT: -- I'm sorry. I'm sorry. I'm looking at

the complaint. Are you talking about the complaint that you -- no. The 92 I was looking at is your complaint against --

(Colloquy not on the record.)

THE COURT: -- your complaint against her. No. These pages are mixed up. I apologize. Well, I could straighten that out. I'm just kind of mystified how there's -- the one that is Docket 3830, apparently, isn't the right complaint?

(Colloquy not on the record.)

THE COURT: Do the declarations change in either of these complaints or are they the same declarations that are sought?

MR. A. SMITH: Well, I don't know what the first complaint is, but there's only one complaint that's been filed, and it's attached to Exhibit H to the Cangelosi declaration.

THE COURT: Okay.

MR. A. SMITH: I don't know what else they're referencing.

THE COURT: Okay. H'mm.

(Colloquy not on the record.)

THE COURT: Wow. This other one that they attached is clearly --

(Colloquy not on the record.)

THE COURT: -- on your pleading paper, um-h'm.

MR. A. SMITH: The only thing I can think of, your

Honor, is some sort of early draft they got ahold of without -- it didn't leave my office -- I don't know -- except with my clients. I don't know how they got it.

(Colloquy not on the record.)

MR. A. SMITH: Maybe Mr. Davis can explain that.

MR. DAVIS: I don't think I should have to explain why I have a complaint that's on his letterhead.

(Colloquy not on the record.)

MR. DAVIS: Obviously, it was sent out.

(Colloquy not on the record.)

MR. A. SMITH: Well, there's one complaint on file, your Honor.

THE COURT: Okay.

MR. A. SMITH: So if he has complaint --

THE COURT: So Exhibit D --

MR. A. SMITH: -- that isn't on file, I'm a little concerned about how that got in his hands.

THE COURT: Exhibit D to the supplement is not the right one. All right.

(Colloquy not on the record.)

THE COURT: It may not make a difference.

MR. DAVIS: H'mm.

THE COURT: I'm just looking if it's the same declarations, and I guess that's the question.

(Colloquy not on the record.)

THE COURT: Okay. All right. So go ahead, then.

(Colloquy not on the record.)

THE COURT: You were referring to paragraph 92. Which paragraph now, C?

MR. DAVIS: I'm referring to paragraph -- basically, the one concession that Mr. Smith has made I believe is to remove --

THE COURT: A.

MR. DAVIS: -- A.

THE COURT: Um-h'm.

MR. DAVIS: Okay? I don't think that does anything, frankly. Paragraph C, well, for the reasons I've mentioned, already. But, in addition, the complaint also seeks relief that's entirely inconsistent with your Honor's order.

Paragraph C, "Plaintiffs contend that a lender in a loan secured by real estate has an absolute right to modify the terms of their promissory note and deed of trust to maximize their recovery irrespective of the rights of a third-party loan servicer." He asked for a declaratory ruling to that effect.

Paragraph E, "Plaintiffs contend that pursuant to the notes executed by third-party borrowers in favor of plaintiffs and other direct lenders, the direct lenders have the right to determine the priority of allocated payments made by third-party borrower -- by the third-party borrower." Excuse me.

Paragraph F, "Plaintiffs contend that based upon Compass' breaches of the loan-servicing agreements, upon termination of the loan-servicing agreement Compass is not entitled to any compensation provided for in Section 5 of the loan-servicing agreements." Okay.

Those provisions -- now I'd like to read from your Honor's confirmation order. We have, of course, the provision I've read, already, that says that they are bound to comply with the terms of the loan-servicing agreements.

At paragraph -- and Mr. Smith said on numerous occasions there are no guarantees. Compass is a sophisticated party. Your Honor provided them no guarantees. They went into this with their eyes wide open. Well, that's exactly wrong.

Your Honor provided us relief in the confirmation order in several respects. The first is they have to comply with the terms of the loan-servicing agreements which includes in our view a demonstration of 30-days' notice to terminate, plus a demonstration of cause.

Second, at paragraph 14 -- this is after the description of a surviving Section 3 right -- toward the end of that paragraph -- and, again, Mr. Smith said there was no right to this effect in the confirmation order.

(Colloquy not on the record.)

MR. DAVIS: I'm reading from the sentence that begins one, two -- it's the eighth line from the bottom of that

paragraph.

Quote, "In the event of a proper exercise of remedies under Section 3 of the loan-servicing agreement, one, neither the direct lenders nor any replacement servicer selected by such direct lender shall have the right or ability to compromise, subordinate, or impair in any respect any rights, claims, or interests purchased by Compass from the estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the loan-servicing agreements," and then it goes on to -- close quote, and then it goes on to talk about how replacement services are bound by the terms of this order irrespective of whether or not they received a copy of it. Okay.

Clearly, the relief sought in the district court complaint in terms of being able to reallocate payments shifted around notwithstanding the rights of a loan servicer is directly contrary to this.

(Colloquy not on the record.)

MR. DAVIS: Finally, Mr. Smith said there's no right in the confirmation order, and your Honor didn't guarantee them that no one would prevent or interfere with their title or use and right to enjoyment of the acquired assets. That's also incorrect.

The end of paragraph 25, the last sentence of that paragraph reads, quote, "Following the closing, no holder of an

interest in the sellers shall interfere" -- and direct lenders are defined as holders of interest in the sellers -- "shall interfere with the asset-purchaser's title to or use and enjoyment of the acquired assets based on or related to such interest or any actions that the sellers may take in their Chapter 11 cases." Again, interest is defined as anything that really relates prior to the closing date.

As your Honor has said -- and your Honor made a very good point -- that the attempted exercise of this right under Section -- or alleged right, under 645, your Honor said, well, why isn't that a claim. Why isn't that a right to equitable relief.

And, clearly, we think you're right, and it is, and that that is an interest as defined in your Honor's order because it existed prior to the closing date, and so, therefore, they have clearly interfered with our right based upon that interest.

(Colloquy not on the record.)

MR. DAVIS: We think if Mr. Smith is now taking the position -- again, he can't unwind the past which is the problem with now coming into court months after the fact and saying, oops, we didn't mean to do what we did. We'll concede that we're not doing it pursuant to this administrative-code section. It doesn't erase all of the damage that's happened.

Your Honor has to deal with that. You have jurisdiction. He's coming into this court saying, your Honor, you don't have

jurisdiction over disputes between two nondebtor third parties.

You clearly have jurisdiction to deal with his violations of your order. If you don't, there's not a person on the planet who does. You have to accept that jurisdiction, and you have to deal with it.

In terms of his arising-in and related-to, I don't think he's made any points that are worthy or necessary for me to respond to. My statements before are clear.

Your jurisdiction to enforce your orders which were entered in connection with core proceedings before this Court are paramount. There's not a case out there that says you can't do it.

And to the extent they've cited cases from the Seventh Circuit that say there has to be an impact on the estate, we have I believe demonstrated that there could and we believe there will be an impact on the estate for your Honor mentioned to Mr. Smith why didn't you raise this at the time of confirmation. Why didn't you raise it? There's a provision in this order that says you are bound by the terms of the loan-servicing agreements. That was the time to raise it, not now.

Your Honor, if you'll just bear with me for a moment, I want to just see what other points I need to address.

(Colloquy not on the record.)

MR. DAVIS: Along this similar line, Mr. Smith

quoted -- I don't think it was a direct quote, but described a portion of the Ames case where the Court said that it felt --

(Colloquy not on the record.)

MR. DAVIS: -- that it may not -- that there's a tension, and the Court should not assume a continuing role as a landlord/tenant Court describing this as basically a similar thing. The Court didn't give Compass assurance that it would be there forever as a forum from which it could, you know, have any disputes concerning the loan-servicing agreements.

Well, first of all, the Ames Court goes on to say -- it says that there is this tension between the bankruptcy court exercising jurisdiction over a contract that passes through bankruptcy, but it says -- and, obviously, Ames does accept subject-matter jurisdiction and finds it has arising-in jurisdiction.

But it says that the Court, quote, "feels that it should ensure that its earlier orders are not frustrated." That appears --

(Colloquy not on the record.)

MR. DAVIS: Let me see if I can find the page reference for your Honor.

(Colloquy not on the record.)

MR. DAVIS: That appears at, well, just about at page -- in the text, but the text surrounding footnote 69.

There is a tension between the Court exercising

jurisdiction over, quote, "disputes between two nondebtor third parties" and what is going on here.

This is vastly different. This is vastly different. This is not -- okay. This is not two years from now, there's one loan, and the direct lenders come into -- you know, and send Compass a notice saying we think you misallocated payments. We think you failed to service properly, enthusiastically, et cetera, and we're giving you notice to terminate.

I agree in that circumstance we wouldn't run into this court to say, your Honor, please find they don't have the right to terminate. This is fundamentally different.

This is a concerted effort that began at the time of the confirmation hearing through lies and deception to deceive direct lenders to villanize Compass so that they could get this groundswell of support to try to overturn us.

There are letters after letters that go to this. And, obviously, at an evidentiary hearing if we need to have one, your Honor can reach this conclusion.

This is an effort to unwind the plan, to unwind the sale, period, full stop. The allegations of defaults are specious, entirely, entirely specious.

One example that they repeat over and over and over again is that -- and this what they've used to incentivize all the direct lenders to try to join their group and replace Compass is that Compass' interests are different than the direct

lenders.

They're only after themselves. They are because of the -- because of the fee structure in the loan-servicing agreements, they're incented to delay because the longer the delay the more they collect in default interest, blah, blah, blah, over and over again until they scare people to the point where they feel that they have no other choice.

The risk that we assumed was that if we defaulted, if we misapplied payments, and there is a default, we run the risk that we can be terminated. That's not what's going on here.

I'll give you one example, your Honor. Your Honor's familiar with the allocation of payments under the loan-servicing agreements. I want to read one short portion of it. It's in Section 5.

It says, you know, that we are entitled. "Servicer is entitled to keep one-twelfth of its annual servicing fee per month," and then it goes on to say, "Any late charges collected from the borrower pursuant to the terms of the note and default interest collected from the borrower pursuant to the terms of the note."

I want to read to you from one note, just one. Application of payments, "All payments on this note shall be applied first to any prepayment fees if any are due; second, to accrued late fees, if any; third, to default interest, if any; fourth, to the payment of accrued ordinary interest then

payable; and, last, to principal.

The idea that we are misapplying payments is absolutely absurd. To the extent that there's a dispute, I have said that we will put that money aside and have a court of competent jurisdiction determine the application on a loan-by-loan basis.

That's what's appropriate, not what's going on here which is scare tactics trying to get people motivated three months after closing to terminate every single loan-servicing agreement that we purchased. That's what's going on here.

And Mr. Smith saying, well, these are minor disputes between two nondebtor third parties, your Honor doesn't have jurisdiction, that's nonsense. That's not what this is about.

Finally, your Honor, I would remind you about the consent to jurisdiction which we refer to which occurred at the confirmation hearing. And in terms of consenting to have -- I agree that --

(Colloquy not on the record.)

MR. DAVIS: -- the mere fact that the Court retained jurisdiction doesn't mean that it has jurisdiction. You clearly have jurisdiction based upon all of the cases that we have cited in our brief.

You have arising-in jurisdiction. You have related-to jurisdiction. Mr. Smith acknowledged that jurisdiction, and the acknowledgement was on December 28th at the confirmation hearing.

The colloquy that occurred before the Court is at footnote 8 of our brief, page 10, and it specifically related, your Honor. You know, I think this is important enough because -- well, I'll leave it at that. Your Honor can reference that.

(Colloquy not on the record.)

MR. DAVIS: Your Honor, if I may have just one more minute. I'll just check to see if there's anything else I need to respond to.

(Colloquy not on the record.)

MR. DAVIS: You know what? I think this is important enough. I am going to read it.

(Colloquy not on the record.)

MR. DAVIS: Your Honor, at the confirmation hearing, Mr. Smith asked the following question. "Is this Court retaining jurisdiction over those issues if somebody wants to terminate the servicing agreement?" In response, Mr. Gordon stated, "That if a dispute arises over the LSA, this Court would be the forum for resolution." The Court then clarified this, "It would be put in the plan."

Mr. Smith then asked whether this would also include rights in paragraph 8 of the LSA. The Court and Mr. Gordon each responded by stating, "The entire agreement survives," and then Mr. Gordon -- I'm sorry. Mr. Smith then acknowledged and said, "Okay."

This is -- I'm probably not doing it the justice that it deserves. I'd ask your Honor to refer to the actual pages of the transcript which occurred at pages 34 and 35 of the December 20th transcript.

Specifically, the issue of termination under Section 8 was raised before the Court. Mr. Smith acknowledged based upon the colloquy before the Court that the Court would have jurisdiction to deal with that.

Now, if Mr. Smith -- if he now says, well, we're not terminating pursuant to Section 8, we're terminating pursuant to Section 3, again, I think that is too clever by a half.

Your Honor, for all of those reasons, this --

(Colloquy not on the record.)

MR. DAVIS: -- this is so fundamentally at odds with your order --

(Colloquy not on the record.)

MR. DAVIS: -- that you must take jurisdiction of this. You have the right. It's not even a close call. It really isn't.

The cases we have cited make it crystal clear you have the right to interpret and enforce your order, particularly, where that order was entered in connection with a core function and in this case confirmation of a plan.

The impact on the estates could be huge. The time to rescind has not expired unlike all of the cases Mr. Smith has

cited. For all of those reasons, your Honor, we ask that you take jurisdiction.

Well, and in terms of what does that mean now that Mr. Smith is no longer, apparently, relying upon Nevada Administrative Code, Section 645B, I think it means a few things.

First, it means dealing with the prior violations of the order, all of the damage that's happened because your order has been violated.

Second, I think it means that there has to be -- well, you can't continue in a limboland. Mr. Smith will say he terminated somehow under Section 3. No 30-day notice requirement is necessary.

They'll walk out of court today, and they'll send notices to all the borrowers saying forget the earlier notice. We've now terminated them under Section 3. We'll be right back here.

There's a 30-day requirement to terminate the LSAs, and there has to be cause. They are not licensed. They do not have the ability to deal with this and to service these loans.

What I think the relief that is appropriate at this point besides dealing with the prior violations of the order and sanctions for that are maintaining the status quo until this Court or some other court -- and I believe it should be this Court -- determines whether there is or is not cause.

(Colloquy not on the record.)

MR. DAVIS: Now, why do I think it should be this Court? I think it should be this Court because the relief that's sought in the district court action in the respects that I've already mentioned are at odds with your order.

This Court should deal with it, this Court, so there are -- I purposely didn't raise it earlier because the emergency motion was clear. They violated the order.

They didn't comply with the terms of the loan-servicing agreements which they were compelled to do. They purported to terminate us under this other administrative-code section.

We'll deal with jurisdiction over the district court complaint that has been removed to your Honor. It is now an adversary proceeding pending before this Court. We'll deal with that another day, presumably, in connection with, you know, Mr. Smith's motion to strike the notice of removal, you know, and, alternatively to remand that proceeding.

I believe your Honor clearly has jurisdiction of that for the reasons that I've mentioned. The relief is inconsistent with your order. That's not what we're here to argue today.

The emergency motion before your Honor, what needs to happen is there has to be --

(Colloquy not on the record.)

MR. DAVIS: -- a maintaining of the status quo. Our rights as a servicer have been damaged enough, already, by their violations of your order. The assets that we've

purchased have been already damaged. Now the status quo should be maintained.

If they think they've got a great basis to demonstrate cause to terminate, remember, cause, it has to exist for every single loan. It's not enough to say, well, there was this one loan, Standard Properties, and there was a misapplication of payments, at least a dispute over it, and that gives us a basis to terminate everything, hocus-pocus. That's not their right.

And the damage that they are continuing to inflict by sending out inflammatory, inaccurate E-mails and correspondence to direct lenders and to borrowers has to stop until your Honor or some other Court determines whether there is or is not a basis to terminate Compass as servicer under each of the loans.

Thank you, your Honor.

THE COURT: Okay.

MR. A. SMITH: Will --

THE COURT: Yes.

MR. A. SMITH: Will your Honor consider any replies to any of those items from me --

THE COURT: I --

MR. A. SMITH: -- or --

THE COURT: I don't think we need it.

Did you need to say something? I mean, I guess you're a pro se. Are you --

MS. KNOLES: I --

THE COURT: -- represented?

MS. KNOLES: I am. I'm pro se.

THE COURT: You're not represented by the Lender Protection Group?

MS. KNOLES: No, I'm not.

THE COURT: Okay.

(Colloquy not on the record.)

THE CLERK: Please state your name, please.

MS. KNOLES: I'm Christina Knoles, K-n-o-l-e-s. Your Honor, I'm not a member of the LPG.

I am a direct lender with significant assets that I have invested and what is now in the hands of Compass, a servicer I don't want and a servicer to my understanding not a single direct lender wants or at least none has come forward to say that they've wanted you because they've had plenty of time to get somebody to come forward on their behalf, and they haven't.

I'm offended at some of the things that they have said. I am not motivated by the LPG demands. I am not motivated by any letter that I got or E-mail or whatever it is they're talking about.

I am motivated by what Compass has done since your plan confirmation has been implemented. They -- they're sitting here making glib comments like, oh, there's a misapplication of payments in the Standard case.

I was a lender in the Standard case. I got the letters

from Compass. I got the deceptive commentary from them who did not disclose that they were taking money when they were asking us to forgive every penny of our accrued interest thinking, oh, we should just be happy to get our money back. Well, we're not happy just to get our money back because that's not what we bargained for.

There is over $500,000,000 in assets that lenders like me that went through no plan confirmation hearing. We were not part of a Direct Lenders Committee. We were not on any committees. We were not part of the LPG. We were not sitting around conspiring with -- behind their backs to try to get anything done.

We're here because of what they have done since your plan was confirmed. It's their letters that motivate me to stand up. It's nothing that the LPG has done.

I don't have any part of that, and there's a group of us that don't have anything to do with the LGP (sic) -- LPG, but we want to be heard, anyway. There's a whole group of people in here. I don't even know any of them, but it looks to me like you could fill 20 courtrooms.

There are 3,000 lenders, and the idea that we're some -- some of us are some kind of a rogue group or a minority group, my goodness, there's thousands of us that have finally come together because we've enabled a way to communicate with one another, and we don't like what's going on.

And we don't want this entity managing our money, anymore. We don't have any more time. A lot of these people -- I've heard of people that have lost their homes over this. They're not getting a penny.

Time is our enemy while Compass continues to keep control of these assets. They've settled about three loans since your confirmation order. Big deal.

There's $500,000,000, 560 mil, $583,000,000 of assets. I'm not an expert on that. I'm not part of any group. I just want to be sure that our voices are heard, and that this Court understands.

Let us out. We have -- we have been tied up in this thing for a year and a half. We have given Compass their -- I'm one of the ones. I was one of the ones wanting to give you a chance. And since this confirmation, you don't deserve --

THE COURT: Please.

MS. KNOLES: -- any more chances --

THE COURT: You --

MS. KNOLES: -- any more --

THE COURT: You talk to the Court.

MS. KNOLES: -- any more chances. It is -- I cannot imagine why this Court would even want to keep jurisdiction.

THE COURT: Did you send a letter of termination?

MS. KNOLES: Yes.

THE COURT: You did? Okay.

MS. KNOLES: Absolutely.

THE COURT: Okay. Was it specific as to the cause --

MS. KNOLES: I am --

THE COURT: -- or was it one of the --

MS. KNOLES: -- a standard --

THE COURT: Was it one of the forms?

MS. KNOLES: Oh, no. I didn't send it --

THE COURT: Okay. So you haven't sent a --

MS. KNOLES: -- to specific --

THE COURT: You haven't sent a letter of termination, then.

MS. KNOLES: Not specific --

THE COURT: Okay.

MS. KNOLES: No. Not specific to them, no, but I have -- I have called their offices. I have tried to speak with Mark Olson. I have tried to get information.

And the answer I get is Compass is going to collect every dime they're legally entitled to receive under this bankruptcy, and we are not going to give you any more information about what we're doing or why we're doing it.

The letters they sent out from Standard to me fraudulently induced us lenders to agree to a deal when we didn't know that they were taking default interest under the table with the Standard Property borrowers.

Now, I -- that is not -- what does he say -- a

misappropriation of payments. I mean, there is no misappropriation. That -- there is nothing to do with it.

There's plenty of breaches here, Judge. There's tons of breaches that are after the fact. I don't --

THE COURT: Well, until you send a letter terminating with the cause --

MS. KNOLES: We have a letter terminating them --

THE COURT: You just told me --

MS. KNOLES: -- with cause.

THE COURT: -- you didn't send a letter terminating.

MR. A. SMITH: I think the confusion --

MS. KNOLES: I'm --

MR. A. SMITH: -- is a letter versus election, your Honor. I think --

MS. KNOLES: I didn't --

MR. A. SMITH: -- she sent an election --

MS. KNOLES: -- send it.

MR. A. SMITH: -- but not a letter.

MS. KNOLES: Yeah.

MR. A. SMITH: I think that's --

MS. KNOLES: I --

THE COURT: Well, then how would they know that if you didn't send a letter terminating?

MR. A. SMITH: Well, all of the elections were attached and sent to Compass.

THE COURT: So you used Ms. Cangelosi's form.

MS. KNOLES: Exactly.

THE COURT: You didn't use your --

MS. KNOLES: Yeah.

THE COURT: -- own form.

MS. KNOLES: No. I didn't reinvent the wheel, no.

THE COURT: Okay.

MS. KNOLES: I didn't feel the need to do that.

THE COURT: Oh, okay.

MS. KNOLES: And I didn't get involved until after the fact, until after your order was issued, and I saw for myself the breaches.

I got the letters from Compass. It had nothing to do with any inflammatory comments or any kind of anything like that. It's what I read in the letters from Compass, and there's other people that have read them, too.

I've talked to other lenders on the phone, and we are all not part of a group that was working behind the scenes during the bankruptcy proceeding trying to figure out a way to kick Compass out after the end.

There's a fair number of us who wanted to give them a chance who said, look, you know, let's see what they do. Okay. Well, we've seen it, and they are -- they have shown exactly what they're going to do, and there is no reason.

These delays are seriously harming our assets, and there's

500,000,000. They say they have $60,000,000 invested, 67,000,000. Well, $63,000,000 of that has nothing to do with anything, other than the First Trust Deed Fund that they bought, a million-and-a-half dollars that went to pay off Silver Point for the stalking-horse bid and other items.

This is not -- this is not chump change for the rest of us. This is our money. This is the direct-lenders' money, and we want to have control. We have the right to have control of our assets.

Compass has had a chance. They failed. They haven't come through. They're damaging us every single day that goes by, time that a lot of these people in this courtroom -- and you just have to look out and see them. You look in their faces, and you will see that they don't have the time.

They don't -- this might be nothing to these people, but it's a lot of money to the people who invested in a low-risk with a moderate expectation of a reward under standard lending practices at the time, and Compass has completely destroyed that.

And we want this Court to let us go and fight this battle on these loan-servicing agreements and what we -- and these postpetition breaches in another court. That's all we're asking for.

Thank you.

THE COURT: Okay. All right. I find that -- I don't

have -- I really don't have any additional time, sir. This is just a -- the hearing is about subject-matter jurisdiction. That's the issue, totally. It's about subject-matter jurisdiction. That's the only legal issue --

(Colloquy not on the record.)

THE COURT: -- that's involved today.

MR. ALEXANDER: I mean, that I want Compass to be removed, and that they're (indiscernible).

THE COURT: It's subject-matter jurisdiction.

MR. ALEXANDER: If they have my money and will give it to me, that's no problem.

THE COURT: It's subject-matter jurisdiction is the only issue I'm here on today. That's all we're on here today is whether or not this Court has the power. Okay? That's the only issue.

MR. ALEXANDER: Well, you're aware that while Compass --

THE COURT: You got two minutes.

MR. ALEXANDER: Okay. You're --

THE COURT: All right?

MR. ALEXANDER: Okay.

THE COURT: If you want to come forward, state your name. You have two minutes.

(Colloquy not on the record.)

THE COURT: And I apologize, but, you know, we've --

and I apologize because you haven't had much time, but I --

MR. ALEXANDER: Yeah. My name as I said before --

THE COURT: Now, are you with the Lender Protection Group?

MR. ALEXANDER: I did use their form to send a notice to Compass.

THE COURT: Okay.

MR. ALEXANDER: But I was initially --

THE COURT: See, that's the problem.

MR. ALEXANDER: No. They're not representing me, your Honor.

THE COURT: Okay.

MR. ALEXANDER: Okay? And I --

THE CLERK: Will you please state --

MR. ALEXANDER: I was --

THE CLERK: -- your name.

MR. ALEXANDER: -- a mortgage --

THE COURT: Mr. Alexander.

MR. ALEXANDER: I was an FHA and VA servicer, so I understand servicing.

THE COURT: Okay. My only issue is subject-matter jurisdiction.

MR. ALEXANDER: Okay.

THE COURT: Not what Compass did or didn't do. That's not before me today.

MR. ALEXANDER: Well --

THE CLERK: Sir, would you state your name, please?

MR. ALEXANDER: Stanley Alexander.

THE CLERK: Thank you.

MR. ALEXANDER: I live in the state of Florida, and I'm here because I was not represented at the time this hearing about jurisdiction was concerned. Had I been here, I would have opposed Compass because they were not licensed at the time that they took the servicing, and they should never have been given the servicing.

USA Capital was -- I checked out. They were licensed in the state, and so I gave them the right to service my loans. I didn't give Compass that right, and Compass has abused any right that the Court gave them.

They said they -- we are breached -- that their -- that they didn't breach their agreement prior to the bankruptcy. Lerin Hills alone was agreed to that would be paid off.

When Compass took over, they prevented the payoff of that loan and have almost -- just about forced the length -- the over -- the mortgagers in that loan to go into bankruptcy, so what Compass has done --

THE COURT: So why didn't you send a letter of termination specifying that cause?

MR. ALEXANDER: I have 11 -- I have 12 loans here, your Honor.

THE COURT: Why didn't you send a letter to Compass?

MR. ALEXANDER: I sent 12 loans to Compass terminating --

THE COURT: So --

MR. ALEXANDER: -- their services.

THE COURT: But did you use Ms. Cangelosi's form?

MR. ALEXANDER: I used the form that they have.

THE COURT: See, that's the problem --

MR. ALEXANDER: Why, your Honor?

THE COURT: -- because it doesn't specify what the cause is.

MR. ALEXANDER: Here is one cause in my hand. Compass -- I have all -- almost --

THE COURT: What does the letter say?

MR. ALEXANDER: No. I have over $2,000,000 in loans.

THE COURT: I understand. What did the letter --

MR. ALEXANDER: This is a check --

THE COURT: No, no, no, no.

MR. ALEXANDER: It --

THE COURT: What did the letter terminating to them say? That's what I'm trying to understand.

MR. ALEXANDER: I -- do you want me to get that? I could read you what it says.

THE COURT: Did you use Ms. Cangelosi's form?

MR. ALEXANDER: I used that form.

THE COURT: Okay. Her form says she's terminating because of Nevada Statute 645B and other cause.

MR. ALEXANDER: Yes.

THE COURT: That's all it says.

MR. ALEXANDER: And other causes.

THE COURT: And other cause.

MR. ALEXANDER: Yeah. But other causes, their default --

MR. A. SMITH: There's a little confusion about that. That's the letter you're referring to. There's also an election form. I think this gentleman signed the election form. He didn't sign the letter that I sent to Compass.

MR. ALEXANDER: No, I didn't. I --

MR. A. SMITH: So in --

MR. ALEXANDER: -- sent them a letter.

THE COURT: All right. Well, if you've terminated and if you've terminated accurately, then you've terminated.

MR. ALEXANDER: Yeah.

THE COURT: Okay. So, now, I don't know how that -- the problem with that is in the servicing. But if you've terminated --

MR. ALEXANDER: Because the service --

THE COURT: -- then you've terminated them.

MR. ALEXANDER: Their servicing of a loan that I made in which I have a mortgage and a deed of trust, and that

overrides anything. It is a contract between myself and the mortgager in which the mortgager expressly agreed to pay me.

The servicer is entitled to collect those funds on my behalf, no different than if I had 100 buildings, and I had a property manager. The servicer is not entitled to take my funds and use it for their own purposes.

And what has happened here, and why I -- I assume all these people are here is that the longer this thing takes the more money will be lost because many of these loans could have been worked out, and Compass is not interested in working these loans out.

Compass' interest -- they are what are known as a vulture fund, and I'm sure your Honor is aware of what a vulture fund is. They know nothing about mortgages.

They are in it because they feel that they can extract a significant amount of money. They're a vulture fund. They're not servicers.

They use the license of USA Capital which should have been revoked and has since been revoked to service the loans, and they used USA's (sic) Capital employees to service those loans.

Your Honor spoke of service fees. Those are things that are contained in the deed of trust and in -- and in -- in -- in the -- the note that the borrower has signed, and their rights that they have on this service agreement would come from me. They can't assume those rights by themselves, and that contract

cannot be breached.

Compass has made many --

THE COURT: But you haven't sent any letter to the borrower saying pay you, have you?

MR. ALEXANDER: Because, your Honor, there are many of us involved in one loan. That's the purpose. That's the reason for a servicer.

THE COURT: Right.

MR. ALEXANDER: And we did not know each other. Had I known these people, any of them, you rest assured there's no chance that they would have gotten the servicing in the first place.

They have in point that they were a vulture fund, and that they expect to make a significant amount of money from these. They do not understand that the loans do not belong to the servicer. The -- the loans belong to these -- to the mortgagees that you see sitting in this room. They are the owners of the mortgage.

And USA Capital was merely the servicing agent. And if USA Capital made an investment in a loan, they were no different than any of these direct lenders. The two things are separate.

But once -- when Compass bought these loans, they were under the impression it was like a bank, when the bank is going to bankruptcy, and they take over the assets of the bank, then

you can liquidate it or do whatever else you want with it, but it's not the case here.

Here I am a mortgagee. I have a recorded instrument. I have a recorded deed of trust, and I have a security interest, and they cannot take that away from me which is what they're trying to do, and I would hope your Honor do not permit that to happen because they'll be other -- another case of worms.

THE COURT: Okay. Thank you. All right.

I find there is subject-matter jurisdiction under Section 1334. Now, what I would be inclined to do is to recommend the withdrawal of the reference, so that we can litigate. All those matters can be litigated in one court.

But you may not want to do that because of the timing issues. It's going to take five times longer to do it there than it is here. Let me go through what my ruling is first, then I'll go through the rationale for it.

So I find there is subject-matter jurisdiction, and there is supplemental or ancillary jurisdiction over those matters which do not precisely fall within the subject-matter jurisdiction.

I think it makes some sense to recommend withdrawal of the reference because there are issues which are not core. You also have the proceeding for which there are other issues, but I would, first of all, enjoin any termination based upon the letter that was sent to the borrowers on May 18th, and I think

you've conceded that.

(Colloquy not on the record.)

THE COURT: I would also enjoin any termination based upon the prior letters of cause that were sent because without getting the merits they're just not specific enough. It's obvious they were meant to be a catchall.

It's just amazing to me how you go through all these machinations. If there really were cause, just send a letter, establish the cause, and you've got it. You spent $200,000 to go through these machinations.

MR. A. SMITH: Wait a minute. Wait a minute, your Honor. I didn't spend $200,000, and we get into this every time --

THE COURT: I know.

MR. A. SMITH: -- about the fees --

THE COURT: But I guess --

MR. A. SMITH: -- I get.

THE COURT: -- what I'm saying is --

MR. A. SMITH: That's not true. All right?

(Colloquy not on the record.)

MR. A. SMITH: And there are so many breaches that I'm not about to write a five-page letter to Compass to explain everything they've done wrong.

THE COURT: Well, I --

MR. A. SMITH: I don't have to.

THE COURT: I think --

MR. A. SMITH: The statute says they can be terminated for cause. I said --

THE COURT: Right.

MR. A. SMITH: -- they're terminated for cause. All these people supported it.

THE COURT: But, query --

MR. A. SMITH: That's what I did.

THE COURT: -- does it not make more sense, for example --

(Colloquy not on the record.)

MR. A. SMITH: No.

THE COURT: -- when anytime you have a -- okay. Fine.

MR. A. SMITH: I don't agree with it.

THE COURT: Okay. All right. That's fine.

MR. A. SMITH: I mean, why do I have to give them an explanation of everything they've done wrong?

THE COURT: Because how do they know that it's not some made-up pretext?

MR. A. SMITH: You're saying they don't know what they did?

THE COURT: Well, no, no. Well, I mean, for example, let's assume the landlord/tenant situation.

(Colloquy not on the record.)

THE COURT: Okay? Let's assume the --

MR. A. SMITH: Your Honor, I filed --

THE COURT: Let's assume the landlord/tenant situation.

MR. A. SMITH: Right.

THE COURT: You're a landlord, and you represent the tenant, and the landlord says I have the absolute right to terminate for cause. You're terminated for cause.

MR. A. SMITH: Right.

THE COURT: What's the first thing as a good attorney you're going to do?

MR. A. SMITH: Well, it depends on which side I'm on.

THE COURT: You're going to tell --

MR. A. SMITH: Suppose I'm --

THE COURT: You're --

MR. A. SMITH: -- Mr. Davis.

THE COURT: You represent the tenant.

MR. A. SMITH: I write me and say what's the cause.

THE COURT: Exactly. Right?

MR. A. SMITH: We could have done that, but, I mean --

THE COURT: So --

MR. A. SMITH: -- it's obvious because I filed a complaint on the same day --

THE COURT: Okay.

MR. A. SMITH: -- listing all the causes.

THE COURT: So my point is --

MR. A. SMITH: It's no secret.

THE COURT: But the point is if there is cause, then, certainly, send the termination letters out. If you don't want to say what the cause is --

MR. A. SMITH: I don't have a --

THE COURT: -- then --

MR. A. SMITH: I don't have a problem --

THE COURT: That's fine.

MR. A. SMITH: -- with that.

THE COURT: Then --

MR. A. SMITH: It --

THE COURT: Then the point is that litigation -- then under the contract they have to say do I or don't I. I don't know.

Under state allow under the contract, do they have to explain what it is? I don't know. I'm just saying if you articulate what the cause, then that joins the issue. If you don't, that's fine, so my --

MR. A. SMITH: I don't --

THE COURT: But my point is if --

MR. A. SMITH: I don't have a problem with that.

THE COURT: My point is this. That if there is this cause, you know, let's address it in that manner, you know,

so --

MR. A. SMITH: It --

THE COURT: So it --

MR. A. SMITH: -- constantly changes.

THE COURT: -- should be addressed.

MR. A. SMITH: Every week that goes by, there's something new. Every week that goes by --

THE COURT: All you need --

MR. A. SMITH: -- there's something different.

THE COURT: -- is one.

MR. A. SMITH: Well, all right.

(Colloquy not on the record.)

MR. A. SMITH: I mean, I --

THE COURT: All you need is just articulate what it is. Now, and the reason -- now, if this were merely a situation in which various lenders said there's cause, and it was terminated, as I said, I don't think there would be jurisdiction, but it certainly appears as if that it's the pretext in some cases because as people have said this has been discussed for months.

MR. A. SMITH: They've been servicing for months.

THE COURT: They've even before confirmation --

MR. A. SMITH: No. Nobody said that. Nobody ever said that.

THE COURT: Ms. Knoles said that.

(Colloquy not on the record.)

THE COURT: That --

(Colloquy not on the record.)

THE COURT: That people were --

MR. A. SMITH: Well, I think --

(Colloquy not on the record.)

MR. A. SMITH: I --

MS. KNOLES: No. I did not say that.

MR. A. SMITH: That is not true.

THE COURT: That, in other words --

MR. A. SMITH: She said when Compass bought -- and I think most of these people might agree -- they wanted to see what happened. You know, these people don't want to service their own loans. They need help.

THE COURT: I know, and I'm --

MR. A. SMITH: But when they saw what was done --

THE COURT: So then follow the procedures.

(Colloquy not on the record.)

THE COURT: Follow the procedures. That's what I'm saying. There's subject-matter jurisdiction.

MR. A. SMITH: I don't have a problem with that, your Honor, I mean, but you --

THE COURT: So follow the procedure --

MR. A. SMITH: Your procedure is different than what I think my procedure is, and that's fine.

THE COURT: Okay. But no.

MR. A. SMITH: You --

THE COURT: But you've agreed now that cause is required under the contract. So, in other words --

MR. A. SMITH: No. What I --

THE COURT: -- you send a letter --

MR. A. SMITH: What I agreed to do is to take that out if that's what it takes to avoid subject-matter jurisdiction.

THE COURT: Okay. So you don't get that proposition. Okay.

MR. A. SMITH: No. I --

THE COURT: That's fine.

MR. A. SMITH: I conceded that issue --

THE COURT: Okay.

MR. A. SMITH: -- in order to avoid subject-matter jurisdiction. But if you say I have subject-matter jurisdiction, I'm not going to just throw stuff away --

THE COURT: No. No, no. I'm --

MR. A. SMITH: -- for no reason.

THE COURT: I'm not disagreeing. I just wanted to understand --

MR. A. SMITH: Okay.

THE COURT: -- your position, so there is subject-matter jurisdiction because of several things. Your

declaratory-relief action seeks to say that the lenders have an absolute right to modify the terms of their promissory note irrespective of the rights of any loan servicer. That appears to me to at least be impacting the order of the Court and the sale order.

You also contend that --

MR. A. SMITH: Which --

THE COURT: I'm sorry. Please, let me just finish.

MR. A. SMITH: I --

THE COURT: Okay?

MR. A. SMITH: Okay.

THE COURT: You also seek a declaration that Compass is not entitled to any compensation provided in Section 5. I think that implicates the order, that order of confirmation, and there's also where if this was merely attempts to say we need to interpret the contract or merely there are postpetition breaches, and I didn't have as I said all these other machinations I wouldn't find supplemental jurisdiction, but I think there's clearly a question of pretext.

For example, based upon the facts alleged and not hearing Compass' side and taking the facts as you allege about Standard Property, that would give the Standard Property lenders the right to terminate in other cases, but it certainly wouldn't give that right to everybody.

MR. A. SMITH: Now, see, that's where I disagree,

your Honor, because these people look, and they see what Compass is doing in one loan, and how they're misusing funds. Do they have to sit around and wait until they're subject --

THE COURT: Where --

MR. A. SMITH: -- to --

THE COURT: What I'm saying --

MR. A. SMITH: -- some problem on --

THE COURT: -- is that's -- you know, you're taking that view.

MR. A. SMITH: I think if it was me, and I saw what Compass did in another loan, and I knew my loan was coming up, I'd say you guys are done because you've shown your pattern of conduct. When it comes around --

THE COURT: Is that cause?

MR. A. SMITH: -- to my turn --

THE COURT: But that's the point.

MR. A. SMITH: -- I don't want you representing me.

THE COURT: Is that cause? That's the point.

MR. A. SMITH: Absolutely.

THE COURT: Under Nevada law --

MR. A. SMITH: And that --

THE COURT: That's your position, and maybe under Nevada law that would be.

MR. A. SMITH: Well --

THE COURT: Maybe that --

MR. A. SMITH: Maybe it is, but it's certainly a postpetition --

THE COURT: I understand, but the real concern is the pretext, the very fact that we've established these LLCs, and now it starts servicing the loan. The fact that we've gone through all of --

MR. A. SMITH: Wait a minute. But --

THE COURT: -- these letters which --

MR. A. SMITH: But you --

THE COURT: It's --

MR. A. SMITH: -- accused us last time of going forward without being prepared. We've gone forward now, and now we're prepared.

THE COURT: I'm just saying --

MR. A. SMITH: We have everything --

THE COURT: -- it's raising the specter of pretext which would relate to --

MR. A. SMITH: It's raising --

THE COURT: -- subject-matter jurisdiction.

MR. A. SMITH: It's preparation, your Honor. We're not idiots. We're not sitting there terminating Compass and saying now we're not going to do anything.

Somebody has to do something. We've investigated all of these loans. We've set up bank accounts. We've set up offices. We want to negotiate settlements --

THE COURT: I understand.

MR. A. SMITH: -- to maximize our return.

THE COURT: You know --

MR. A. SMITH: That's what --

THE COURT: -- I --

MR. A. SMITH: -- it's about.

THE COURT: I just find there's subject-matter jurisdiction. I think these just relate to what was purchased.

Now, to the contrary --

(Colloquy not on the record.)

THE COURT: -- you know, Compass, if it doesn't perform, you have the absolute right to send the letters of termination.

The question is -- and, normally, another Court would have that jurisdiction. But because all these things are intertwined because you want to do all these things, including modify their rights to what they paid for --

MR. A. SMITH: I didn't want to do that.

THE COURT: If you didn't want to do that, that would be a different story.

MR. A. SMITH: I don't want to do that.

(Colloquy not on the record.)

THE COURT: If you concede -- okay.

(Colloquy not on the record.)

THE COURT: Well, then let me ask you this.

(Colloquy not on the record.)

THE COURT: I asked you before, and you said you didn't want to concede it. Do you concede that you're not going to attempt to modify the rights under the contract for their receipt of the servicing fees to which they paid for?

As I said, for example, their right to default interest may be zero for a number of reasons.

MR. A. SMITH: Right.

THE COURT: One, the contract is interpreted --

MR. A. SMITH: Whatever their rights --

THE COURT: -- to say --

MR. A. SMITH: -- are under the contract are their rights.

THE COURT: That's right.

MR. A. SMITH: I can't modify them just like you --

THE COURT: But --

MR. A. SMITH: -- you couldn't --

THE COURT: But --

MR. A. SMITH: -- modify them.

THE COURT: I'm sorry. Your complaint asked for that.

MR. A. SMITH: Which? Which paragraph, your Honor?

THE COURT: Your complaint says, "Plaintiffs contend that a lender in a loan secured by real property has an absolute right to modify the terms of their note --

MR. A. SMITH: No.

THE COURT: -- irrespective of the rights --

MR. A. SMITH: Notes.

THE COURT: -- of any third-party loan servicer.

MR. A. SMITH: No.

MS. KNOLES: No.

MR. A. SMITH: No, no, no.

THE COURT: Right.

MR. A. SMITH: It's --

THE COURT: Ma'am.

MR. A. SMITH: Which one is this?

THE COURT: Paragraph 3. Understand --

MR. A. SMITH: Paragraph 3?

THE COURT: -- irrespective of any rights of the third-party loan servicer which leads me to believe that you mean that, for example, you say no default interest is payable, so, therefore, there's nothing --

MR. A. SMITH: I --

THE COURT: -- for them to get.

MR. A. SMITH: I can't follow you because I can't know -- I don't know where you are.

THE COURT: Paragraph C.

MR. A. SMITH: C. Okay.

THE COURT: Okay? You contend that a lender in a loan secured by real property has an absolute right to

modify --

MR. A. SMITH: And that --

THE COURT: -- the terms --

MR. A. SMITH: That's the promissory note, and I mentioned that earlier, your Honor, because the loan-servicing agreement is just that, a contract --

THE COURT: Sure.

MR. A. SMITH: -- between us and now Compass. I mean, I don't agree with it, but that's where we are, but underlying that as a note.

And the problem is that note now -- Mr. Davis read you one provision. There are only two or three notes that are like that.

(Colloquy not on the record.)

MR. A. SMITH: Every other note says that the direct lender can waive default interest. The direct lender can waive late fees and charges, and, of course, they can. I mean, anybody in their right mind that lends money is going to say --

THE COURT: Well, but wait.

MR. A. SMITH: -- you know what, if it takes that to get paid --

THE COURT: But --

MR. A. SMITH: -- I'm going to waive it.

THE COURT: Okay.

MR. A. SMITH: And that --

THE COURT: But asked for the --

MR. A. SMITH: That's why I'm saying they don't get to the point where they get to collect --

THE COURT: Sure.

MR. A. SMITH: -- default interest if the lenders say, you know what, we've waiving it.

THE COURT: But --

MR. A. SMITH: We'd rather get paid.

THE COURT: But you don't ask for that. You say they have an absolute right to modify the terms. If the term is in there, they have an absolute right.

What are you asking in this paragraph? What are you asking for in this relief?

MR. A. SMITH: They have an absolute right --

THE COURT: What do you have in mind?

MR. A. SMITH: -- to waive default interest and late fees, and maybe it's inartfully drafted, but I'm not asking to modify anything because I can't.

THE COURT: Well, that's what --

MR. A. SMITH: How could I --

THE COURT: -- it says.

MR. A. SMITH: -- ask to modify something, your Honor?

THE COURT: I'm sorry.

MR. A. SMITH: No.

THE COURT: That's what your complaint says.

MR. A. SMITH: Well, if you read it that way, your Honor, I --

THE COURT: Well, I'm sorry.

MR. A. SMITH: I'm saying --

THE COURT: "Plaintiffs contend that a lender in a loan secured by real property has an absolute right to modify" --

(Colloquy not on the record.)

THE COURT: -- "the terms" --

MR. A. SMITH: No.

THE COURT: -- "of" --

MR. A. SMITH: The note.

THE COURT: -- "the promissory note" --

(Colloquy not on the record.)

THE COURT: -- "and deed of trust to maximize their recovery" --

MR. A. SMITH: Right.

THE COURT: -- "irrespective of the rights of any third-party loan servicer."

MR. A. SMITH: Okay.

THE COURT: "Modify" was the word --

MR. A. SMITH: Let me --

THE COURT: -- you used.

MR. A. SMITH: -- just say clearly I can't change the

loan-servicing agreement. I can't change the promissory note. No Court can.

THE COURT: So --

MR. A. SMITH: All I'm saying is who -- and if you read it that way, I apologize. It's inartfully drafted, perhaps, but what we're trying to do is enforce the terms of all those contracts all based upon postpetition conduct of Compass, period.

THE COURT: But it --

MR. A. SMITH: Period.

THE COURT: Now, that's what you say, but, you know --

MR. A. SMITH: Well, your Honor, I'm --

THE COURT: -- you --

MR. A. SMITH: I'm saying --

THE COURT: The very fact --

MR. A. SMITH: I'm happy --

THE COURT: -- that your loan-servicing agreements again --

MR. A. SMITH: Well --

THE COURT: -- had the fact that this default interest was in --

MR. A. SMITH: -- who --

THE COURT: -- makes --

(Colloquy not on the record.)

THE COURT: -- me suspect.

(Colloquy not on the record.)

THE COURT: That's --

MR. A. SMITH: I --

THE COURT: -- my concern.

MR. A. SMITH: Your Honor, I wouldn't even try -- how could I come before this Court and ask for that? I would never ask for it. It's impossible.

THE COURT: But that's what's in there.

MR. A. SMITH: Well, it's in context. I've explained what it meant. I'm sorry if it reads that way, but I'm not trying to modify anything, and I'll say that --

MR. DAVIS: Well --

MR. A. SMITH: -- in open court.

THE COURT: So all right.

MR. A. SMITH: You can rely --

THE COURT: So let's --

MR. A. SMITH: -- on that.

THE COURT: -- go back. I asked you this again before, and you were a little -- I mean, maybe I misunderstood you.

MR. A. SMITH: Right.

THE COURT: Are you agreed that all you're trying to do is determine the interpretation of how payments are to be made under the various documents and determine whether or not a

particular termination letter was effective? Is that all you're trying to do?

MR. A. SMITH: Well, the way you -- I'm a little concerned with the way you said it, but all I'm trying to do is enforce the agreements as they are based upon postpetition conduct.

I mean, you say are the letters effective. I mean, really, underlying that is do we have a right to terminate Compass for cause under Section 3. That's a postclosing right, so yes.

I mean, are the letters effective or not? I don't want to limit it that much. I just want to say I'm trying to determine that we have a right to terminate Compass.

I'm trying to determine that we have a right to waive default interest and do what's necessary in order for all these people to maximize their recoveries. I'm trying to determine that Compass doesn't get to deduct from the direct-lenders' recovery their default interest.

THE COURT: But --

MR. A. SMITH: In other words, if there's only $100,000 owed, and there's $100,000 in principal, Compass doesn't get to knock $30,000 off of it because it thinks they get default interest ahead of time. Some Court's going to have to decide that.

THE COURT: I agree.

MR. A. SMITH: But that's a contractual dispute.

THE COURT: Well, I think, you know, the problem is if you had narrowed it in the beginning, I think you would have made a better case that there was no subject-matter jurisdiction, but, you know, I can't tell that you're really not trying to do these things which attempt to take away the rights they paid for.

MR. A. SMITH: Well, you --

THE COURT: They are not entitled to keep the servicing contracts forever if they don't abide by the terms.

MR. A. SMITH: Right.

THE COURT: Everybody knows that. Everybody --

MR. A. SMITH: That's --

THE COURT: -- agrees with it.

MR. A. SMITH: That's what I'm after.

THE COURT: Everybody agrees with that.

MR. A. SMITH: That's what I'm after.

THE COURT: But by the same token, you're not entitled to do a vigilante we don't like them, we're out of here, without following the steps.

MR. A. SMITH: Well, that's okay. I agree with that.

THE COURT: So --

MR. A. SMITH: Your Honor, you know, I'm happy to amend the complaint. I never intended to have that resolved. I'm sorry you read it that way.

I intended to seek to enforce the agreements to terminate Compass. I still believe that I have the absolute right to -- that all these people have the absolute right under the state statute to do so.

But if that's something that you think is a surviving Section 3 right, in order to avoid having it all jammed up, I'm willing to waive that. I'm willing to amend the complaint to take away the offending provisions.

But I think it's clear what I'm asking for. I'm asking for the ability to go to another Court to determine postpetition actions of Compass, not surviving Section 3 rights --

THE COURT: Right.

MR. A. SMITH: -- under the terms of the contracts, period.

THE COURT: But your problem is going to be it's going to be slower there than it is here.

MR. A. SMITH: Your Honor, I'll --

(Colloquy not on the record.)

MR. A. SMITH: I --

THE COURT: I mean, I'll enjoin -- I mean, I will -- I find there's subject-matter jurisdiction. I'll enjoin the notices to borrowers that went out with the May 13th letter.

Probably, the best thing is to -- the question is on the letters that were sent out on its face I kind of doubt that

they're sufficient.

But I don't want to be in a situation where you now tomorrow send out letters to borrowers, and we haven't had the chance to -- someone, me, another Court -- hasn't had a chance to adjudicate, A, was that appropriate notice and, B, was cause shown.

MR. A. SMITH: Well --

THE COURT: That's the problem I want to avoid. I don't want to be back here on another motion --

MR. A. SMITH: I understand.

THE COURT: -- because you're going out tomorrow saying, okay, the first letter was good. The second letter was good.

MR. A. SMITH: Well, I think the starting point is where do we go from there. I mean, you said you would recommend withdrawal of the reference. Is there going to be a future hearing on that or how do you propose proceeding --

(Colloquy not on the record.)

THE COURT: If you want --

MR. A. SMITH: -- on that avenue?

THE COURT: -- to have argument on whether or not I should recommend withdrawal of the reference, I'd be glad to do that. I mean, the point is as we know a Court retains jurisdiction until the reference is actually withdrawn. And so in the meantime, you would have a forum to hear these issues.

MR. A. SMITH: Well, I'd like to hear the withdrawal of the reference issue because I -- and I'm not conceding that this Court -- I mean, I'm not conceding that this Court has that decision. I'm just not sure --

THE COURT: No. I think --

MR. A. SMITH: -- whether it's this court or the --

THE COURT: -- it's at the district court.

MR. A. SMITH: Right.

THE COURT: My point is I would recommend withdrawal of the reference, and I guess you're right. The district court would be the one to determine --

MR. A. SMITH: I mean --

THE COURT: -- whether or not --

MR. A. SMITH: -- my request --

THE COURT: -- the (indiscernible) --

MR. A. SMITH: -- would --

THE COURT: -- gets withdrawn.

MR. A. SMITH: What I would want to do is go to the district court and ask for a withdrawal of the reference. That would be how I would want to proceed.

THE COURT: All right. I have no -- and I would be glad to recommend withdrawal of the reference.

MR. A. SMITH: That's how I will proceed.

THE COURT: Okay. Because you're right. I can't withdrawal the reference. That Court has to do it, but there

has to be a forum in the meantime, and the point is by having subject-matter jurisdiction we now have solved our jurisdictional issues.

MR. A. SMITH: Okay.

THE COURT: Everybody's got a forum.

MR. A. SMITH: Right.

THE COURT: And as far as how we proceed now, the order is that the --

(Colloquy not on the record.)

THE COURT: -- May 18th letter sent to the borrowers is to be withdrawn, and I think you've already sent that letter, have you not --

MR. A. SMITH: May 18th.

THE COURT: -- or not?

MR. A. SMITH: No. May 18th.

THE COURT: Have you already sent the letter to the borrowers saying that --

(Colloquy not on the record.)

THE COURT: -- it's to be ignored?

MR. A. SMITH: No.

THE COURT: Was that not part of the prior order?

MR. A. SMITH: No.

THE COURT: I apologize.

MR. A. SMITH: You didn't --

THE COURT: All right.

MR. A. SMITH: -- order that.

THE COURT: Okay. That should be ordered. I think everybody should agree. I mean, that's agreed. That letter must be sent to all those borrowers indicating that that letter was void and of no effect, and that Compass is the servicer until further order the Court.

And then the next thing is on the effect of the May 18th letters terminating. How do you want to get a quick hearing? I would enjoin their termination until we get --

MR. A. SMITH: You're enjoining me from sending out any more letters.

THE COURT: No.

MR. A. SMITH: You're not.

THE COURT: No.

MR. DAVIS: Your --

MR. A. SMITH: Okay.

MR. DAVIS: Your Honor --

MR. A. SMITH: So you --

MR. DAVIS: -- I'd like to be heard --

MR. A. SMITH: So you can --

MR. DAVIS: -- on this.

MR. A. SMITH: So okay.

THE COURT: No. You can send out a new letter today --

MR. A. SMITH: Okay.

THE COURT: -- you know, if you've got grounds. You --

MR. A. SMITH: Right.

THE COURT: You risk if you -- by doing that, you know, you can make a determination if you think the 30 days does or doesn't apply.

MR. A. SMITH: Well, obviously --

THE COURT: You risk if a Court later finds if you had to do it by 30 days that it won't --

MR. A. SMITH: That's fine.

THE COURT: -- be effective --

MR. A. SMITH: I don't care --

THE COURT: -- for 30 days.

MR. A. SMITH: -- about that. I --

THE COURT: Okay.

MR. A. SMITH: I mean, it's clear as a bell. There's no 30 days required under that, so it doesn't say it. I --

THE COURT: Yeah. What --

MR. A. SMITH: I can't write it in there.

THE COURT: What's the meaning of that paragraph?

MR. A. SMITH: Which?

THE COURT: That's the oddity --

MR. A. SMITH: You mean --

THE COURT: -- about it.

MR. A. SMITH: -- Section 8?

THE COURT: The termination paragraph.

MR. A. SMITH: It's not termination under Section 8. I'm talking about Section 3.

THE COURT: I understand, but it's an issue. You may be --

MR. A. SMITH: Well --

THE COURT: -- absolutely right.

MR. A. SMITH: -- here's the difference. I mean, under Section 3 if somebody terminates, but that doesn't change the servicer. That just means that person's gone. The only way to change the servicer is under Section 3, so you have to follow Section 3 which means you have to have 51 percent, and you have to terminate for cause.

THE COURT: Yeah. And there's the other argument that, well, what does that section -- how do they work together or do they not work together. Maybe it's an evidentiary. It's an issue. It --

MR. A. SMITH: I suppose.

THE COURT: Well, if you take the position it's effective immediately, then you risk then the Court determining that, no, it had to be 30 days.

MR. A. SMITH: Just so there's no surprises, I'm going to take that risk.

THE COURT: Okay.

MR. A. SMITH: Okay?

THE COURT: All right.

MR. A. SMITH: And I also --

THE COURT: Now --

MR. A. SMITH: I'm going to ask the district court for an expedited hearing if they can on that issue, and I realize in the interim that you have jurisdiction. And if we need some sort of relief, other than what you've already ordered today, we come back --

THE COURT: Okay.

MR. A. SMITH: -- here.

THE COURT: And how do we --

(Colloquy not on the record.)

THE COURT: Again, I would also enjoin any notices to borrowers based upon that purported letter until -- probably, the best way to do it is to have Compass have the right to come in on ten-days' notice and say that notice wasn't effective if it believes that's the case.

MR. DAVIS: Your Honor --

MR. A. SMITH: Yeah.

MR. DAVIS: -- I'd like to be heard --

MR. A. SMITH: (Indiscernible).

MR. DAVIS: -- on these issues because we're going far down a path that I think is the wrong path, so may I be heard for a few moments?

THE COURT: Well, you're not going to convince me --

MR. DAVIS: No, no.

THE COURT: -- which way to go. Okay.

I'm sorry, Mr. Smith. Are you --

MR. DAVIS: Do you have anything to add?

MS. JARVIS: Your Honor --

THE COURT: Yes, Ms. Jarvis.

MS. JARVIS: -- could I just ask for a clarification? Mr. Smith had said that they were going to I guess withdraw their claims based on, basically, the invalidity of the contracts under Nevada law or at least that's what I heard him say with respect --

THE COURT: Um-h'm.

MS. JARVIS: -- to these claims. Does that mean he will also withdraw those claims from the appeals as well?

THE COURT: I don't think that's before us, and I don't know. You can talk to him later about that.

MR. DAVIS: Your Honor, I'm concerned about the path we're going down for a few reasons. There has to be -- the only way around this is to have a quick determination by this Court, the district court, or a state court, a Court that has competent jurisdiction over whether there is or isn't cause to terminate Compass.

THE COURT: I agree.

MR. DAVIS: Okay?

THE COURT: And that's why I'm --

MR. DAVIS: That's what --

THE COURT: I'm --

MR. DAVIS: -- we have to get to, and that's what we should be aiming for. Mr. Smith -- we can't -- we have already had sufficient real irreparable damage to the rights that we have purchased based upon the actions that have been taken to date. It's happened. Okay?

Now, how do we avoid that? We certainly don't avoid future damage until a Court finds if there's cause or not by allowing Mr. Smith to go and send another letter based upon his interpretation of Section 3 which is clearly at odds with our interpretation of Section 8. Your Honor has said --

THE COURT: No. Send a letter to you.

MR. DAVIS: You --

THE COURT: No. He cannot send it to the borrower.

MR. DAVIS: The problem is if the only matter that were before the district court -- first of all, the district court does not have subject-matter jurisdiction. That's the fundamental problem. The entity -- here's the reason. The entity that -- well, in terms of complete diversity jurisdiction unless they're just going to withdraw --

THE COURT: Right.

MR. DAVIS: -- the reference --

THE COURT: That's what I find --

MR. DAVIS: -- based upon your --

THE COURT: -- by my finding subject-matter jurisdiction.

MR. DAVIS: Okay.

THE COURT: The district court has jurisdiction --

MR. DAVIS: Okay.

THE COURT: -- under --

MR. DAVIS: You're --

THE COURT: -- 1334.

MR. DAVIS: Okay. On that basis, you're right. There wouldn't otherwise be because there's not complete diversity.

THE COURT: Arguably, that --

MR. DAVIS: Oh, okay. But --

THE COURT: That's what --

MR. DAVIS: But --

THE COURT: -- you're --

MR. DAVIS: But --

THE COURT: -- saying.

MR. DAVIS: But based upon your Honor's finding that you have subject-matter jurisdiction under 1334, clearly, the district court does as well.

THE COURT: Okay.

MR. DAVIS: But the aspect is is the district court then going to determine whether the aspects that we have discussed today that are the relief that's sought in the

complaint runs afoul of your order?

THE COURT: It would because -- I mean, I understand what you're saying. On one hand, it's like because the same Judge, but that's not really a theory. It's the same court.

And because the bankruptcy courts sit by a referral from district courts, it would be the district court interpreting the order of the bankruptcy court, and it may decide that it won't accept the withdrawal of the reference as to those particular issue by virtue of that various fact.

Keep in mind we have some supplemental jurisdiction issues here, too. The supplemental jurisdiction is the interpretation of the contract, and that may or may not -- of, for example, how the interest is applied, which may or may not involve core/noncore which would mean that I'd have to make a finding and recommendations as opposed to just hearing it.

So that's why I believe the appropriate thing to do is that I find that there's subject-matter jurisdiction, recommend the withdrawal of the reference. In the meantime, as I said, we would enjoin any letters going to any borrowers based upon any purported termination until a Court has had the -- either this Court if the reference hasn't been withdrawn or another Court determines it's appropriate.

And I think the way to accomplish that so that they're not hung up is that you would have to -- if they send the notice of termination, you'd have to within ten days file a request for a

hearing.

And I recognize we're sort of using those Section 3 procedures which weren't accomplished. I'm trying to establish a remedy to get us to what is cause and how was cause established in a fast and efficient manner.

I fully recognize that that wasn't -- you know, that's separate and apart. I'm just trying to figure out --

MR. DAVIS: I'd like to --

THE COURT: -- a method by which we accomplish the Court's jurisdiction. That's what I'm trying to do.

MR. DAVIS: Perhaps, one way to do it that might be less of running back and forth and ten-days' notice and running to which court and not knowing which court is to simply say that there will be a preliminary injunction which prevents contact to borrowers, okay --

THE COURT: Save that thought --

MR. DAVIS: -- letters of termination --

THE COURT: -- for a moment. Okay.

MR. DAVIS: -- and --

THE COURT: Go ahead.

MR. DAVIS: I'm sorry. You say save it?

THE COURT: Yeah. I need to ask you a question about that, but go ahead.

MR. DAVIS: And do you want to ask me the question now?

THE COURT: Yeah. Well, on the contact with borrowers, what provision in the contract precludes a lender from speaking to a borrower?

Let's assume it's not a -- you know, assume it's not defamatory, just a -- what provision in the contract precludes that? Is there such a provision?

MR. DAVIS: I'm not aware of a provision, and maybe we can deal with that issue in terms of --

THE COURT: I mean, I would certainly enjoin a connect with a borrower that says don't pay them, pay me.

MR. DAVIS: Well, the --

THE COURT: But you mean more than that, don't you?

MR. DAVIS: The problem is how do you police it. How do you police when someone calls up a borrower and says, you know, don't listen to Compass, anymore? Although they're technically the servicer, there's cause to terminate them.

THE COURT: Well, when they don't pay --

MR. DAVIS: You should deal with us.

THE COURT: -- then you, you know, send them a notice of breach.

MR. DAVIS: Here's my suggestion, your Honor, because I think, ultimately, what we're talking about is there needs to be a hearing on whether there should be a long-term preliminary injunction pending an ultimate resolution or ultimate adjudication of whether there is or isn't cause, whether this

Court here -- you know, the normal standards, irreparable harm, likelihood of success on the merits, et cetera, where a Court determines they either have or haven't shown sufficiently cause to terminate on every loan, and we either will or won't suffer irreparable harm.

But what I'm afraid of is we leave this courtroom today, and you basically enjoin them from taking further action with respect to the old notices, but they can send another notice tomorrow, and then we're running to court, and then they can contact a borrower. The damage that's already happened to all the assets that we purchased is going to continue.

I would recommend that there be a -- call it -- preliminary injunction that -- a few things have to be dealt with. First, withdrawal of the reference, will the Court accept it or not?

Second, then there has to be a preliminary hearing, a hearing on a preliminary injunction which will go through the determination of the merits. That will either happen in this court if the district doesn't accept jurisdiction or it will happen in the district court.

But until we get to that and until some Court sits down on a loan-by-loan basis -- or as Mr. Smith says, maybe in the aggregate, we'll fight about that later.

But until a Court hears the merits of whether there isn't, you know, irreparable harm, likelihood of success on the merits

in terms of their ability to show cause, et cetera, et cetera, nothing should change.

THE COURT: Well, but the point is that their rights to terminate are a continuing right. I mean, and --

MR. DAVIS: But they've already exercised the right or at least attempted to exercise right, and they have done so in a manner that was reckless. It was reckless of this Court's order.

THE COURT: Sure. And there may be damages, and there may be --

MR. DAVIS: And there may be damages.

THE COURT: -- an injunction on that.

MR. DAVIS: There will be damages, and they've already teed up the issue. They believe there's cause. We don't. A Court needs to determine it.

I would, frankly, if your Honor wanted --

THE COURT: You're going to rely --

MR. DAVIS: -- to allow --

THE COURT: Well, let me ask this. Are you relying -- if you --

MR. DAVIS: I don't want Mr. -- if Mr. Smith took the position that he would abide by the 30-day notice provision so that we would have the opportunity to go to a court of competent jurisdiction for a preliminary injunction, that would be one thing. He's not saying that.

He's saying I have right with no notice, again, more recklessness, no notice to terminate this, and then I'm going to go contact all the borrowers. Okay? That's what we have to avoid.

He's already damaged our assets enough. It can't happen again. I would prefer just to have you -- again, your order say preliminary injunction until the issue of withdrawal of the reference is dealt with, and Compass is heard on a motion for a preliminary injunction whether before this Court or the district court on whether they've satisfied the standards to get through the ultimate determination on the merits as to whether or not there's cause to terminate Compass because that's ultimately where we have to get to.

I don't mind getting to that hearing quickly. That's fine. I'm not trying to delay this at all. In fact, I'd be prepared to schedule an evidentiary hearing before your Honor on 30-days' notice to get to the actual issue of cause and not deal with withdrawal of the reference and all the other issues. Let's do that. Let's get --

THE COURT: Okay.

MR. DAVIS: Let's take discovery over a very short period of time loan by loan, determine if -- and then we'll have a hearing over whether there's cause, and we can do it in 30 days --

THE COURT: Okay.

MR. DAVIS: -- before your Honor.

THE COURT: Mr. Smith, any thoughts as to that procedure?

MR. A. SMITH: Yeah. I --

THE COURT: Ms. Knoles, I don't --

MR. A. SMITH: I --

THE COURT: -- really need to --

MR. A. SMITH: I --

MS. KNOLES: I have a real --

THE COURT: Ms. Knoles, please.

MS. KNOLES: Your Honor, I'm sorry, but I have a --

THE COURT: I'm sorry, Ms. Knoles.

MS. KNOLES: -- basic question. I -- there is no power of attorney here. Are you telling me by your order that -- are you signing a power of attorney for me --

THE COURT: I --

MS. KNOLES: -- to have --

THE COURT: That's a separate --

MS. KNOLES: -- these people act --

THE COURT: -- issue.

MS. KNOLES: Well, someone has to decide it. There's no powers of attorney --

THE COURT: Well, but --

MS. KNOLES: -- that --

THE COURT: -- the contract says and the

loan-servicing agreement says that they don't have to sign one.

MS. KNOLES: That doesn't --

THE COURT: So that's what the --

MS. KNOLES: -- say that in the --

THE COURT: Ms. Knoles, please.

MS. KNOLES: I -- I'm sorry. I -- I have a right to speak, your Honor. There is no power --

THE COURT: Ms. Knoles --

MS. KNOLES: There is --

THE COURT: -- that's not the --

MS. KNOLES: -- no power of attorney. They don't have a power of attorney to act for me.

THE COURT: Then send --

MS. KNOLES: It hasn't even --

THE COURT: -- a letter of termination.

MS. KNOLES: We have. We'll do it again.

THE COURT: No. Do it --

MS. KNOLES: But in the meantime, well, who settles my loans? Who acts on my behalf? Who calls the borrowers? Who does all of this work when there's no power of attorney on the record? Are you signing it?

THE COURT: But you didn't have a power of attorney before. What did you --

MS. KNOLES: I --

THE COURT: -- do before?

MS. KNOLES: I -- I certainly did. It's now expired, so are you telling me I have to sign another one?

THE COURT: No.

MS. KNOLES: Are you saying --

THE COURT: I'm not telling you, you have to sign it.

MS. KNOLES: Then who is going to sign one? Are you signing one?

THE COURT: Ms. Knoles, please.

MS. KNOLES: Are you signing one for me, Judge?

THE COURT: No.

MS. KNOLES: Well, then what --

THE COURT: And that's not before me today, Ms. Knoles. Please.

MS. KNOLES: Somebody has to have a power of attorney to act here. They don't have one. I --

THE COURT: That's not --

MS. KNOLES: It is.

THE COURT: -- the issue.

MS. KNOLES: No one can act for these lenders. There's a whole bunch of us out here. Who is going to be able to be able to --

THE COURT: Ms. Knoles --

MS. KNOLES: -- call the borrowers?

THE COURT: -- I'm going to take a recess.

MS. KNOLES: Oh, take --

THE COURT: Okay?

MS. KNOLES: -- a recess.

THE COURT: And then we're going to come back, and we're going to finish up with just the discussion that we have about jurisdictional issues. What to do with the power-of-attorney issue is not before me today.

MS. KNOLES: It's --

THE COURT: Okay?

MS. KNOLES: It's --

THE COURT: Thank you very much.

MS. KNOLES: But we have to have it.

THE CLERK: All rise.

(Recess at 02:32:35 p.m.)

(Court reconvened at 02:44:47 p.m.)

THE COURT: Be seated.

(Colloquy not on the record.)

THE COURT: Okay. I need to take a couple of matters first that are on the other calendar, so --

THE CLERK: Do you want to call them?

THE COURT: Yeah. Go ahead.

(Thereupon, the case was trailed at 02:45:02 p.m.)

(Court reconvened at 03:07:16 p.m.)

THE COURT: Okay. Now, Mr. Davis and Mr. Smith, have you come up --

MR. A. SMITH: I was --

THE COURT: -- with any procedural --

MR. A. SMITH: I have a suggestion.

THE COURT: -- ideas? Yes.

MR. A. SMITH: I do. I will seek withdrawal from the reference, and I will seek it on an expedited basis, and, probably it'd be helpful if counsel would agree or support that.

But in the interim, in order to satisfy your concerns, I will agree that there won't be any letters sent to anybody, and I won't send any letters to Compass. I won't send any letters to the borrowers.

So I just from -- from our point, I maintain a status quo until the matter can be heard by the district court and then request from Compass similar to what you ordered before that they don't take -- they can take the servicing fees, but they don't take any late fees, default interest, or anything else. That those simply be held until the matter can be addressed.

And one more thing, I'm not sure if this is true. But if there are any foreclosure sales scheduled to take place -- and I don't know if there are or are not -- we just request that those be continued until after the matter can be heard in the district court.

THE COURT: Okay.

MR. A. SMITH: Okay?

THE COURT: Now, that's fine, but, you know, I'm

hearing people saying nobody's doing anything to collect on our debt, but, you know, you're saying don't do a foreclosure procedure, so --

MR. A. SMITH: Well, there's a --

THE COURT: -- as long as you understand --

MR. A. SMITH: There is a reason --

THE COURT: -- that that tension --

MR. A. SMITH: There's a --

THE COURT: -- there --

MR. A. SMITH: Yeah. There's a real reason for that, your Honor. I mean, as a lot of these loans, the problems are not solved by a foreclosure. They're actually aggravated.

For example, a lot of these borrowers had promises of additional money or additional things from USA Mortgage, and there's already a couple of lawsuits against the lenders, and we're concerned that without exploring a resolution --

THE COURT: Sure.

MR. A. SMITH: -- of these things and just foreclosing there may be a lot more lawsuits that come against the lenders, and we may lose the ability to work out a loan --

THE COURT: Sure.

MR. A. SMITH: -- because, really --

THE COURT: That's always a dilemma about foreclosures. The good news is you foreclose. The bad news is you foreclose.

MR. A. SMITH: Yeah.

THE COURT: So --

MR. A. SMITH: Then they own the property.

THE COURT: Yeah.

MR. A. SMITH: And then there's things you have to do.

THE COURT: I understand. I'm just pointing out there's a lot of people here, you know, apparently upset because Compass isn't starting foreclosures.

MR. A. SMITH: Right.

THE COURT: But you take the position, and it's certainly a logical position, that maybe a foreclosure's not the right position, so people need to understand that tension between those --

MR. A. SMITH: Right. And --

THE COURT: -- two concepts.

MR. A. SMITH: And I'm not saying don't do it. I'm just saying put it on hold --

THE COURT: Sure.

MR. A. SMITH: -- until we have it done, and I think it can be resolved fairly quickly.

THE COURT: And I assume that that won't constitute a cause, though.

MR. A. SMITH: That won't constitute a cause.

THE COURT: Okay.

MR. A. SMITH: Okay. That's fine.

THE COURT: Now, and, again, I just wanted to make sure that there was a form available because, you know, as people said, you know, the individuals have the rights if there's cause to terminate, and I didn't want --

MR. A. SMITH: Right.

THE COURT: -- to foreclose anybody's rights in the meantime by there not being a form available.

MR. A. SMITH: Right.

THE COURT: And so this Court would -- until the reference is withdrawn, there is jurisdiction here.

MR. A. SMITH: Right.

THE COURT: So if the parties feel that you need in a particular case to determine whether that's appropriate --

MR. A. SMITH: Right.

THE COURT: -- that's fine.

MR. A. SMITH: I understand. Okay. Thank you.

MR. DAVIS: Your Honor, I'm not sure what we're talking about in terms of until the matter can be heard by the district court. Are we talking about --

THE COURT: Assuming that --

MR. DAVIS: -- the merits --

THE COURT: -- you --

MR. DAVIS: -- of whether or not there is cause or

not to terminate Compass? Is that what we're --

THE COURT: Is that what you were --

MR. DAVIS: -- talking about?

THE COURT: That's what you were -- I don't want to put words in your mouth.

MR. A. SMITH: No. No. I was just saying that as you suggested the proper procedure to bring the withdrawal of the reference would be in the district court, so I'll ask for an expedited hearing to consider that matter based upon what your comments --

THE COURT: But the question is what happens in the interim, and I don't want to put words in your mouth. As I understand it, what you're saying is you would agree that pending a determination at least at this stage you would acknowledge, one, that the borrowers would -- no new letters of termination --

MR. A. SMITH: Right.

THE COURT: -- would go to borrowers. Query --

MR. A. SMITH: Or --

THE COURT: -- would new letters --

MR. A. SMITH: Or Compass.

THE COURT: -- go to them?

MR. A. SMITH: No. Neither.

THE COURT: Okay.

MR. A. SMITH: Both. No new letters --

THE COURT: Okay.

MR. A. SMITH: -- to anybody.

THE COURT: Okay. Or to the extent that -- since to the extent that you don't represent certain people, should we say that they -- the letters are sent, but they're ineffective until there's a determination as to cause --

MR. A. SMITH: I --

MR. DAVIS: Well --

THE COURT: -- because --

MR. A. SMITH: I can only -- I mean, I can't -- I don't know. If somebody else sends a letter, that's beyond my ability to stop. I can't help it. I --

THE COURT: Exactly.

MR. A. SMITH: I don't know if it will happen or not. It hasn't happened. I doubt it will, but it's beyond my ability to control. I'm just saying the Lenders Protection Group is not --

THE COURT: Okay.

MR. A. SMITH: You know, obviously, we've played the active role here, so we're not going to send letters --

THE COURT: Okay.

MR. A. SMITH: -- to borrowers or to Compass, so --

MR. DAVIS: Your Honor, my suggestion is if what we really want is to -- and, ultimately, what I think needs to happen is we have to get to the bottom-line question of is

there or is there not cause. My suggestion is that we do a few things.

First, your Honor say -- now, Mr. Smith said he'll file a motion to withdraw the reference. I'm not in a position today without speaking to my client to say what our position with that will be. Until the district court rules on whether it will accept the withdrawal, obviously, the matter remains before your Honor.

My suggestion is -- we've accomplished a lot today. Let's have your order say that -- a couple of things. In terms of getting to the bottom line of is there cause, I think you should order so that we can actually have meaningful discovery and meaningful processing get to the issues, the real issues, which is what -- we're dancing jurisdiction and then withdrawal, and let's get to the issue. The issue is is there cause or not.

There should be a particularized statement sent to us -- it doesn't have to be a termination letter -- which says here is the cause that exists with respect to each loan, and maybe it's --

THE COURT: Oh, query, and so --

MR. DAVIS: Maybe --

THE COURT: I didn't mean to interrupt.

MR. DAVIS: But --

THE COURT: Sorry.

MR. DAVIS: But --

THE COURT: Go ahead.

MR. DAVIS: In the interest while you still have jurisdiction, in order to get this process moving -- and, frankly, we're going to need this for discovery and to get to an evidentiary hearing -- there should be a particularized statement as to what is being alleged as cause.

It can be something that, you know, to the extent there are date -- you know, things have happened subsequent to the date in which its furnished, and that it wants to be supplemented based upon it, that's fine, but that will help expedite the process --

THE COURT: Sure.

MR. DAVIS: -- whether your Honor deals with this or it's dealt with by another Court.

THE COURT: Well, the thing is it's Mr. Smith's choice, in essence. If he wants to -- you know, they're the parties that are affected the most by not having termination because it's not terminated until its terminated.

So if he wants to wait until the district court makes a determination, and the district court -- and if it accepts the withdrawal, it has a chance to do a hearing, that seems to me that's up to him.

If on the converse he thinks he wants it done quicker, rather than sooner, there's still a forum here in the meantime.

MR. A. SMITH: Right.

THE COURT: But it's his choice because he's the one being affected. You're fine. As long as you're not terminated, you can do whatever -- you know, you can continue to do whatever.

MR. DAVIS: Well, there were conditions about we can't foreclose. We can't do this. I mean, we are the servicer, and we will do what we think in our duty, our fiduciary duty, we think it makes sense --

THE COURT: Well --

MR. DAVIS: -- in terms of pursuing foreclosure proceedings, in terms of negotiating with borrowers. We can't have our hands tied behind our back --

MR. A. SMITH: Well --

MR. DAVIS: -- based upon what we think are -- if there's been no demonstration, of course --

THE COURT: So then maybe --

MR. DAVIS: -- just to say --

THE COURT: -- the answer is --

MR. DAVIS: -- that there is cause doesn't mean that there is.

MR. A. SMITH: As an interim --

THE COURT: Just a very interim order.

MR. A. SMITH: As an interim --

THE COURT: Why don't we make it for 60 days --

MR. A. SMITH: Okay.

THE COURT: -- so that they're not --

MR. A. SMITH: And then --

THE COURT: Then in 60 days we have a status and see where we go --

MR. A. SMITH: And then --

THE COURT: -- from there.

MR. A. SMITH: -- if nothing's done, then we come back here --

THE COURT: Sure.

MR. A. SMITH: -- in 60 days.

THE COURT: Exactly.

MR. A. SMITH: Okay. That's fair.

MR. DAVIS: Well, I --

THE COURT: That gives you something to do, you know, in 60 days. Now, so that we're clear on the other issue about the discovery, I take it what you're saying is that that notice that was sent May 18th you're saying is ineffective for all purposes or are you --

MR. A. SMITH: Well --

THE COURT: And you're going to send a new letter?

MR. A. SMITH: No.

THE COURT: You're saying that letter's still --

MR. A. SMITH: I'm --

THE COURT: It is what it is.

MR. A. SMITH: I'm --

THE COURT: And it --

MR. A. SMITH: It is what it is, and you've already said your opinion about it.

THE COURT: Okay.

MR. A. SMITH: I'm just saying --

THE COURT: So the point is he would have the right to do discovery -- both of you would -- concerning the effect of this order in the interim pending whomever has a hearing, right, because discovery proceeds.

MR. A. SMITH: That's an interesting question because the only way to do discovery I guess is pursuant --

THE COURT: Well, it --

MR. A. SMITH: -- to the adversary proceeding --

THE COURT: Oh, and --

MR. A. SMITH: -- or pursuant to the complaint, and we haven't had the --

THE COURT: Well, we'll turn this into a contested proceedings, and the Court has the right at any stage to make a contested proceeding into an adversary, so I will rule that the rules apply.

Technically, I guess you both should do a discovery plan because you don't want to be in the stage where, all right --

MR. A. SMITH: That's fine.

THE COURT: -- let's assume the district court says,

fine, I'll withdraw the reference, and we're going to have a hearing next week. You both need to have discovery to understand --

MR. A. SMITH: Okay.

MR. DAVIS: Well --

THE COURT: -- where you are.

MR. A. SMITH: Yeah. I --

MR. DAVIS: And --

MR. A. SMITH: I think that that makes some sense.

THE COURT: I don't want to hold --

MR. A. SMITH: I --

THE COURT: -- anybody up.

MR. A. SMITH: I'm hoping --

MR. DAVIS: Well --

MR. A. SMITH: -- that the matter can be heard within 30 days before the district court, but I don't know.

MR. DAVIS: What matter are we -- this continues to beg the question. What matter are we talking about? Are we talking about a --

THE COURT: The determinations.

MR. DAVIS: We're talking about a determination following an evidentiary hearing on whether or not there is or isn't cause because that can never be heard by the district court in 30 days.

MR. A. SMITH: No, no, no, no. We're talking about

withdrawal of the reference.

THE COURT: Oh, okay. You're talking withdrawal of the reference.

MR. A. SMITH: That's it. Obviously, we're not going to have that decision --

THE COURT: Okay.

MR. A. SMITH: -- in 30 days.

MR. DAVIS: All right.

MR. A. SMITH: Right.

THE COURT: But in the meantime, is there any objection to discovery commencing such that, you know, you can assume, thereafter, as the Court decides --

MR. A. SMITH: I --

THE COURT: -- have a hearing on it?

MR. A. SMITH: I don't have a problem with that as long as we can reasonably cooperate with each other --

THE COURT: Yeah.

MR. A. SMITH: -- with the dates and that sort of thing.

THE COURT: Yeah. Yeah.

MR. A. SMITH: I don't think that hurts anybody. I mean, I think it's good for everybody.

MR. DAVIS: Your Honor, things have been moving around a lot, and I want to just make sure that I am crystal clear on what --

THE COURT: I agree.

MR. DAVIS: -- we're agreeing to --

THE COURT: I agree.

MR. DAVIS: -- because it's been moving around like a pendulum. What we're saying I believe is that your Honor's order will provide that Compass remains the servicer.

I would suggest we do -- you already have an order that says this or I'm not sure if your Honor has signed it, yet, but I think we've submitted an order to your Honor.

THE COURT: It never got to me. I never saw one --

MR. A. SMITH: There --

THE COURT: -- I don't believe.

MR. A. SMITH: There was one that we --

THE COURT: Was there?

MR. A. SMITH: You signed --

THE COURT: Did I --

MR. A. SMITH: I didn't --

THE COURT: -- sign it?

MR. A. SMITH: I didn't see you sign it, your Honor, but we signed off on it.

THE COURT: When was it submitted?

MR. A. SMITH: Mr. Davis prepared it. It has been --

THE COURT: Oh, you're right.

MR. A. SMITH: -- a couple of weeks.

THE COURT: I did sign this today or so ago I think.

MR. DAVIS: Okay.

THE COURT: I do --

MR. DAVIS: I mean, that --

THE COURT: -- about 100 of these a day, so --

MR. DAVIS: That order provides that Compass remains the servicer until further order of the Court. This matter remains before you and until it's withdrawn.

My suggestion is -- and we'll take a look at that order to see maybe if it needs to be amended in any respect, but that that order continue, and that we are on behalf of Compass willing to proceed as expeditiously as possible to get to the issue of whether there is or isn't cause. That's not the issue.

We'd, frankly, love to tee it up before your Honor. If the district court takes the withdrawal, we will deal with the issues there. That's fine as well.

But what has to be in place is there has to be a maintenance of the status quo until this Court or if the withdrawal is referenced the district court orders otherwise, period, and we can proceed.

Mr. Smith has my commitment we'll proceed as expeditiously as possible with discovery and getting to an evidentiary hearing. And other than that, I'm not sure what else we're talking about.

MR. A. SMITH: Well, I --

THE COURT: Sure.

MR. A. SMITH: I think the order is -- I mean, I don't like it, but it is what you ordered. I think the only additions that should be in there is that no actual foreclosure sale should take place until either the status conference or the matter's heard before the district court on the withdrawal of the reference, and there's one other thing.

THE COURT: Now, is there any objection --

MR. A. SMITH: Oh --

THE COURT: I'm sorry.

MR. A. SMITH: -- no. And --

THE COURT: Go ahead.

MR. A. SMITH: And just put in there that there is going to be a -- I mean, we can pick a date that there will be --

THE COURT: Okay.

MR. A. SMITH: -- a status conference unless the withdrawal of the reference has occurred prior to that time.

THE COURT: Okay. All right. Kind of let me summarize things and add things as we go because I apologize.

MR. A. SMITH: Okay.

THE COURT: It's my fault as much as anything that we've been drifting around. It's hard and trying to like do these and also create remedies because there's two separate issues.

The first issue -- and let me go back. I realize I've said this, but let me just all kind of put it in one place.

MR. A. SMITH: Okay.

THE COURT: And that is that I -- let me deal with the orders first and then some of the rationale, and, again, let me articulate that in one place.

MR. A. SMITH: Do you want us to stand here or sit or --

THE COURT: Whichever you prefer, whichever's easier for you.

Is that there is jurisdiction under 1334 at least, if nothing else, under related-to or arising-under because many of these issues implicate the Court's interpretation of the order.

And by Court, I mean a bankruptcy court, not necessarily this judge or the bankruptcy court as qua bankruptcy court as opposed to the district court exercising powers under 1334 which are referred in the bankruptcy court.

The particular clauses that are implicated are the clauses which deal with the free and clear of all claims. That would certainly involve issues concerning modification, also enjoined from pursuing interests against the property, and the interest includes those by direct lenders.

Other things that are implicated are modifying the obligations. Now, through the colloquy that's happened.

It appears as if some of the things that the direct

lenders -- that Lenders Protection Group sought to do may not proceed. But since this whole area is related together, and there's supplemental jurisdiction, I think that it would be inappropriate to take some things and not other things.

I also think it's appropriate and I would not stand in the way of withdrawal of the reference because some matters do involve areas which are not strictly subject-matter jurisdiction. It would be supplemental jurisdiction.

Now, in devising -- as we know under 1334, a case remains with the Court until such time as the reference is withdrawn. That includes discovery.

The reason we're talking about some of these interim remedies is for the very reason of what do we do in the interim with some of these real issues that are facing the parties, and that's why we're discussing those.

And just to make it clear, it's not that I'm suggesting that the termination is somehow different. It's just what happens in the interim.

Termination, there's two parts to termination. One is what's happened before, and then there's the continuing rights that lenders have to terminate along the way.

The parties have stipulated that to prevent this target from moving any farther than it is, that, in essence, there will be a 60 day standstill if you will.

And let me go recite what my understanding of the

stipulation is -- and if I'm wrong, then clarify -- which would mean that during the 60-day period or such time earlier if the district court withdraws the reference and orders to the contrary, that no terminations would be sent to Compass.

And borrowers would not be contacted with any statements that no payments should be made to them, that no payments should be made to Compass. Let me go back to that in a moment after I go through the other issue.

Compass would agree not to foreclose on any property during this period of time. Now, is that the parties' understanding of the stipulated part of the order, and I have a couple of issues I want to add on.

MR. DAVIS: Your Honor, there are several aspects of that that just don't work --

THE COURT: Okay.

MR. DAVIS: -- for us. Okay? I would agree that that's consistent with kind of the colloquy that's gone on for the last five or ten minutes, but there are aspects of that that just don't work.

Your Honor has found that the actions that have been taken or at least you have jurisdiction to determine that the actions that have been taken it's our position have violated your orders. Okay? Nothing has been shown, other than an allegation of cause, and I think I would like to --

THE COURT: Okay. I want you --

MR. DAVIS: -- confer --

THE COURT: -- to tell me what the problem is and not why first.

MR. DAVIS: A number of problems. The first thing, the status quo should be maintained until this Court or if the district court withdraws the reference and then orders, otherwise --

THE COURT: So why --

MR. DAVIS: -- period.

THE COURT: -- is what I have said --

MR. DAVIS: Well, what you said --

THE COURT: -- not maintaining the status quo?

MR. DAVIS: -- is you said 60 days. So on the 61st day, we could get a notice under Section 3, and we could be running to court with no notice trying to --

THE COURT: We will have a hearing --

MR. DAVIS: -- get an injunction.

THE COURT: -- on the 60th day, and then I will either extend it or not.

MR. A. SMITH: That --

THE COURT: I --

MR. A. SMITH: That's what I understood --

THE COURT: That's an appropriate clarification.

MR. A. SMITH: -- you meant.

THE COURT: I think that's what you understood.

MR. DAVIS: Okay. That's not what I understood.

THE COURT: And I --

MR. DAVIS: Okay.

THE COURT: And I apologize for the confusion.

MR. DAVIS: What is --

THE COURT: I'm sorry. If you need to confer, you can.

MR. DAVIS: Okay. If you can give me one second, your Honor?

THE COURT: Sure.

(Colloquy not on the record.)

THE COURT: Oh, this collateral issue, on the fee issue -- and this will involve you, Mr. Smith. On the fees, I will not be able to get to all the fees on Friday. I'm going to defer because I've had to spend, you know, several days working on this.

MR. A. SMITH: Um-h'm.

THE COURT: So I'm going to defer the Mesirow, the Ray, Quinney, the Schwartzer fees, the Orrick fees, and the Beckley fees. This is only for reasons of just trying to make my way through everything.

I will be able to address the committee members, Lewis and Roca, all the financial assistance, except for Mesirow --

MR. A. SMITH: Okay.

THE COURT: -- Gordon & Silver, and Shea & Carlyon,

and Stutman, Treister. I just want to let people know because to the extent that they're not addressing something that they're impacted --

MR. A. SMITH: Sure. Thanks.

THE COURT: -- they don't need to appear.

MR. A. SMITH: Thanks. And is there a new date or --

THE COURT: Yeah. Ooh, what was it?

THE CLERK: You said July the 5th.

THE COURT: But they couldn't make it July 5th. We changed that.

THE CLERK: July 27th.

THE COURT: Was it July 27th I think? July 27th.

MR. A. SMITH: Okay.

THE COURT: Sorry. Go ahead.

MS. JARVIS: Your Honor?

THE COURT: Uh-huh.

MS. JARVIS: Just in relation to that I believe just to give you a head's up, I believe for the debtors that the July 27th date is a problem meaning Mesirow, Ray, Quinney, and Schwartzer McPherson, and so we would ask to be bumped over to August 7th which I think is the next --

THE COURT: Okay.

MS. JARVIS: -- date.

THE COURT: I don't have a problem with that.

MS. JARVIS: Okay.

THE COURT: Okay. Thanks.

And, again, I apologize, and I appreciate the fact there have been some reductions made, you know, but I need to independently review them and get a sense for all the fees, and that's why I just need to take the time and go through them, and I just, unfortunately, just haven't been able to do it. I got a little bit distracted this week, so all right.

Sorry. Go ahead, Mr. Davis.

MR. A. SMITH: We understand, your Honor.

MR. DAVIS: Your Honor, I'm trying -- there's a few things. We are the servicer. Your Honor has found that your order says the status quo continues.

THE COURT: Um-h'm.

MR. DAVIS: Okay? We have paid substantial moneys for that purpose.

THE COURT: Okay.

MR. DAVIS: We have --

THE COURT: Just tell me what the problem is. I --

MR. DAVIS: Well --

THE COURT: I understand what the --

MR. DAVIS: The problem is that by taking -- we have to have the right to continue to put pressure on borrowers be it foreclosure, be it, you know, continuing to negotiate. We have active cases that are pending. We've expended millions of dollars to commence foreclosure proceedings.

If LPG wants to pursue the claims that we breached, et cetera, in a different court which will obviously involve delay in terms of withdrawal of the reference -- your Honor has mentioned those -- that's okay. Okay? I'm not looking to extend this forever.

We need the -- the sooner we can get to have a Court determine whether there is or isn't cause the better as far as I'm concerned and as far as Compass is concerned. Okay?

The question is it has to be crystal clear that we are the servicer, period. We exercise our fiduciary dates. If we do something wrong, someone has the right to sue us, but that is our --

THE COURT: H'mm. I --

MR. DAVIS: That is our right.

THE COURT: I see what you're saying.

MR. DAVIS: That's what we paid for, and we're not --

THE COURT: So what if we did it this -- doesn't it not --

MR. DAVIS: And I --

THE COURT: -- make sense to -- I'm sorry.

MR. DAVIS: One other aspect.

THE COURT: Hold on one second.

MR. DAVIS: And --

THE COURT: I'm sorry.

MR. DAVIS: And having an order that has a finite

period of time when borrowers say, well, so you're the servicer for 60 days. Maybe I can delay a little bit, and then someone else will be there. It has to be clear until the Court orders otherwise we're the servicer.

THE COURT: Okay.

MR. DAVIS: We will move --

THE COURT: I see --

MR. DAVIS: -- expeditiously --

THE COURT: -- what you're saying.

MR. DAVIS: -- as possible to have this Court or any other Court determine --

THE COURT: So what if we --

MR. DAVIS: -- the issues.

THE COURT: What if we indicated -- and I think this is really what the agreements say -- that they cannot pursue foreclosure unless the lenders' consent --

MR. A. SMITH: That's fine.

THE COURT: -- because the point is that way -- I mean, it's more or less what the agreement says, anyway.

MR. A. SMITH: I think that's a good idea.

THE COURT: And that way, the point is, you know -- I mean, and you, apparently, have got to be better with just giving information to people because if, indeed, you say there's misinformation, then that's your fault as much as anybody else. The point is --

MR. DAVIS: I --

THE COURT: -- because you apparently are not communicating correctly.

MR. DAVIS: You're talking about --

THE COURT: So transparency is the answer. I'm saying people perceive that. The way to resolve that issue is to be transparent.

So foreclosures can commence, but only, you know, with the consent of the lenders which was the order we have right now.

MR. DAVIS: That's not what the order we have.

MR. A. SMITH: That's not what (indiscernible).

THE COURT: The --

MR. DAVIS: No.

THE COURT: The interim order, I thought it did say that.

MR. DAVIS: Absolutely not. The interim order --

MR. A. SMITH: No. It --

MR. DAVIS: -- says --

MR. A. SMITH: It didn't cover that issue --

MR. DAVIS: -- we are --

MR. A. SMITH: -- because there weren't --

MR. DAVIS: -- the servicer.

MR. A. SMITH: -- any foreclosures --

THE COURT: Oh, okay.

MR. A. SMITH: -- set to go.

MR. DAVIS: There are foreclosures.

MR. A. SMITH: I think that's --

MR. DAVIS: There were then. That --

THE COURT: Do you have --

MR. DAVIS: That was --

THE COURT: Well --

MR. DAVIS: -- the --

THE COURT: Okay.

MR. DAVIS: Of course --

MR. A. SMITH: I don't know --

MR. DAVIS: -- we do. We have foreclosures that are pending in the very near term.

(Colloquy not on the record.)

THE COURT: When is --

MR. DAVIS: And --

THE COURT: Are they pending in the next 60 days?

MR. A. SMITH: Yes.

MR. DAVIS: How many?

THE COURT: Okay.

MR. DAVIS: I mean, we have 17 --

THE COURT: All right.

MR. DAVIS: -- pending --

THE COURT: So get --

MR. DAVIS: -- foreclosure --

THE COURT: -- the lenders' --

MR. DAVIS: -- actions.

THE COURT: -- consent.

MR. DAVIS: But, your Honor --

MR. A. SMITH: What does --

MR. DAVIS: -- these --

MR. A. SMITH: -- that mean?

MR. DAVIS: We either have the right --

(Colloquy not on the record.)

UNIDENTIFIED SPEAKER: That's not notifying anyone --

MR. DAVIS: We have the --

UNIDENTIFIED SPEAKER: -- (indiscernible).

THE COURT: Please.

MR. DAVIS: We have --

THE COURT: You don't --

MR. DAVIS: We --

THE COURT: Under the agreement, it's -- well, look, you either do it one of two ways. If you want to have a hearing -- the problem is that if you want to run in on these injunction hearings, you can run in, but I don't see why 60 days with the lenders' consent. Now, they're going to cutoff their nose to spite their face, perhaps.

MR. DAVIS: They're --

THE COURT: If you don't agree to a foreclosure, and the senior lienholder forecloses you out, you all are in trouble.

MR. A. SMITH: And we're --
THE COURT: So don't --
MR. A. SMITH: We're very conscious --
THE COURT: -- forget that.
MR. DAVIS: Yes. But --
MR. A. SMITH: -- of that, your Honor.
MR. DAVIS: Your Honor, well, there has been no demonstration of any basis whatsoever to terminate us. We have paid --
(Colloquy not on the record.)
MR. DAVIS: -- these estates.
THE COURT: They --
MR. DAVIS: There hasn't been --
THE COURT: There's allegations --
MR. DAVIS: There have been --
THE COURT: -- of cause.
MR. DAVIS: -- allegations of cause.
THE COURT: I understand.
MR. DAVIS: They are --
THE COURT: So --
MR. DAVIS: -- unfounded allegations of cause.
MR. A. SMITH: That (indiscernible).
THE COURT: I understand that. It has --
MR. DAVIS: A Court --
THE COURT: -- to be litigated.

MR. DAVIS: -- has to determine that.

MR. A. SMITH: And we're talking about an interim --

THE COURT: We're talking about --

MR. A. SMITH: -- measure --

THE COURT: -- 60 days.

MR. A. SMITH: -- yeah, in order to protect everybody until the matter --

THE COURT: And it has to be done --

MR. A. SMITH: -- can be litigated, properly.

THE COURT: By the way, it needs to be done on a loan-by-loan basis. You can't just say -- and you may be right. Person A because they found out about some incident may have the right to terminate --

MR. A. SMITH: Right.

THE COURT: -- based upon that, but the point is you can't just overall say people want to terminate. You've got to do it on a loan-by-loan basis.

MR. A. SMITH: Absolutely.

MR. DAVIS: Well --

MR. A. SMITH: I agree.

THE COURT: Yeah.

MR. DAVIS: Your Honor, can we take this in steps just so I can understand what we're agreeing to or what we're talking about? When you say that it has to be done on a loan-by-loan basis, we clearly believe that that's the case.

THE COURT: Um-h'm.

MR. DAVIS: Okay? Your Honor has --

THE COURT: He agreed.

MR. DAVIS: -- said that. Okay. So why don't we -- now, what I'm unclear about is I think the old notices are ineffectual. I think we've agreed to that. I think we've agreed that --

THE COURT: Well, I think he did agree to that.

MR. A. SMITH: Well --

MR. DAVIS: Well, yes. That was agreed to.

MR. A. SMITH: -- we agreed that --

MR. DAVIS: And --

MR. A. SMITH: -- you ordered --

THE COURT: Oh, the --

MR. A. SMITH: -- that that's the case. I'm not conceding it. I mean, I think ultimately, somebody's going to decide that, but nothing further --

MR. DAVIS: Well --

MR. A. SMITH: -- is being done.

MR. DAVIS: You just --

MR. A. SMITH: What we're --

MR. DAVIS: -- ordered it.

MR. A. SMITH: What we're talking about --

MR. DAVIS: I think you decided it.

MR. A. SMITH: -- is a holding pattern until -- I

mean, it is my understanding is you haven't made factual meritorious decisions --

THE COURT: Right.

MR. A. SMITH: -- today. You --

THE COURT: Right.

MR. A. SMITH: Today was about --

THE COURT: Subject-matter jurisdiction --

MR. A. SMITH: -- jurisdiction.

THE COURT: -- only.

MR. A. SMITH: Yeah. And you said that, and so now we've covered that issue. Now we got to cover what happens in the interim. We're trying to protect both parties.

THE COURT: Exactly.

MR. DAVIS: Your Honor --

MR. A. SMITH: So --

MR. DAVIS: -- our rights --

MR. A. SMITH: -- that's --

MR. DAVIS: I'm sorry. I didn't mean to interrupt you.

MR. A. SMITH: Go ahead.

MR. DAVIS: Our rights are not protected. We have bought these assets. We now have an order that says we can't collect certain fees.

(Colloquy not on the record.)

MR. DAVIS: We now have an order that says we can't

foreclose, and there's been no demonstration of anything. We need to continue to be the servicer until your Honor --

THE COURT: You are.

MR. DAVIS: -- orders otherwise, but we're not if we have 10,000 constraints around us about what we can do.

(Colloquy not on the record.)

THE COURT: So tell me exactly what --

MR. DAVIS: Your order, your order that you just signed two days ago, should continue. It says that we remain the servicer. There can be no --

THE COURT: Well, what specific loans --

MR. DAVIS: -- attempts to --

THE COURT: -- are in foreclosure in the next 60 days?

MR. A. SMITH: I think there's two.

(Colloquy not on the record.)

THE COURT: Why don't you have a meeting with those direct lenders on those two loans and explain to them why you need to go forward with it.

(Colloquy not on the record.)

MR. A. SMITH: I think everybody would appreciate that.

MR. DAVIS: Your Honor, that may be a very good idea.

THE COURT: I mean --

MR. DAVIS: And --

THE COURT: I mean --

MR. DAVIS: And for all I know, they have. You know, I don't -- that may have happened, already. Or if it hasn't, it's a good idea. Maybe it should happen.

MR. A. SMITH: Well, I can tell you --

MR. DAVIS: But --

MR. A. SMITH: -- it didn't happen.

MR. DAVIS: -- there are pending foreclosure actions that have already been commenced and that have deadlines and dates and are moving forward.

MR. A. SMITH: Those are fine.

MR. DAVIS: And we --

MR. A. SMITH: Let them move forward. I'm only talking about no actual sales take place until we come back before the Court. They've given notices. I realize that.

THE COURT: Okay.

MR. A. SMITH: Things are --

THE COURT: So are you --

MR. A. SMITH: -- marching along.

THE COURT: -- saying there's sales pending on those two the next 60 days?

MR. DAVIS: Yes.

(Colloquy not on the record.)

THE COURT: Okay. There are sales --

MR. A. SMITH: That was --

THE COURT: -- foreclosure sales, pending.

MR. DAVIS: Yes.

UNIDENTIFIED SPEAKER: I have not been notified of --

THE COURT: But, sir --

UNIDENTIFIED SPEAKER: -- (indiscernible).

THE COURT: -- you don't need to. Okay? And, please, don't do that.

(Colloquy not on the record.)

MR. A. SMITH: And I think --

THE COURT: There's --

MR. A. SMITH: -- there's --

THE COURT: I don't think there's any requirement under the loan-servicing agreement that if they --

MR. A. SMITH: Yeah. But --

THE COURT: -- have to be noticed of the actions taken. That was one of the things --

MR. A. SMITH: I don't think so, your Honor.

THE COURT: -- as given.

MR. A. SMITH: But that goes to the very heart of this whole matter.

THE COURT: But the point is if you, look, explain to people why you're doing it, maybe you'd get someplace.

MR. A. SMITH: I think --

MR. DAVIS: Your Honor, sometimes, you reach the place where, you know --

THE COURT: And if you have the absolute --

MR. DAVIS: -- you know --

THE COURT: You know, you have the absolute -- you know, they have the absolute right to foreclose under the agreements, but the question is are you the servicer.

I mean, and I don't know why you want to spend -- you know, you -- spend $100,000 to determine whether or not you've already been terminated as opposed to talking to people and seeing why should or should not this foreclosure go forward at this particular time and what are the benefits and the detriments of going forward --

MR. A. SMITH: I think that communication would go a long way to help the direct lenders.

THE COURT: -- because, you know, I mean, I think everybody realizes on one hand it's -- on one hand, I think there's some people who believe that they lent -- pick a number -- $600,000,000, $60,000,000 -- sorry. Smaller numbers -- $3,000,000, and the property's worth $3,000,000, but the reality is the property's worth 1,000,000 and there's a senior letter ahead of it. Some people I think have that a misconception because they're not as sophisticated.

On the other extreme, you have people who understand full well that you could foreclose, but the problem is then what do you do with the property and the costs and the expenses, and it's a question of how do you extract your value, and that's

always a -- and that's the problem you get into when you get into these mortgage-lending situations.

If you're a lender on these loans, you always face the problem. When that loan doesn't pay, you're going to be stuck with the property or you lose your asset, and I don't think a lot of people have come to grips with that.

Just because somebody said they're going to pay you, if they don't pay you, you either get nothing because you lose the property or you take over the property, and you still get nothing because you got a senior lender out there.

A lot of these loans have mechanic's liens on them. A lot of them have -- you know, the Standard loan case, don't forget that -- and they may have well violated their rights, but the point is the direct lenders were sued, and the bankruptcy creditors in this estate paid to defend you in that lawsuit.

The fees weren't charged to you. Other creditors are paying for your defense in that lawsuit. Now, it wasn't your fault.

MR. A. SMITH: That really doesn't have anything to do --

THE COURT: It wasn't --

MR. A. SMITH: -- (indiscernible).

THE COURT: -- your fault, but the point was there's liability there. There's all these various issues that affect, and it would be important that the people could understand and

somebody -- you know, talk to each other about this, so --

MR. A. SMITH: But --

THE COURT: But aside from that, on that, the foreclosures in the 60 days. I guess what we could do is --

MR. A. SMITH: If there's no agreement, we can come back --

THE COURT: If no agreement --

MR. A. SMITH: -- before your Honor.

THE COURT: -- come back, and I'll determine --

MR. A. SMITH: That's fair.

THE COURT: -- whether or not based upon the agreements on those particular loans were they terminated and what rights do you have.

MR. A. SMITH: Right.

THE COURT: That way you're limiting it to those particular loans.

MR. A. SMITH: Okay.

THE COURT: That solves that problem.

MR. DAVIS: Your Honor, I am told by my client that this is a very, very serious issue in terms of being able to proceed with the foreclosures --

MR. A. SMITH: I think we --

MR. DAVIS: -- in terms of --

MR. A. SMITH: -- (indiscernible).

MR. DAVIS: -- the things that have been commenced.

THE COURT: So tell me --

MR. DAVIS: And --

THE COURT: So tell --

MR. DAVIS: But --

(Colloquy not on the record.)

THE COURT: What I'm saying is come back with a pleading. If you want to seal it with only showing it to Mr. Smith, that's fine, so that you're not, you know, giving your hand to the borrower.

I mean, because you're right. The last thing Mr. Smith wants is some borrower saying, hey, I don't have to pay anybody because these guys are fighting.

MR. A. SMITH: Right.

MR. DAVIS: But, your Honor --

THE COURT: That's the last thing he wants.

MR. DAVIS: -- we can't negotiate with borrowers for settlements if we can't foreclose. I mean, on the one hand, you're saying -- well, here's what's happening.

We are willing to get to the bottom line is there cause or not because we think there isn't. Okay? We're willing to do it on 30-, 45-days' notice before you.

Unfortunately, before the district court because of the withdrawal of the reference issues, it would take a lot longer. Okay? We're willing to do that quickly because we want our unfettered rights that we purchased back.

It's very easy. If we can't foreclose, and we can't collect default interest, and we can't collect late fees, any of the things that we're entitled to, okay, which we deferred last time -- those were the two things that we left out.

We didn't say we couldn't foreclose. We said default interest and late charges would remain sitting in the account until further order the Court.

THE COURT: And that still has to be determined by some Court.

MR. DAVIS: It has to be determined by some Court, but the same way that the Lender Protection Group, you know, has been able to send notices, claim that they are, and proceed as though their rights are unfettered until -- we have to be able to continue --

(Colloquy not on the record.)

MR. DAVIS: -- to pursue either workouts with borrowers, foreclosures if necessary. But if you take away the only threat that a servicer has which is to foreclose on a defaulted loan --

THE COURT: No. He's saying that you can send out your notices of foreclosure. The only question is in this 60-day period do we actually go forward with a foreclosure sale --

MR. A. SMITH: You cannot --

THE COURT: -- which has implications about what

happens. Now --

MR. A. SMITH: Cannot prior to sale.

THE COURT: Well, maybe the answer is you can go forward with the foreclosure sale, but you're not allowed to bid?

MR. A. SMITH: No.

MR. DAVIS: (Indiscernible) --

MR. A. SMITH: I mean --

MR. DAVIS: -- (indiscernible).

MR. A. SMITH: -- because I think at that point we have all kinds of problems, your Honor. I mean, we need to look at it to determine if it's appropriate.

Compass has a different agenda than we do. Compass has asked -- and I'm sorry to say it this way. But in our opinion, Compass is after making its profit on its investment. All the --

THE COURT: But the --

MR. A. SMITH: -- other people --

THE COURT: The point is --

MR. A. SMITH: But --

THE COURT: -- if somebody bids at the sale --

MR. A. SMITH: So we --

THE COURT: -- in excess of the debt, how can you complain?

MR. A. SMITH: You don't know that, though, 'til you

cry the sale, and you also --

THE COURT: I understand.

MR. A. SMITH: -- don't know if --

THE COURT: But, query, cannot -- and I don't know.

MR. A. SMITH: You don't know --

THE COURT: And under state law --

MR. A. SMITH: -- if the borrower's going to come back and sue the direct lenders saying you didn't do what you were supposed to do. Now you've pushed us to the limit, and you're going to foreclose, and now we're going to sue you. We need to look at all of that.

THE COURT: But that's your problem, anyway. You got that problem, anyway.

MR. A. SMITH: Well, that's the problem --

THE COURT: You've got --

MR. A. SMITH: -- why we're --

THE COURT: -- that problem now.

MR. A. SMITH: And that's why we want Compass terminated because they don't care about that aspect.

THE COURT: But you've got that problem now, anyway.

MR. A. SMITH: Well, what we'll do is we'll go meet with these people and see what can be worked out because we have a total different agenda than Compass.

MR. DAVIS: No.

MR. A. SMITH: And --

THE COURT: Well --
MR. A. SMITH: -- you know --
MR. DAVIS: Your Honor --
THE COURT: -- but you're talking yourself out of jurisdiction on this one because --
MR. DAVIS: Your Honor, we --
THE COURT: But why can't we find --
MR. DAVIS: We have --
THE COURT: I understand the two -- you have two that are set to foreclose --
MR. DAVIS: I --
THE COURT: -- in 60 days?
MR. DAVIS: I would ask for a short recess, so I can call my client and confirm it.
THE COURT: Okay.
MR. DAVIS: It could be significantly more than that.
THE COURT: Well, maybe we should --
MR. DAVIS: I don't know.
THE COURT: You're --
MR. DAVIS: But --
THE COURT: And you're not in town on Friday, right?
MR. DAVIS: I'm gone --
THE COURT: You're gone.
MR. DAVIS: Well --
THE COURT: And when do you return?

MR. DAVIS: All of next week --

THE COURT: All of --

MR. DAVIS: -- as well.

THE COURT: -- next week.

MR. DAVIS: I'm out all of next week. I'll be back the following week.

MR. A. SMITH: (Indiscernible).

THE COURT: Okay. Because the question is on the foreclosures. I mean, if -- oh, I'd ask Mr. Smith.

MR. A. SMITH: Well, can we --

THE COURT: He has a better sense.

MR. A. SMITH: -- just --

THE COURT: Under Nevada --

MR. A. SMITH: -- say --

THE COURT: Under Nevada law, can you call a sale? And if no one bids, do you have to credit bid? No. You can continue it, can't you?

MR. A. SMITH: You can continue it.

THE COURT: Yeah.

MR. A. SMITH: Sure.

THE COURT: So what's the problem with going to a foreclosure sale? Are these Nevada properties or -- oh, they're out-of-state --

MR. DAVIS: No. They're --

THE COURT: -- properties.

MR. DAVIS: They're --

MR. A. SMITH: And you don't mean --

MR. DAVIS: -- out-of-state properties.

MR. A. SMITH: -- a credit bid. You mean if a true third party comes in and bids the full price --

THE COURT: Excuse me.

MR. A. SMITH: -- it's sufficient --

THE COURT: Yes.

MR. A. SMITH: Yeah.

THE COURT: You, obviously --

MR. A. SMITH: I think --

THE COURT: -- don't object to that.

(Colloquy not on the record.)

MR. A. SMITH: Obviously, if somebody comes in and bids full price to pay us off in full, we're happy as long as Compass doesn't take the money and say now you don't get --

THE COURT: Well, now, that's --

MR. DAVIS: Your Honor, I'm offended --

MR. A. SMITH: -- it.

MR. DAVIS: -- by that statement. We have an order --

MR. A. SMITH: They could be offended --

MR. DAVIS: -- that your Honor --

MR. A. SMITH: -- all they want.

(Colloquy not on the record.)

MR. A. SMITH: It's happened.

MR. DAVIS: Your Honor has an order that says --

THE COURT: Your clients got paid.

MR. DAVIS: -- default interest and late charges. This is why everyone is getting riled up. You have an order that says we cannot collect late charges or default interest. It must sit in the account and can't be applied.

Our goal is to maximize the recovery either by negotiating deals with particular borrowers or foreclosing, whatever makes sense. It comes to be a pot, and then some Court, your Honor, or some other Court will determine how it gets whacked up.

MR. A. SMITH: Right.

MR. DAVIS: But we are the servicer. We have to have the right to continue to do that. If you take away the right to foreclose, we have no ability to get anything done. You've taken away all of our rights as servicer. Sure. Why don't we just extend --

THE COURT: But the point is --

MR. DAVIS: -- the district court action --

THE COURT: -- if they've --

MR. DAVIS: -- for a year?

THE COURT: If they've terminated you, you would have no right to foreclose.

MR. DAVIS: But the --

THE COURT: That's why I'm saying that by waiting the

60 days we don't have to do a determination before then. It's just two loans.

Why don't you find out how many loans are. Maybe we can address those loans earlier, rather than later.

MR. A. SMITH: (Indiscernible).

MR. DAVIS: Okay. Can we take a five-minute recess?

THE COURT: Sure. Okay.

MR. A. SMITH: Also, your Honor, you said that you were going to recommend withdrawal of the reference, right? Is that what --

THE COURT: I would recommend. But if you think it's -- the question is procedural. Does it come from the parties or does it come from the Court?

MR. A. SMITH: Right.

THE COURT: I would recommend withdrawal.

MR. A. SMITH: Okay.

MR. DAVIS: Now, your Honor, there are a couple of things that -- the one matter that I want to just clarify for the record, Mr. Smith on the record today has withdrawn from and will no longer pursue termination under Nevada Administrative Code, Section 645B.

MR. A. SMITH: No. I --

MR. DAVIS: That was a predicate that was agreed -- see, I knew this would happen. This was agreed to earlier in the hearing, and now he's going to say he didn't agree to that.

THE COURT: He --

MR. A. SMITH: No. I think the Judge knows exactly what I agreed with.

THE COURT: And I threw you a curve ball by finding subject -- as I understood it once we went through the questioning, he agreed to it if the Court found no subject-matter jurisdiction.

MR. A. SMITH: Correct.

THE COURT: I found subject-matter jurisdiction. But by the same token, you have agreed, though, that -- or I will order that that letter to borrowers is ineffective or is to be stayed at least pending a determination --

MR. A. SMITH: Right.

THE COURT: -- that that can be done because, quite frankly, I think that claim is rather flimsy, and so --

MR. A. SMITH: I understand --

THE COURT: Well, on an --

MR. A. SMITH: -- your opinion.

THE COURT: -- injunctive aspect.

MR. A. SMITH: And I understand your opinion, and your order was clear in that regard.

THE COURT: Okay. And I understand the confusion there. I understand why Mr. Davis thought to the contrary. I was --

MR. A. SMITH: Right.

THE COURT: Since I was thinking about the direction I was going, that's why I questioned him a little more carefully on that.

MR. A. SMITH: Okay.

THE COURT: I understand it's just a misunderstanding between the two parties there. All right.

Did you get a chance to check that or you need to call yourself --

MR. DAVIS: I --

THE COURT: -- Mr. Davis?

MR. DAVIS: Yeah. I'll need five minutes.

THE COURT: Okay. All right. We'll take a recess.

Thank you.

MR. DAVIS: Thank you, your Honor.

THE CLERK: All rise.

(Recess at 03:43:59 p.m.

(Court reconvened at 04:09:40 p.m.)

THE COURT: Be seated. Okay.

Mr. Davis.

MR. DAVIS: Your Honor, I appreciate the accommodation of the short break. I think we made a lot of progress, and here's what I would suggest. If we take the order that your Honor signed this week, and we make a few modifications to it -- I've discussed this with Mr. Smith -- I think that will then be acceptable.

What we discussed doing was taking that order, adding to it a finding that your Honor has subject-matter jurisdiction with respect to the emergency motion, adding to it a provision that the LPG will not send any further notices of termination to Compass or to any borrowers, you know, and actions of like kind pending further order of this Court, adding a provision that for 60 days Compass agrees that it will not go to -- or, actually, effect a foreclosure sale.

MR. A. SMITH: Cry.

MR. DAVIS: I'm sorry?

MR. A. SMITH: Cry a foreclosure sale --

MR. DAVIS: I'm not sure --

MR. A. SMITH: -- and (indiscernible).

MR. DAVIS: -- what cry means, but, essentially, we will not sell pursuant to a noticed foreclosure proceeding.

THE COURT: Just to clarify, what if --

MR. DAVIS: We will not sell the property pursuant to -- we have the right to notice a foreclosure. We have the right to give notice to borrowers of defaults, et cetera, to proceed up to the point of sale within that 60-day period. Obviously, that allows us to keep pressure on the borrowers.

THE COURT: Not even to --

MR. DAVIS: We --

THE COURT: Just to clarify, not even to actually call and accept a bid for the full price or --

MR. A. SMITH: The problem --

THE COURT: I'm just --

MR. A. SMITH: We --

THE COURT: -- trying to clarify.

MR. A. SMITH: We talked about that --

MR. DAVIS: We --

MR. A. SMITH: -- your Honor --

THE COURT: Your concern --

MR. A. SMITH: -- because the problem is --

THE COURT: -- is the state laws?

MR. A. SMITH: Well, no. I mean, if you have somebody show up, you don't know what they're going to bid, so you can't say, well, we're only going to sell it if you bid principal interest, default interest, and late fees, because you don't know what they're going to bid, so you either have to open it up for bidding or not.

THE COURT: Well, no. But that's what I'm saying. Isn't the full bid, though, all those fees?

MR. A. SMITH: Well, the problem is this. Since the direct lenders -- it's their money. If an acceptable bid is not obtained, they will have to enter a credit bid, and then they own the property.

THE COURT: No. What I'm saying can you --

MR. A. SMITH: And that's --

THE COURT: I guess your concern is you don't know if

they'd have to do a credit bid or if they could just continue the sale.

MR. A. SMITH: Exactly right.

THE COURT: Okay.

MR. A. SMITH: That's why --

THE COURT: I just wanted that calculation.

MR. A. SMITH: Right.

THE COURT: I'm not just disagreeing. I just wanted the --

MR. A. SMITH: Okay.

THE COURT: -- clarification.

MR. DAVIS: And --

THE COURT: Okay.

MR. DAVIS: And we would reserve the right to come back before your Honor and seek a further order of the Court permitting us to go forward with a sale during that 60-day period to the extent we thought, you know, it were warranted.

MR. A. SMITH: And what we --

THE COURT: Okay.

MR. A. SMITH: What we discussed --

THE COURT: On what --

MR. A. SMITH: -- is we --

THE COURT: -- day's notice just so we're clear on this. I'm not --

MR. DAVIS: It would have to be -- we're only

talking --

MR. A. SMITH: One week.

MR. DAVIS: -- about a 60-day period, so it would have to be a short time.

THE COURT: Okay. One-week's notice.

MR. A. SMITH: But we also agree that we'd discuss it first, I mean. And so, in other words, we're not going to be running to the Court blindly.

THE COURT: Thank you.

MR. A. SMITH: I mean --

MR. DAVIS: Sure.

MR. A. SMITH: -- counsel's going to notify me what's going on, and then so we could talk about it and maybe save the Court time --

MR. DAVIS: That would --

MR. A. SMITH: -- in argument.

MR. DAVIS: Yes. Absolutely.

THE COURT: Great.

MR. A. SMITH: Okay.

(Colloquy not on the record.)

MR. A. SMITH: And the rest of the protections in the original order remain.

THE COURT: Okay. So what we need --

MR. DAVIS: And --

THE COURT: -- we need to do --

MR. DAVIS: And the only other thing --
THE COURT: I'm sorry.
MR. DAVIS: -- we would add to the order -- I'm sorry, your Honor -- is just provide for a further --
THE COURT: Hearing date.
MR. A. SMITH: Right.
MR. DAVIS: Or --
THE COURT: So what we'll do is --
MR. DAVIS: -- a status conference.
THE COURT: -- let's have a status conference about five days before the 60 days --
MR. DAVIS: Fine.
THE COURT: -- such that if we're running up to some kind of emergency or something we, you know, can deal with it.
MR. A. SMITH: Right.
MR. DAVIS: That makes sense, your Honor.
MR. A. SMITH: That's fair.
THE CLERK: Well, the 20th of August will be 60 days, so five days prior to that would be (indiscernible) -- I'm sorry -- August the 15th which is a motion-calendar date (indiscernible).
MR. A. SMITH: I'm gone August 1st through the 15th. It can be any day after that.
THE COURT: Okay. Well --
THE CLERK: How about the 17th?

MR. A. SMITH: Oh, the 17th? Yeah. Okay.

THE CLERK: Does the 17th work, Judge? That's a Friday at 9:30.

MR. A. SMITH: August 17th at 9:30. Okay.

THE CLERK: And that's --

MR. DAVIS: Great.

THE CLERK: -- the status?

MR. A. SMITH: Right.

MR. DAVIS: A status conference, yes.

THE COURT: Now, just so you know, I'm not available in September because when I made plans months ago I thought I'd be not seeing any of your happy faces again because I thought everything was all resolved.

(Colloquy not on the record.)

THE COURT: So, anyway, so --

MR. A. SMITH: Okay.

MR. DAVIS: Okay. Thank you, your Honor. Thank you for your --

THE COURT: Okay.

MR. DAVIS: -- indulgence as to --

THE COURT: So we'll have that status hearing. That's just going to be a status only on that day --

MR. DAVIS: A status only.

THE COURT: -- unless --

MR. A. SMITH: The withdrawal --

THE COURT: -- pleadings are filed --

MR. A. SMITH: The reference is --

THE COURT: -- which would indicate that you needed to have that motion or unless there's some particular pleading that indicates that that's going to be some --

MR. A. SMITH: Or the reference --

THE COURT: -- sort of hearing --

MR. A. SMITH: -- has been withdrawn.

THE COURT: -- or the reference has been withdrawn.

MR. A. SMITH: Right. Okay.

THE COURT: Exactly right.

MR. A. SMITH: Yep.

THE COURT: And, now, as we -- why don't you prepare -- are you going to prepare the recommendation of withdrawal? I'll --

MR. A. SMITH: Yes.

THE COURT: Okay. Fine. And I'll sign that because, again --

MR. A. SMITH: Okay.

THE COURT: And I think it's appropriate because we had this mixed questions of core/noncore --

(Colloquy not on the record.)

THE COURT: -- you know, supplemental jurisdiction that's clearly exercisable under 1334, but then that gets you into areas in which this Court would not have jurisdiction

without making reports and recommendations.

MR. A. SMITH: Right.

THE COURT: In which case, it would save everybody time if that Court had it, plus that way you all can -- you know, to the extent that you have other issues that are now pled in diversity, you could plead in connection with the supplemental under 1334 including I guess any claims or causes of action you may have, so --

MR. A. SMITH: Right. I understand.

THE COURT: Okay.

MR. DAVIS: And just so there -- I mean, just to clarify, so there's absolutely no misunderstanding. The references in this order which we'll say until further order of this Court should the reference be withdrawn, it's my clear belief that that means until further order of the district court just so that there's --

THE COURT: Right. In other words --

MR. DAVIS: I just want to make sure there's no misunderstanding of that.

THE COURT: -- further order of the Court with whom jurisdiction lies.

MR. DAVIS: I --

THE COURT: Does that make sense to clarify it that way?

MR. DAVIS: I'm not sure we need to change the

language.

THE COURT: Okay.

MR. DAVIS: I prefer to leave the language as it's still before you. But as long as Mr. Smith will acknowledge that on the record, I'll be --

(Cellular telephone ringing.)

MR. A. SMITH: Well --

MR. DAVIS: -- content.

MR. A. SMITH: -- I don't understand it, so I really can't acknowledge it. I mean, I --

(Colloquy not on the record.)

MR. A. SMITH: If the reference is withdrawn, then we deal with the district court. If it isn't, we deal with you.

MR. DAVIS: Okay. I --

THE COURT: Right.

MR. DAVIS: I just --

MR. A. SMITH: Yeah.

MR. DAVIS: Just so we're clear, the --

THE COURT: That further order of the Court --

MR. DAVIS: The order will say --

THE COURT: -- means --

MR. DAVIS: -- until further order of this Court. If the reference is withdrawn, it means until further order of the district court.

MR. A. SMITH: Yep.

THE COURT: Why don't you mean further order of the Court? That solves the problem.

MR. A. SMITH: Yeah. That's fine.

MR. DAVIS: Perfect.

Thank you, your Honor.

MR. A. SMITH: Right.

THE COURT: Okay.

MR. A. SMITH: Thanks very much --

THE COURT: Thank you very much.

MR. A. SMITH: -- your Honor.

THE COURT: All right. Thank you.

THE CLERK: All rise.

(Court concluded at 04:16:08 p.m.)

I certify that the foregoing is a correct transcript. from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Michele Phelps 06/25/07

Michele Phelps, Transcriptionist Date